**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

EDWARD J. AND VICKIE FANGMAN,

DAMON M. OLIVER
4780 Melbourne Road
Baltimore, MD 21229

BETTY M. HOWARD
11967 Cardamom Drive
Woodbridge, VA 22192

CLAYTON J. ANTHONY
9 Lydia Court
Baltimore, MD 21208

JANICE M. MANUEL
4702 Omaha Street
Capitol Heights, MD 20743

ERIC L. HAYNES
8216 Sweeney Drive
Clinton, MD 20735

JOSEPH J. QUINN
957 Cloverfields Drive
Stevensville, MD 21666

DELORIS F. WOODS
3810 Wine Road
Westminster, MD 21158

JAMESON AND KATHERINE COOPER
2701 Farm View Drive
Fallston, MD 21047

GERALDINE R. WALTERS
2036 Park Avenue
Baltimore, MD 21217

STEVEN A. MESSINA
3790 Old Columbia Pike
Ellicott City, MD 21043

ROSE A. LEASE
5218 Biddison Lane
Baltimore, MD 21206

Civil Action No.: 1:14-CV-00081-RDB

JAMES AND DANA PIPP
906 South Main Street
Hampstead, MD 21074

LAWRENCE AND CONCETTA CRUPI
2554 Paddock Drive
Davidsonville, MD 21035

CHARLES MILBURN
1296 Steamboat Road
Shady Side, MD 20764

FRANK AND SAMMIE CHERRY
206 Bluff Terrace
Silver Spring, MD 20902

HELEN L. HOUSEHOLDER
11718 Eastman Road NE
Cumberland, MD 21502

BARBARA J. BOYD
3303 Gibbons Avenue
Baltimore, MD 21214

PRESTON AND BEATRICE JOHNSON
209 Canvasback Drive
Havre De Grace, MD 21078-4207

GERALD AND ANN JONES
5705 Rayburn Drive
Camp Springs, MD 20748-2249

JOHN AND TINNA MAHONEY
228 Summer Street
Hagerstown, MD 21740-5310

PATRICIA GIBSON
4189 Windsor Heights Place
White Plains, MD 20695

BRUCE AND MARGARET EISENSTEIN
607 W. 40th Street
Baltimore, MD 21211-2219

Plaintiffs,

v.

GENUINE TITLE, LLC,

BRANDON GLICKSTEIN, INC.
SERVE ON:
Brandon Glickstein
18 Farm Gate Way
Reisterstown, MD 21136

COMPETITIVE ADVANTAGE MEDIA
GROUP, LLC
SERVE ON:
Michael N. Mercurio
Suite 200
8171 Maple Lawn Blvd.
Fulton, MD 20759

DOG DAYS MARKETING, LLC
SERVE ON:
Michael N. Mercurio
Suite 200
8171 Maple Lawn Blvd.
Fulton, MD 20759

WELLS FARGO HOME MORTGAGE, INC.
SERVE ON: CSC-LAWYERS
INCORPORATING SERVICE
11 E Chase Street
Baltimore, MD 21202

WELLS FARGO, N.A.
SERVE ON: CSC-LAWYERS
INCORPORATING SERVICE
11 E Chase Street
Baltimore, MD 21202

MAVERICK FUNDING CORP.
SERVE ON: HSC AGENT SERVICES, INC.
245 West Chase Street
Baltimore, MD 21201

WEST TOWN BANK & TRUST A/K/A
WEST TOWN SAVINGS BANK
SERVE ON: RODERICK SWAN
9822 Notting Hill Drive
Frederick, MD 21704

EMERY FEDERAL CREDIT UNION
7890 E. Kemper Road
Cincinnati, Ohio 45249-8967

PNC MORTGAGE
SERVE ON:
CSC-LAWYERS INCORPORATING

SERVICE COMPANY
7 St. Paul Street
Suite 820
Baltimore, MD 21202

PNC BANK, N.A.
SERVE ON: CSC-LAWYERS
INCORPORATING SERVICE COMPANY
7 St. Paul Street
Suite 820
Baltimore, MD 21202

METLIFE HOME LOANS, LLC
SERVE ON: THE CORPORATION TRUST
INCORPORATED
351 West Camden Street
Baltimore, MD 21201

METLIFE BANK N.A.
SERVE ON: THE CORPORATION TRUST
INCORPORATED
351 West Camden Street
Baltimore, MD 21201

NET EQUITY FINANCIAL
SERVE ON: WILLIAM J. PETERSON, III
635 Prestwick Trail
Belair, MD 21014

EAGLE NATIONAL BANK
3 Dickinson Drive
Chadds Ford, PA 19317
and
8045 West Chester Pike
Upper Darby, PA 19082

E MORTGAGE MANAGEMENT
SERVE ON: NATIONAL REGISTERED
AGENTS, INC. OF MD.
351 W Camden Street
Baltimore, MD 21201

BANK OF AMERICA, N.A.
SERVE ON: THE CORPORATION TRUST
INCORPORATED
351 West Camden Street
Baltimore, MD 21201

Defendants.

## FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Edward and Vickie Fangman, Damon M. Oliver, Betty M. Howard, Clayton J. Anthony, Janice M. Manuel, Eric L. Haynes, Joseph J. Quinn, Deloris F. Woods, Jameson and Katherine Cooper, Geraldine R. Walters, Steven A. Messina, Rose A. Lease, James and Dana Pipp, Lawrence and Concetta Crupi, Charles Milburn, Frank and Sammie Cherry, Helen L. Householder, Barbara J. Boyd, Preston and Beatrice Johnson, Gerald and Ann Jones, John and Tinna Mahoney, Patricia Gibson, and Bruce and Margaret Eisenstein, Class Plaintiffs, on behalf of themselves and on behalf of the entire class of persons similarly situated, by and through their attorneys, Michael Paul Smith, Natalie Mayo of Smith, Gildea & Schmidt, LLC and Timothy F. Maloney of Joseph, Greenwald and Laake, PA as co-counsel hereby file this First Amended Complaint and state as follows:

### INTRODUCTION

1. Plaintiffs were borrowers who currently have or had federally related mortgage loans with and/or serviced by Defendant Lenders, which were or are secured by Plaintiffs' residential real property. For the purposes of procuring title insurance and to facilitate the escrow and settlement process, all Plaintiffs used Defendant Genuine Title as a result of the Defendant Lenders' referral thereto.

2. The Plaintiffs and class members were victims of an illegal kickback scheme whereby the Defendants Wells Fargo Home Mortgage, Inc., Wells Fargo, N.A., Maverick Funding Corp., West Town Bank & Trust, Emery Federal Credit Union, PNC Mortgage, PNC Bank, N.A., MetLife Home Loans, LLC, MetLife Bank, N.A., Net Equity Financial, Eagle National Bank, E Mortgage Management, and Bank of America, N.A., (hereinafter "Defendant Lenders") received unearned fees and kickbacks from Defendants Genuine

5

Title, LLC, Brandon Glickstein, Inc., Dog Days Marketing, LLC, Competitive Advantage Marketing Group, LLC (hereinafter, "Genuine Defendants") in violation of the Real Estate Settlement Procedures Act, 12 U.S.C. 2601-2617 ("RESPA").

3. The Genuine Defendants provided free marketing materials and cash to referring mortgage brokers employed by Defendant Lenders from 2009 to 2014. These payments were concealed from Plaintiffs and were not disclosed on the Plaintiffs' HUD-1s.

## PARTIES

4. Plaintiffs bring this action pursuant to Fed. R. Civ. Pro. 23 as a class action on their own behalf and on behalf of the entire class of people similarly situated.

5. Plaintiff Damon M. Oliver is a resident of Baltimore City, Maryland.

6. Plaintiff Betty M. Howard is a resident of Prince William's County, Virginia.

7. Plaintiff Clayton J. Anthony is a resident of Baltimore County, Maryland.

8. Plaintiff Janice M. Manuel is a resident of Prince George's County, Maryland.

9. Plaintiff Eric L. Haynes is a resident of Prince George's County, Maryland.

10. Plaintiff Joseph J. Quinn is a resident of Queen Anne's County, Maryland.

11. Plaintiff Deloris F. Woods is a resident of Carroll County, Maryland.

12. Plaintiffs Jameson and Katherine Cooper are residents of Harford County, Maryland.

13. Plaintiff Geraldine R. Walters is a resident of Baltimore City, Maryland.

14. Plaintiff Steven A. Messina is a resident of Howard County, Maryland.

15. Plaintiff Rose A. Lease is a resident of Baltimore City, Maryland.

16. Plaintiffs James and Dana Pipp are residents of Carroll County, Maryland.

17. Plaintiffs Lawrence and Concetta Crupi are residents of Anne Arundel County, Maryland.

18. Plaintiff Charles Milburn is a resident of Anne Arundel County, Maryland.

19. Plaintiffs Frank and Sammie Cherry are residents of Montgomery County, Maryland.

20. Plaintiff Helen L. Householder is a resident of Alleghany County, Maryland.

21. Plaintiff Barbara J. Boyd is a resident of Baltimore City, Maryland.

22. Plaintiffs Preston and Beatrice Johnson are residents of Harford County, Maryland.

23. Plaintiffs Gerald and Ann Jones are residents of Prince George's County, Maryland.

24. Plaintiffs John and Tinna Mahoney are residents of Washington County, Maryland.

25. Plaintiff Patricia Gibson is a resident of Charles County, Maryland.

26. Plaintiffs Bruce and Margaret Eisenstein are residents of Baltimore City, Maryland.

27. Defendant Genuine Title, LLC (hereinafter "Genuine Title") is a Maryland corporation headquartered in and maintains its principal place of business in Baltimore County, Maryland. Genuine Title solicits and does business with residents throughout the United States.

28. Defendant Dog Days Marketing, LLC is a Maryland Limited Liability Company with its principal place of business in Baltimore County, Maryland.

29. Defendant Brandon Glickstein, Inc. is a Maryland corporation with its principal place of business in Baltimore County, Maryland.

30. Defendant Competitive Advantage Media Group, LLC is a Maryland Limited Liability Company with its principal place of business in Baltimore County, Maryland.

31. Defendant Wells Fargo Home Mortgage, Inc. is a division of Wells Fargo Bank, N.A. engaged in the business of consumer lending in Maryland and elsewhere. Over the relevant time frame, Wells Fargo Home Mortgage was a licensed mortgage lender in the State of Maryland.

32. Defendant Wells Fargo Bank, N.A. is a member of the national association of banks doing business throughout the United States and existing under the laws of the State of California. Through its wholly owned division Wells Fargo Home Mortgage, it is engaged in the business of consumer lending in Maryland and elsewhere. Over the relevant time frame, Wells Fargo Home Mortgage was a licensed mortgage lender in the State of Maryland.

33. Defendant Maverick Funding Corp. is a foreign corporation headquartered in the State of New Jersey. It is engaged in the business of consumer lending in Maryland and elsewhere. During the relevant time frame, Maverick Funding Corp. was a licensed mortgage lender in the State of Maryland.

34. Defendant West Town Bank & Trust, also known as West Town Savings Bank is a national banking institution formed in the State of Illinois. During the relevant time frame, West Town Bank & Trust was engaged in the business of consumer lending in Maryland and elsewhere and was licensed in the State of Maryland.

35. Defendant Emery Federal Credit Union is a member owned credit union headquartered in the State of Ohio. During the relevant time frame, Emery Federal Credit Union was engaged in the business of consumer lending in Maryland and elsewhere and was licensed in the State of Maryland.

36. Defendant PNC Mortgage is a division of PNC Bank, N.A. and is engaged in the business of consumer lending in Maryland and elsewhere.

37. Defendant PNC Bank, N.A. is a member of the national association of banks doing business throughout the United States and existing under the laws of the State of

Delaware. During the relevant time frame, PNC Bank, N.A., through its division PNC Mortgage was engaged in the business of consumer lending in Maryland and elsewhere.

38. Defendant Met Life Home Loans, LLC is a division of MetLife Bank, N.A. and is engaged in the business of consumer lending in Maryland and elsewhere.

39. Defendant Met Life Bank, N.A. is a member of the national association of banks doing business throughout the United States. During the relevant time frame, MetLife Bank N.A. through its wholly owned division Met Life Home Loans, LLC was engaged in the business of consumer lending in Maryland and elsewhere.

40. Defendant Net Equity Financial, Inc. is a corporation formed in the State of Maryland. During the relevant time frame, Net Equity Financial, Inc. was engaged in the business of consumer lending in Maryland and elsewhere and was licensed in the State of Maryland.

41. Defendant Eagle National Bank is a national banking association based in the State of Pennsylvania. During the relevant time frame, Eagle National Bank was engaged in the business of consumer lending in Maryland and elsewhere and was licensed in the State of Maryland.

42. Defendant E Mortgage Management, LLC is a corporation formed in the State of New Jersey. During the relevant time frame, E Mortgage Management, LLC was engaged in the business of consumer lending in Maryland and elsewhere and was licensed in the State of Maryland.

43. Defendant Bank of America, N.A. is a member of the national association of banks doing business throughout the United States. During the relevant time frame, Bank of America N.A. was engaged in the business of consumer lending in Maryland and elsewhere.

## JURISDICTION AND VENUE

44. This Court has subject matter over this action pursuant to 28 U.S.C. § 1331.

45. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in Maryland and because Genuine Title systematically and continually transacted business in this District during the applicable time period.

**FACTUAL ALLEGATIONS FOR INDIVIDUAL AND CLASS RELIEF**

46. 12 U.S.C. 2607 states in relevant part:

   (a) Business Referrals. No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

   (b) Splitting charges. No person shall give and no person shall accept any portion, split or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving federally related mortgage loan other than for services actually performed.

47. The purpose of 12 U.S.C. § 2607 is to eliminate payment of unearned fees in connection with settlement services provided in federally related mortgage transactions and to protect consumers from unnecessarily high settlement charges caused by certain abusive practices. See 12 U.S.C. § 2601.

48. Genuine Title is a title services company, licensed under the laws of various states, including Maryland, and regulated by the Maryland Insurance Commissioner.

49. At all times mentioned, the Defendant Lenders' employees and/or agents were licensed mortgage brokers (collectively referred to herein as "Referring Brokers"), and at all relevant times were acting within scope of the business relationship and duties of their employment on behalf of Defendant Lenders, specifically seeking borrowers and

securing loans for residential mortgages through Defendant Lenders. Said residential mortgages and the relationships established as a result were for the benefit of Defendant Lenders.

50. In connection with the real estate settlements involved herein, the Defendant Lenders' employees and/or agents received and accepted cash payments, free marketing materials and other things of value from Genuine Defendants in exchange for referral of Genuine Title to borrowers for title and settlement services.

**Free Marketing Materials in Exchange for Referrals**

51. Genuine Defendants purchased sales leads and hired printing and/or mailing services to print and mail marketing materials for mortgage brokers in exchange for referrals. The marketing materials would contain the Referring Broker's name and lending institution. The marketing materials included letters to people with mortgages in which the Referring Brokers would suggest refinancing with Defendant Lenders and provide their contact information (hereinafter "Free Marketing Materials").

52. Free Marketing Materials were printed and provided at the expense of Genuine Title to Referring Brokers employed by Defendant Lenders.

53. Specifically, Genuine Defendants paid for the set-up, printing and mailing of letters to persons with mortgages suggesting and/or informing the borrowers of an opportunity to refinance their mortgage with the Referring Brokers. See Exhibit 1. (*an example of a Wells Fargo marketing piece paid for by Genuine Title*).

54. The potential borrowers to whom these letters were addressed were sourced through sales leads purchased by Genuine Defendants and provided to the Printing Companies by Genuine Title for the benefit of the Referring Brokers. The expense of these letters was

another illegal benefit to Referring Brokers for which the Referring Brokers provided no services of value, but instead referrals of clients and/or a promise to refer future clients.

55. Genuine Defendants would instruct the Printing Companies to use a varying number of leads and produce a varying number of mail pieces for each job. Upon information and belief, the number of leads and pieces Genuine Title requested correlates to the volume of business referred to Genuine Title by the referring broker.

56. Upon completion of the job, the Printing Companies were instructed to mail the marketing pieces directly to the Referring Brokers, an invoice was sent to Genuine Title and Genuine Defendants would remit payment to the Printing Company for the Referring Brokers' marketing materials and for the postage required for the mailing.  See Exhibit 2.

57. Genuine Defendants also provided Free Marketing Materials with an understanding and agreement that the Referring Brokers receiving the Free Marketing Materials would refer borrowers to Genuine Title for real estate settlement services, including performing a title search and procuring title insurance.

**Cash Payments in Exchange for Referrals**

58. Not only did the Genuine Defendants provide Referring Brokers with Free Marketing Materials, Genuine Title Defendants also paid cash directly to the Referring Brokers in exchange for referrals (hereinafter "Referring Cash").

59. Genuine Title paid the Printing Companies for Free Marketing Materials from its operating account. However, to avoid detection, Genuine Title began using sham companies to serve as conduits to make the illegal cash payments in an attempt to avoid detection by regulators, plaintiffs and the public.

60. The payments vary in amount, and upon information and belief, correlate to the volume of referrals to Genuine Title by the Referring Brokers.

61. In order to disguise receipt of Referring Cash payments, some Referring Brokers created shell companies to receive the Referring Cash payments. The shell companies had no business purpose except to service as a conduit for the Referring Cash Payments.

62. When regulators began to investigate Genuine Title, Genuine Title drafted sham Title Services Agreements with the intent to disguise Referring Cash payments as legitimate fees for alleged services provided by Referring Brokers and back-dated said agreements. However, the Referring Cash payments were not made in accordance with the fee schedule in the Title Services Agreements.

63. In some instances, the Referring Cash was paid to Referring Brokers pursuant to sham Title Services Agreements in which Genuine Title agreed to pay the referring brokers for title services that were not, in fact, performed.  The recitation of payment for non-existence title services disguised the fact that the payments were actually for illegal Referring Cash payments.  *See Title Services Agreement attached hereto as Exhibit 3.* These illegal Referring Cash Payments were made to compensate Referring Brokers for referrals received in the past or to induce additional referrals in the future.

64. As previously stated, in an attempt to legitimize this illegal practice, Genuine Title principals contacted Referring Brokers in October 2013, presenting to the Referring Brokers a Title Services Agreement to sign and falsely backdate to the time period in which said Referring Brokers were receiving Referring Cash from Genuine Defendants. See Exhibit 3. (same as previous).

**The Kickback Scheme**

65. Genuine Defendants and the Defendant Lenders through Referring Brokers created an elaborate scheme by which Defendants disguised the kickbacks and the Kickback Scheme.

66. In or about 2006, Brandon Glickstein, one of Genuine Title's marketing and account representatives, formed Brandon Glickstein, Inc. for the purpose of "advertising and marketing and to engage in any other lawful purpose and business." *See relevant SDAT Records, attached hereto as Exhibit 4.*

67. Brandon Glickstein, Inc. was one of the conduits through which Genuine Title contracted with vendors to provide Free Marketing Materials for Referring Brokers. From 2010 to 2013, Genuine Title paid Brandon Glickstein, Inc. more than $3,000,000.00 for the use and benefit of Referring Brokers.

68. In turn, Brandon Glickstein, Inc. made numerous payments to printing and direct mailing companies, including but not limited to F&N Mailing Services, Capital Mailing Services, Inc. and Direct Mail Marketing (collectively "Printing Companies").

69. Plaintiffs believe and therefore aver, it was Genuine Title employee, Ken Bartz, and Genuine Title owner, Jay Zuckerberg that most often corresponded with the Printing Companies including approving proofs and instructing the Printing Companies on how many marketing pieces were to be completed for each Referring Broker.

70. Not only did payment for the Free Marketing Materials come from Brandon Glickstein, Inc.'s account, but also Referring Cash. Routinely, payments were made from the Brandon Glickstein, Inc. banking account to individuals who were employed by Defendant Lenders at the time of the payment. The Referring Cash payments varied month to month based on volume of settlements generated by the Referring Brokers.

71. On or about May 21, 2009, Brandon Glickstein formed another sham company, Competitive Advantage Media Group, LLC (hereinafter "CAM"). The Resident Agent for CAM was Jonathan S. Bach, Esq., the in-house attorney for Genuine Title. Additionally, the address for CAM was the same physical address of Genuine Title. However, on or about May 13, 2013, CAM changed its Resident Agent and Resident Agent's address to Michael N. Mercurio at 8171 Maple Lawn Boulevard, Suite 200, Fulton, Maryland 20759. *See relevant SDAT Records and Genuine Title Contact List, collectively attached hereto as Exhibits 5 & 6.*

72. Genuine Title also paid CAM as a conduit for Free Marketing Materials and Referring Cash to various brokers and loan officers employed by Defendant Lenders who were referring federally related mortgage loans to Genuine Title.

73. Upon information and belief, Genuine Title also created and used Defendant Dog Days Marketing Company, LLC as a conduit for paying for Free Marketing Materials and Referring Cash to various brokers and loan officers employed by Defendant Lenders.

74. Brandon Glickstein, Inc., CAM and Dog Days Marketing Company, LLC are sham marketing companies formed by principals of Genuine Title (collectively referred to as "Genuine Sham Marketing Companies"). Plaintiffs believe, and therefore aver that these companies were formed solely to facilitate illegal payments and kickbacks to Referring Brokers employed by Defendant Lenders to compensate them for referring settlements to Genuine Title.

75. The Genuine Sham Marketing Companies did not have their own office space and all of the companies shared a resident agent, principal and/or employee with Genuine Title.

**Injury to Plaintiffs**

76. Plaintiffs were charged for settlement services related to their federally related mortgage by Genuine Title while Defendants were engaging in the Kickback Scheme.

77. Congress enacted RESPA in 1974 as a response to the abuses in the real estate settlement process. Congress found that kickbacks and unearned fees in the settlement process resulted in unnecessarily high settlement charges.

78. As a result of the Kickback Scheme in the instant case, Plaintiffs were deprived of kickback free settlement services and process as required by 12 U.S.C. § 2607.

79. 12 U.S.C. § 2607(d)(2) states in relevant part:

> "Any person or persons who violate the prohibitions or limitations of [12 USC § 2607] shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service."

80. 12 U.S.C. § 2607(d)(5) further states:

> "In any private action brought pursuant to this subsection, the court may award to the prevailing party the court costs of the action together with reasonable attorneys' fees."

## FACTS FOR INDIVIDUAL CLASS REPRESENTATIVES

81. Each Plaintiff in this case was a victim of the Kickback Scheme as described in the above stated paragraphs.

82. All Plaintiffs learned of the illegal kickbacks less than one year prior to filing of the Complaint and could not have known about the Kickback Scheme until contacted by undersigned counsel.

83. The transactions of the Plaintiffs and the course of events thereafter exemplify the working of the Kickback Scheme, and are typical of the transactions involving all members of the proposed class.

**Wells Fargo Home Mortgage, Inc. and Wells Fargo Bank, N.A.**

84. From 2009 until approximately early 2014, licensed mortgage brokers employed by Wells Fargo Bank, N.A. and Wells Fargo Home Mortgage Division (Defendants collectively referred to herein as "Wells Fargo") received Free Marketing Materials and/or Referring Cash from Genuine Defendants in exchange for referrals of Wells Fargo borrowers to Genuine Title for settlement services. See Exhibit 7. (*Sample of Marketing Materials printed for Wells Fargo brokers*).

85. In exchange for referrals, Genuine Defendants remitted payment for Wells Fargo mortgage brokers' marketing materials in violation of RESPA. See Exhibit 7. (same as last Exhibit).

86. In addition to Free Marketing Materials, Wells Fargo brokers, including, but not limited to Todd Cohen and Marcus Nole, received Referring Cash from Genuine Defendants in exchange for referrals. *See Exhibit 8*.

87. In or about October 2013, Damon M. Oliver obtained a residential mortgage loan from Wells Fargo. Plaintiff Oliver was referred to and settled with Genuine Title on October 24, 2013.

88. In or about November 2013, Betty M. Howard obtained a residential mortgage loan from Wells Fargo. Plaintiff Howard was referred to and settled with Genuine Title on November 19, 2013.

89. In or about October 2013, Clayton J. Anthony obtained a residential mortgage loan from Wells Fargo. Plaintiff Anthony was referred to and settled with Genuine Title on October 4, 2013.

90. Wells Fargo arranged for Plaintiffs Oliver, Howard, and Anthony to use Genuine Title for title and settlement services in accordance with Genuine Title and Wells Fargo brokers' understanding that the brokers would receive Free Marketing Materials and/or Referring Cash in exchange for referrals to Genuine Title for title and settlement services.

91. Plaintiffs Oliver, Howard, and Anthony did, in fact use Genuine Title for settlement services and Plaintiffs paid for said settlement services.

92. As a direct and proximate cause of the actions of the Defendants, Plaintiffs Oliver, Howard, and Anthony and other Class Members similarly situated were deprived of impartial and fair competition.

**Maverick Funding Corp.**

93. From 2009 until approximately early 2014, licensed mortgage brokers employed by Maverick Funding Corp. ("Maverick"), a mortgage lender providing residential lending to borrowers, received Free Marketing Materials and/or Referring Cash from Genuine Defendants in exchange for referrals of Maverick borrowers to Genuine Title for settlement services.

94. Since 2009, William "Bill" Richardson was employed as a licensed mortgage broker by Maverick.

95. In 2012 and 2013, Mr. Richardson received more than $168,000 in payments from Genuine Title for referrals to Genuine Title. Mr. Richardson also received payment from Sham Marketing Companies in the form of cash and/or payment for tickets to Ravens football games. *See Exhibit 9 (checks showing payment from Brandon Glickstein, Inc. to Bill Richardson for referrals to Genuine Title).*

96. Genuine Title paid Mr. Richardson Referring Cash in exchange for Mr. Richardson sending Maverick borrowers to Genuine Title for settlement and title services.

97. Neither Maverick nor Mr. Richardson actually provided any material work or title services for Genuine Title reasonably related to the compensation, the compensation was in fact for the referrals.

98. In or about November 2013, Janice Manuel obtained a residential mortgage loan from Maverick. Plaintiff Manuel was referred to and settled with Genuine Title on November 22, 2013.

99. In or about March 2013, Eric Haynes obtained a residential mortgage loan from Maverick. Plaintiff Haynes was referred to and used Genuine Title for title and settlement services. Plaintiffs Haynes settled with Genuine Title on March 19, 2013.

100. In or about September 2012, Joseph J. Quinn obtained a residential mortgage loan from Maverick. Plaintiff Quinn was referred to and used Genuine Title for title and settlement services. Plaintiff Quinn settled on September 29, 2012.

101. Maverick arranged for Plaintiffs Manuel, Haynes and Quinn to use Genuine Title for title and settlement services in accordance with Genuine Title and Maverick brokers' understanding that brokers would receive Free Marketing Materials and/or Referring Cash as quid pro quo for referrals to Genuine Title.

102. Plaintiffs Manuel, Haynes and Quinn did, in fact use Genuine Title for settlement services and Plaintiffs paid for said settlement services.

103. As a direct and proximate cause of the actions of the Defendants, Plaintiffs Manuel, Haynes and Quinn and other Class Members similarly situated were deprived of impartial and fair competition between settlement service providers in violation of RESPA.

**West Town Bank & Trust, a/k/a West Town Savings Bank**

104.   From 2009 until approximately early 2014, licensed mortgage brokers employed by West Town Savings Bank & Trust, also known as West Town Savings Bank ("West Town"), a mortgage lender providing residential lending to borrowers, received Free Marketing Materials and/or Referring Cash from Genuine Defendants in exchange for referrals of West Town borrowers to Genuine Title for settlement services.

105.   Christopher S. Casazza and Brent Erickson were employed as licensed mortgage brokers by West Town. Casazza and Erickson had been employed by West Town since 2010.

106.   Casazza and Erickson received Referring Cash payments from Genuine Sham Marketing Companies. *See Exhibit 10 (checks showing payment from Brandon Glickstein, Inc. to Chris Casazza and Jani Erickson paid to the order of Brent Erickson).*

107.   Genuine Title paid Casazza and Erickson Referring Cash in exchange for referring West Town borrowers to Genuine Title for settlement and title services.

108.   In 2013, Genuine Title paid $10,000.00 to West Town broker Craig Arman, paid to the order of Robin Arman[2], in exchange for referring West Town borrowers to Genuine Title for settlement and title services.

109.   West Town, Casazza, Erickson or Arman did not actually provide material work or title services for Genuine Title reasonably related to the compensation.

110.   In or about May 2011, Deloris F. Woods obtained a residential mortgage loan from West Town. Plaintiff Woods used Genuine Title for title and settlement services. Plaintiff Woods settled May 23, 2011.

---

[2] Upon information and belief, Robin Arman is Mr. Arman's spouse.

111.   In or about January 2011, Jameson and Katherine Cooper obtained a residential mortgage loan from West Town. Plaintiffs Cooper used Genuine Title for title and settlement services. Plaintiffs Cooper settled January 4, 2011.

112.   In or about August 2011, Geraldine Walters obtained a residential mortgage loan from West Town. Plaintiff Walters used Genuine Title for title and settlement services. Plaintiff Walters settled August 20, 2011.

113.   West Town arranged for Plaintiffs Woods, Cooper and Walters to use Genuine Title for title and settlement services in accordance with Genuine Title and West Town brokers' understanding that brokers would receive Free Marketing Materials and/or Referring Cash as quid pro quo for referrals to Genuine Title.

114.   Plaintiffs Woods, Cooper and Walters did, in fact use Genuine Title for settlement services and Plaintiffs paid for said settlement services.

115.   As a direct and proximate cause of the actions of the Defendants, Plaintiffs Woods, Cooper and Walters and other Class Members similarly situated were deprived of impartial and fair competition between settlement service providers in violation of RESPA.

**Emery Federal Credit Union**

116.   From 2009 until approximately early 2014, licensed mortgage brokers employed by Emery Federal Credit Union ("Emery"), a mortgage lender providing residential lending to borrowers, received Free Marketing Materials and/or Referring Cash from Genuine Defendants in exchange for referrals of Emery borrowers to Genuine Title for settlement services.

117. During the relevant time period, Adam Mandelberg, Gary Klopp and Paul Ellis were employed as mortgage brokers for Emery.

118. In 2005, Adam Mandelberg created R&R Marketing Group. Genuine Title paid Adam Mandelberg via R&R Marketing Group, LLC approximately $36,000 in 2011, $127,000 in 2012 and approximately $23,000 in 2013 for referrals received by Genuine Title from Emery Federal Credit Union and Adam Mandelberg.

119. In 2009, Gary Klopp created Carroll Abstracts, Inc. The resident agent of said Maryland Corporation was Jonathan S. Bach, Esq., Genuine Title's Title Attorney. Gary Klopp was the sole director of Carroll Abstracts, Inc. Genuine Title paid Carroll Abstracts, Inc. approximately $58,000 in 2011 and approximately $185,000 in 2012. Carroll Abstracts, Inc. was forfeited in 2011. In 2012, Gary Klopp created All County Settlements, LLC.  In 2013, Genuine Title paid All County Settlements, LLC approximately $54,000.

120. Adam Ellis created Mystion Abstract Inc. in 2012. In 2012, Genuine Title paid Mystion Abstracts more than $70,000.

121. R&R Marketing, LLC, Carroll Abstracts, Inc., All County Settlements, LLC and Mystion Abstracts Inc. were sham companies created by Emery brokers, Mandelberg, Klopp, and Ellis for the purpose of disguising illegal kickbacks as legitimate payments for title services when in fact, they were not providing any material work or services for Genuine Title.

122. In addition to Mandelburg, Klopp and Ellis, Genuine Title Defendants paid other Emery brokers Referring Cash in exchange for referrals, including, but not limited to Oday Marogi and William Furgione in 2012.

123.  In or about May 2012, Steven A. Messina obtained a residential mortgage loan from Emery.

124.  Emery arranged for Plaintiff Messina to use Genuine Title for title and settlement services in accordance with Genuine Title and Emery brokers' understanding that brokers would receive Free Marketing Materials and/or Referring Cash as quid pro quo for referrals to Genuine Title.

125.  Plaintiff Messina was referred to and used Genuine Title for title and settlement services. Plaintiff Messina settled on May 17, 2012. Plaintiff Messina paid Genuine Title for those settlement and title services.

126.  As a direct and proximate cause of the actions of the Defendants, Plaintiff Messina and other Class Members similarly situated were deprived of impartial and fair competition between settlement service providers in violation of RESPA.

**PNC Mortgage and PNC Bank, N.A.**

127.  From 2009 until approximately early 2014, licensed mortgage brokers employed by PNC Mortgage and PNC Bank, N.A. (Defendants collectively referred to herein as "PNC"), a mortgage lender providing residential lending to borrowers, received Free Marketing Materials and/or Referring Cash from Genuine Defendants in exchange for referrals of PNC borrowers to Genuine Title for settlement services.

128.  During the relevant time period, Thomas Bowen was employed as a licensed mortgage broker by PNC.

129.  Mr. Bowen received Free Marketing Materials from Genuine Defendants in exchange for referrals to Genuine Title. *See Exhibit 11* (*Sample of a Marketing Material printed for Thomas Bowen*).

130. Genuine Defendants remitted payment for Mr. Bowen's marketing materials in violation of RESPA. *See Exhibit 12* (*Invoice for Thomas Bowen marketing materials and payment for same by Genuine Title*).

131. In or about June 2010, Rose A. Lease obtained a residential mortgage loan from PNC.

132. PNC arranged for Plaintiff Lease to use Genuine Title for title and settlement services in accordance with Genuine Title and PNC's brokers' understanding that the brokers would receive Free Marketing Materials and/or Referring Cash in exchange for referrals to Genuine Title for title and settlement services.

133. Plaintiff Lease did, in fact use Genuine Title for settlement services and settled on June 23, 2010. Plaintiff Lease paid Genuine Title for those settlement and title services.

134. As a direct and proximate cause of the actions of the Defendants, Plaintiff Lease and other Class Members similarly situated were deprived of impartial and fair competition between settlement service providers in violation of RESPA.

**MetLife Home Loans, LLC and MetLife Bank, N.A.**

135. From 2009 until approximately early 2014, licensed mortgage brokers employed by MetLife Home Loans, LLC and MetLife Bank, N.A. (Defendants collectively referred to herein as "MetLife") received Free Marketing Materials and/or Referring Cash from Genuine Defendants in exchange for referrals of MetLife borrowers to Genuine Title for settlement services.

136. During the relevant time period, John Folino was employed as a licensed mortgage broker by MetLife.

137. Folino received Free Marketing Materials from Genuine Defendants in exchange for referrals to Genuine Title. *See Exhibit 13. (Sample of a Marketing Material printed for Folino)*

138. In exchange for referrals, Genuine Defendants remitted payment for Folino's marketing materials in violation of RESPA. *See Exhibit 14. (Invoice for Folino marketing materials and payment for same by Genuine Title).*

139. In or about February 2011, James and Dana Pipp obtained a residential mortgage loan from MetLife.

140. In or about October 2009, Lawrence and Concetta Crupi obtained a residential mortgage loan from Metlife.

141. In or about July 2010, Charles Milburn obtained a residential mortgage loan from Metlife.

142. MetLife arranged for Plaintiffs Pipp, Crupi and Milburn to use Genuine Title for title and settlement services in accordance with Genuine Title and MetLife brokers' understanding that the brokers would receive Free Marketing Materials and/or Referring Cash in exchange for referrals to Genuine Title for title and settlement services.

143. Plaintiffs Pipp did, in fact use Genuine Title for settlement services and settled on February 8, 2011. Plaintiffs Pipp paid Genuine Title for those settlement and title services.

144. Plaintiffs Crupi did, in fact use Genuine Title for settlement services and settled on October 19, 2009. Plaintiffs Crupi paid Genuine Title for those settlement and title services.

145. Plaintiff Milburn did, in fact use Genuine Title for settlement services and settled on July 22, 2010. Plaintiff Milburn paid Genuine Title for those settlement and title services.

146. As a direct and proximate cause of the actions of the Defendants, Plaintiffs Pipp, Crupi, Milburn and other Class Members similarly situated were deprived of impartial and fair competition between settlement service providers in violation of RESPA.

**Net Equity Financial, Inc.**

147. During the relevant time period, William J. Peterson III was the President of Net Equity Financial, Inc. ("Net Equity").

148. In 2011, Mr. Peterson created BTS Management and Consulting, LLC ("BTS"). In 2012, Genuine Title paid BTS approximately $49,000.

149. Genuine Title made payments to BTS instead of Mr. Peterson in an attempt to disguise illegal kickbacks as legitimate payments for title services when in fact, neither BTS nor Mr. Peterson were not providing any material work or title services for Genuine Title.

150. In 2010 to 2011, another licensed mortgage broker, Kate Estep, was employed by Net Equity. In 2011, Kate Estep received Free Marketing materials from Genuine Title.

151. In or about June 2013, Frank and Sammie Cherry obtained a residential mortgage loan from Net Equity.

152. Net Equity arranged for Plaintiffs Cherry to use Genuine Title for title and settlement services in accordance with Genuine Title and Net Equity brokers' understanding that brokers would receive Free Marketing Materials and/or Referring Cash as quid pro quo for referrals to Genuine Title.

153. Plaintiffs Cherry used Genuine Title for title and settlement services and settled June 17, 2013.

154. In or about April 2012, Helen L. Householder obtained a residential mortgage loan from Net Equity.

155. Net Equity arranged for Plaintiff Householder to use Genuine Title for title and settlement services in accordance with Genuine Title and Net Equity brokers' understanding that brokers would receive Free Marketing Materials and/or Referring Cash as quid pro quo for referrals to Genuine Title.

156. Plaintiff Householder used Genuine Title for title and settlement services and settled April 30, 2012.

157. In or about February 2012, Barbara Boyd obtained a residential mortgage loan from Net Equity.

158. Net Equity arranged for Plaintiff Boyd to use Genuine Title for title and settlement services in accordance with Genuine Title and Net Equity brokers' understanding that brokers would receive Free Marketing Materials and/or Referring Cash as quid pro quo for referrals to Genuine Title.

159. Plaintiff Boyd used Genuine Title for title and settlement services and settled February 28, 2012.

160. Plaintiffs Cherry, Householder and Boyd did, in fact use Genuine Title for settlement and title services and Plaintiffs Cherry, Householder and Boyd paid for said settlement and title services.

161. As a direct and proximate cause of the actions of the Defendants, Plaintiffs Cherry, Householder and Boyd and other Class Members similarly situated were deprived of impartial and fair competition between settlement service providers in violation of RESPA.

**Eagle National Bank**

162. Beginning in 2009 and upon information and belief continuing until on or about early 2014 based upon Genuine Defendants' continuing pattern of practice, licensed mortgage brokers employed by Eagle National Bank (hereinafter "Eagle National"), a mortgage lender providing residential lending to borrowers, received Free Marketing Materials from Genuine Defendants in exchange for referrals of Eagle National borrowers to Genuine Title for settlement services.

163. In or about October, 2010, Edward & Vickie Fangman obtained a residential mortgage loan from Eagle National in relation to the refinancing of their home.

164. Eagle National referred Plaintiffs Fangman to Genuine Title for title and settlement services.  On the basis of this recommendation, Plaintiffs Fangman used Genuine Title for the title and settlement services for the refinancing of their home.  Plaintiffs Fangman settled on or about October 22, 2012. Plaintiffs Fangman paid Genuine Title for those title and settlement services.

165. In exchange for referrals, Genuine Title provided Free Marketing Materials to Eagle National referring brokers in violation of RESPA. *See Exhibit 15.*

**E Mortgage Management, LLC**

166. Beginning in 2009 and upon information and belief continuing until on or about early 2014 based upon Genuine Defendants' continuing pattern of practice, E Mortgage Management, LLC ("E Mortgage") received Free Marketing Materials from Genuine Defendants in exchange for referrals of E Mortgage borrowers to Genuine Title for title and settlement services. *See Exhibit 16.*

167. In or about October 2011, Plaintiffs Preston and Beatrice Johnson obtained a residential mortgage loan from E Mortgage.

168. Plaintiffs Johnson were referred to and used Genuine Title for title and settlement services and settled on October 12, 2011.

169. In or about September 2011, Plaintiffs Ann and Gerald Jones obtained a residential mortgage loan from E Mortgage.

170. Plaintiffs Jones were referred to and used Genuine Title for title and settlement services and settled on September 9, 2011.

171. In or about June 2012, Plaintiffs Tinna and John Mahoney obtained a residential mortgage loan from E Mortgage.

172. Plaintiffs Mahoney were referred to and used Genuine Title for title and settlement services and settled on June 25, 2012.

173. Net Equity arranged for Plaintiffs Johnson, Jones and Mahoney to use Genuine Title for title and settlement services in accordance with Genuine Title and Net Equity brokers' understanding that brokers would receive Free Marketing Materials and/or Referring Cash as quid pro quo for referrals to Genuine Title.

174. Plaintiffs Johnson, Jones and Mahoney did, in fact use Genuine Title for settlement and title services and paid Genuine Title for those services.

175. As a direct and proximate cause of the actions of the Defendants, Plaintiffs Johnson, Jones, and Mahoney and other Class Members similarly situated were deprived of impartial and fair competition between settlement service providers in violation of RESPA.

**Bank of America, N.A.**

176. Beginning in 2009 and upon information and belief continuing until on or about early 2014 based upon Genuine Defendants' continuing pattern of practice, licensed mortgage brokers employed by Bank of America, N.A. ("Bank of America"), a mortgage lender providing residential lending to borrowers, received Free Marketing Materials and/or Referring Cash from Genuine Defendants in exchange for referrals of Bank of America borrowers to Genuine Title for settlement services.

177. Upon information and belief, Erika Parker was employed by Bank of America during the relevant time period.

178. Parker received Referring Cash payments from Genuine Sham Marketing Companies. *See Exhibit 17.* (*checks showing payment from Brandon Glickstein, Inc. and Competitive Advantage Media Group to Parker paid to the order of Erika Parker.*)

179. In or about May 2009, Patricia Gibson obtained a residential mortgage loan from Bank of America in relation to the refinancing of her home.

180. Bank of America referred Plaintiff Gibson to Genuine Title for title and settlement services.  On the basis of this recommendation, Plaintiff Gibson used Genuine Title for the title and settlement services for the refinancing of their home.  Plaintiff Gibson settled on or about May 21, 2009. Plaintiff Gibson paid Genuine Title for those title and settlement services.

181. In or about October, 2010, Bruce and Margaret Eisenstein obtained a residential mortgage loan from Bank of America in relation to the refinancing of their home.

182. Bank of America referred Plaintiffs Eisenstein to Genuine Title for title and settlement services.  On the basis of this recommendation, Plaintiffs Eisenstein used Genuine Title for the title and settlement services for the refinancing of their home.   Plaintiffs

Eisenstein settled on or about October 20, 2010. Plaintiffs Eisenstein paid Genuine Title for those title and settlement services.

183.   As a direct and proximate cause of the actions of the Defendants, Plaintiffs Gibson, and Eisenstein and other Class Members similarly situated were deprived of impartial and fair competition between settlement service providers in violation of RESPA.

## CLASS ACTION ALLEGATIONS

184.   The allegations in the above stated paragraphs are incorporated by reference as if fully restated herein.

185.   Class definition: The Plaintiffs and Class Members are borrowers who retained Genuine Title for settlement and title services and Defendant Lenders on the purchase and/or refinance of their residence from 2009 to 2014.

186.   The Plaintiffs bring this action on behalf of themselves and all other similarly situated individuals pursuant to Fed. R. Civ. P. 23.

187.   The questions of law and fact in this action are uniquely common to all members of the Class.

188.   There are questions of law and fact which are not only common to the Class, but which predominate over any question affecting only individual Class members.   The predominating questions include, but are not limited to:

   a.   Whether Defendant Lenders and their agents and/or representatives received unearned fees and illegal kickbacks from Genuine Title and Sham Marketing Companies for referral of business to Genuine Title;

   b.   Whether payments to Defendant Lenders and their agents and/or representatives violated RESPA;

    c.   Whether Defendants actively concealed the Kickback Scheme to avoid detection by Plaintiffs and Class Members;

    d.   Whether the Plaintiffs and the Class are entitled to treble damages under RESPA;

    e.   Whether the Plaintiffs and the Class are entitled to attorneys' fees and expenses under RESPA.

189.   The claims of the Plaintiffs are typical of the claims or defenses of the respective Class Members.

190.   The Plaintiffs/ Class Representatives will fairly and adequately protect the interests of the Class. The interests of the named Plaintiffs and all other members of the Class are identical.

191.   Plaintiffs' counsel have combined substantial experience in complex litigation and class action proceedings and will adequately represent the Class's interests.

192.   The Class consists, upon information and belief, of approximately 4,000 to 5,000 individuals, and thus are so numerous that joinder of all members is impracticable.

193.   Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Defendants.

194.   This action entails questions of law and fact common to Class members that predominate over any questions affecting only individual Plaintiffs, and, therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

195.   Most members of the Class are unaware of their rights to prosecute a claim against Defendants.

196. No member of the Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

**COUNT I**
**Violation of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2607(a) and (b) and MD Code, Real Property § 14-127**

197. Plaintiffs incorporate the above stated paragraphs as if restated herein.

198. All transactions at issue in the instant complaint are incident to or part of real estate settlement services involving federally related mortgage loans and thereby are subject to the provisions of RESPA, 12 U.S.C. § 2601, et seq.

199. As a title service provider, Genuine Title is subject to the provisions of RESPA, 12 U.S.C. § 2601, et seq.

200. As lenders and/or servicers of federally related mortgage loans, Defendant Lenders are subject to the provisions of RESPA, 12 U.S.C. § 2601, et seq.

201. Genuine Defendants paid Defendant Lenders Referring Cash and/or provided Free Marketing materials in exchange for referrals of business to Genuine Title in violation of RESPA, 12. U.S.C. § 2607(a) and (b).

202. Defendant Lenders by and through their agents and/or employees received Free Marketing Materials and/or Referring Cash for referrals of business as part of real estate settlement services provided to Plaintiffs and Class members, in violation of RESPA, 12 U.S.C. § 2607(a) and (b), and MD Code, Real Property § 14-127.

203. All loans referred to Genuine Title as part of the Kickback Scheme were secured by first or subordinate liens on residential real property and were made in whole or in part by

Defendant Lenders and/or their affiliates whose deposits or accounts are insured by the Federal Government and/or who is regulated by an agency of the Federal Government.

204. The payment and/or arranging of payment of kickbacks to the Defendant Lenders by Genuine Defendants and Defendant Lenders' receipt thereof constituted a violation of 8(a) of RESPA, which prohibits the payment of referral fees or kickbacks in connection with the origination of federally-related mortgage loans.

205. Payments by Genuine Defendants to Defendant Lenders and Defendant Lenders' receipt thereof constituted a violation of 8(b), which prohibits the splitting of fees in connection with the origination of federal related mortgage loans.

206. On or around the time of settlement, the kickbacks were paid by Genuine Title through Genuine Sham Marketing Companies or pursuant to sham title services agreements drafted to conceal the Kickback Scheme.

207. The kickbacks paid by Genuine Defendants to Defendant Lenders were also made solely for the purpose of Genuine Title receiving referrals, and no title services were actually performed by Defendant Lenders or Genuine Sham Marketing Companies in connection with these payments and/or materials, in violation of 12 U.S.C. § 2607(b).

208. Genuine Title actively concealed the kickbacks paid to Referring Brokers from Plaintiffs and Class Members, as set forth above.

209. Despite exercising due diligence, the Plaintiffs and Class Members could not have known about the Kickback Scheme until contacted by undersigned counsel.

210. As a direct and proximate cause of Genuine Title's actions, the Plaintiffs and Class Members used Genuine Title for title and settlement services, paid for said services and

were deprived of impartial and fair competition in violation of § 2607 of RESPA and MD Code, Real Property § 14-127.

WHEREFORE:

a.  Class Plaintiffs respectfully demand this Court to certify this class action pursuant to Federal Rule of Civil Procedure 23 and set this matter for trial; and

b.  Demand judgment for Plaintiffs and Members of this Class against Defendants and award the Plaintiffs and Class Members an amount equal to:

    1.  Compensatory damages totaling $10,000,000.00;

    2.  Treble damages for settlement services charged by Genuine Title, including, but not limited to, title insurance premiums, in an amount equal to three times the amount of any charge paid for such settlement services, pursuant to 12 U.S.C. § 2607(d)(2);

    3.  Reasonable attorneys' fees, interest and costs; and

    4.  Such other and further relief as this Court deems proper.

### COUNT II
### Violation of the Maryland Consumer Protection Act (MCPA)

211.  Plaintiffs incorporate the above stated paragraphs as if restated herein.

212.  Genuine Defendants and Defendant Lenders knowingly concealed payment of kickbacks and their relationships from Plaintiffs and Class Members.

213.  Genuine Title charged fees to Plaintiffs and Class Members, which were used to further the Kickback Scheme.

214.  Genuine Title and Defendant Lenders failed to disclose to Plaintiffs and Class Members that Genuine Title was participating with referring loan officers/banks and Genuine Sham

Marketing companies and failed to disclose their affiliated business relationships among other things.

215. These omissions constituted unfair and/or deceptive trade practices as defined by Maryland Annotated Code, Commercial Law § 13-301.

216. Despite exercising reasonable diligence, the Plaintiffs and Class Members did not, and could not have learned of the illegal kickbacks until contacted by counsel.

217. But for Genuine Title's Kickback Scheme, Plaintiffs and Class members were deprived of impartial and fair competition and the costs paid by Plaintiffs and Class members to Genuine Title for settlement services would have been much lower.

218. Genuine Title's unfair and/or deceptive trade practices were a direct and proximate cause of the damages sought by Plaintiffs and Class members.

WHEREFORE:

a. Class Plaintiffs respectfully demand this Court to certify this class action pursuant to Federal Rule of Civil Procedure 23 and set this matter for trial; and

b. Demand judgment for Plaintiffs and Members of this Class against Defendants and award the Plaintiffs and Class Members $10,000,000.00 in damages, with reasonable attorneys' fees, interest, costs and such other and further relief as this Court deems proper.

Respectfully submitted,

_____/s/_____
Michael Paul Smith, Esq. #23685
Natalie Mayo, Esq. #19056
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, MD 21204
(410) 821-0070 / (410) 821-0071 (fax)
Email: nmayo@sgs-law.com
*Co-Counsel for Plaintiffs*

_____/s/_____
Timothy F. Maloney, Esq. #03381
Joseph, Greenwald & Laake
6404 Ivy Lane
Suite 400
Greenbelt, Maryland 20770
(301) 220-2200 / (301) 220-1214 (fax)
Email: tmaloney@jgllaw.com
*Co-Counsel for Plaintiffs*

## PRAYER FOR JURY TRIAL

The Plaintiffs hereby request a trial by jury on the foregoing Amended Complaint.

_____/s/_____
Michael Paul Smith, Esq. #23685
Natalie Mayo, Esq. #19056
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, MD 21204
(410) 821-0070 / (410) 821-0071 (fax)
Email: nmayo@sgs-law.com

_____/s/_____
Timothy F. Maloney, Esq. #03381
Joseph, Greenwald & Laake
6404 Ivy Lane
Suite 400
Greenbelt, Maryland 20770
(301) 220-2200 / (301) 220-1214 (fax)
Email: tmaloney@jgllaw.com
*Co-Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify, this 2nd day of January, 2015, that I served copies of the foregoing First Amended Class Action Complaint, Exhibits and Demand for Jury Trial via this Court's CM/ECF system to counsel of record for the parties.

_____/s/_____
Michael Paul Smith, Esq. #23685
Natalie Mayo, Esq. #19056
Timothy F. Maloney, Esq. #03381

~~EDWARD J. FANGMAN AND~~                        *
~~VICKIE G. FANGMAN,~~                         IN THE
~~4309 Hoffmanville Road~~                      *
~~Manchester, MD 21102~~                      ~~CIRCUIT~~ UNITED STATES DISTRICT COURT
                                        *

    *~~Plaintiffs~~*                        FOR
~~v.~~                                       *
                                        ~~BALTIMORE COUNTY~~
~~GENUINE TITLE, LLC~~                        *
~~SERVE ON:~~
   ~~Genuine Title, LLC~~                   *
   ~~c/o Jay Zukerberg~~
   ~~11155 Dolfield Road~~                  *
   ~~Suite 101~~
   ~~Owings Mills, MD 21117,~~             *
                                        ~~Case No.:~~
    *~~Defendant~~*                        *

*    *    *    *    *    *    *    *    *    *    *    *    *

**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

EDWARD J. AND VICKIE FANGMAN,

DAMON M. OLIVER
4780 Melbourne Road
Baltimore, MD 21229

BETTY M. HOWARD
11967 Cardamom Drive
Woodbridge, VA 22192

CLAYTON J. ANTHONY                        Civil Action No.: 1:14-CV-00081-RDB
9 Lydia Court
Baltimore, MD 21208

JANICE M. MANUEL
4702 Omaha Street
Capitol Heights, MD 20743

ERIC L. HAYNES
8216 Sweeney Drive
Clinton, MD 20735

JOSEPH J. QUINN
957 Cloverfields Drive
Stevensville, MD 21666

1

DELORIS F. WOODS
3810 Wine Road
Westminster, MD 21158

JAMESON AND KATHERINE COOPER
2701 Farm View Drive
Fallston, MD 21047

GERALDINE R. WALTERS
2036 Park Avenue
Baltimore, MD 21217

STEVEN A. MESSINA
3790 Old Columbia Pike
Ellicott City, MD 21043

ROSE A. LEASE
5218 Biddison Lane
Baltimore, MD 21206

JAMES AND DANA PIPP
906 South Main Street
Hampstead, MD 21074

LAWRENCE AND CONCETTA CRUPI
2554 Paddock Drive
Davidsonville, MD 21035

CHARLES MILBURN
1296 Steamboat Road
Shady Side, MD 20764

FRANK AND SAMMIE CHERRY
206 Bluff Terrace
Silver Spring, MD 20902

HELEN L. HOUSEHOLDER
11718 Eastman Road NE
Cumberland, MD 21502

BARBARA J. BOYD
3303 Gibbons Avenue
Baltimore, MD 21214

PRESTON AND BEATRICE JOHNSON
209 Canvasback Drive
Havre De Grace, MD 21078-4207

GERALD AND ANN JONES
5705 Rayburn Drive

2

Camp Springs, MD 20748-2249

JOHN AND TINNA MAHONEY
228 Summer Street
Hagerstown, MD 21740-5310

PATRICIA GIBSON
4189 Windsor Heights Place
White Plains, MD 20695

BRUCE AND MARGARET EISENSTEIN
607 W. 40th Street
Baltimore, MD 21211-2219

Plaintiffs,

v.

GENUINE TITLE, LLC,

BRANDON GLICKSTEIN, INC.
SERVE ON:
Brandon Glickstein
18 Farm Gate Way
Reisterstown, MD 21136

COMPETITIVE ADVANTAGE MEDIA
GROUP, LLC
SERVE ON:
Michael N. Mercurio
Suite 200
8171 Maple Lawn Blvd.
Fulton, MD 20759

DOG DAYS MARKETING, LLC
SERVE ON:
Michael N. Mercurio
Suite 200
8171 Maple Lawn Blvd.
Fulton, MD 20759

WELLS FARGO HOME MORTGAGE, INC.
SERVE ON: CSC-LAWYERS
INCORPORATING SERVICE
11 E Chase Street
Baltimore, MD 21202

WELLS FARGO, N.A.
SERVE ON: CSC-LAWYERS
INCORPORATING SERVICE

3

11 E Chase Street
Baltimore, MD 21202

MAVERICK FUNDING CORP.
SERVE ON: HSC AGENT SERVICES, INC.
245 West Chase Street
Baltimore, MD 21201

WEST TOWN BANK & TRUST A/K/A
WEST TOWN SAVINGS BANK
SERVE ON: RODERICK SWAN
9822 Notting Hill Drive
Frederick, MD 21704

EMERY FEDERAL CREDIT UNION
7890 E. Kemper Road
Cincinnati, Ohio 45249-8967

PNC MORTGAGE
SERVE ON:
CSC-LAWYERS INCORPORATING
SERVICE COMPANY
7 St. Paul Street
Suite 820
Baltimore, MD 21202

PNC BANK, N.A.
SERVE ON: CSC-LAWYERS
INCORPORATING SERVICE COMPANY
7 St. Paul Street
Suite 820
Baltimore, MD 21202

METLIFE HOME LOANS, LLC
SERVE ON: THE CORPORATION TRUST
INCORPORATED
351 West Camden Street
Baltimore, MD 21201

METLIFE BANK N.A.
SERVE ON: THE CORPORATION TRUST
INCORPORATED
351 West Camden Street
Baltimore, MD 21201

NET EQUITY FINANCIAL
SERVE ON: WILLIAM J. PETERSON, III
635 Prestwick Trail
Belair, MD 21014

EAGLE NATIONAL BANK

3 Dickinson Drive
Chadds Ford, PA 19317
and
8045 West Chester Pike
Upper Darby, PA 19082

E MORTGAGE MANAGEMENT
SERVE ON: NATIONAL REGISTERED
AGENTS, INC. OF MD.
351 W Camden Street
Baltimore, MD 21201

BANK OF AMERICA, N.A.
SERVE ON: THE CORPORATION TRUST
INCORPORATED
351 West Camden Street
Baltimore, MD 21201

Defendants.

---

**FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

*Plaintiffs, EDWARD J. FANGMAN and VICKIE G. FANGMAN*Plaintiffs, Edward and Vickie Fangman, Damon M. Oliver, Betty M. Howard, Clayton J. Anthony, Janice M. Manuel, Eric L. Haynes, Joseph J. Quinn, Deloris F. Woods, Jameson and Katherine Cooper, Geraldine R. Walters, Steven A. Messina, Rose A. Lease, James and Dana Pipp, Lawrence and Concetta Crupi, Charles Milburn, Frank and Sammie Cherry, Helen L. Householder, Barbara J. Boyd, Preston and Beatrice Johnson, Gerald and Ann Jones, John and Tinna Mahoney, Patricia Gibson, and Bruce and Margaret Eisenstein, Class Plaintiffs, on behalf of themselves and on behalf of the entire class of persons similarly situated, by and through their attorneys, Michael Paul Smith, Natalie Mayo ~~andof~~ Smith, Gildea & Schmidt, LLC, and Timothy F. Maloney of Joseph, Greenwald and Laake, PA as co-counsel hereby ~~sue Genuine Title, LLC,~~file this First Amended Complaint and state as follows:

**NATURE OF THE ACTION**

~~EDWARD J. FANGMAN and VICKIE G. FANGMAN, Class~~ **INTRODUCTION**

1. Plaintiffs~~,~~ were borrowers who currently have or had federally related mortgage loans with and/or serviced by Defendant Lenders, which were or are secured by Plaintiffs' residential real property. For the purposes of procuring title insurance and to facilitate the escrow and settlement process, all Plaintiffs used Defendant Genuine Title as a result of the Defendant Lenders' referral thereto.

2. The Plaintiffs and class members were victims of an illegal kickback scheme whereby the Defendants Wells Fargo Home Mortgage, Inc., Wells Fargo, N.A., Maverick Funding Corp., West Town Bank & Trust, Emery Federal Credit Union, PNC Mortgage, PNC Bank, N.A., MetLife Home Loans, LLC, MetLife Bank, N.A., Net Equity Financial, Eagle National Bank, E Mortgage Management, and Bank of America, N.A., (hereinafter "Defendant Lenders") received unearned fees and kickbacks from Defendants Genuine Title, LLC, Brandon Glickstein, Inc., Dog Days Marketing, LLC, Competitive Advantage Marketing Group, LLC (hereinafter, "Genuine Defendants") in violation of the Real Estate Settlement Procedures Act, 12 U.S.C. 2601-2617 ("RESPA").

3. The Genuine Defendants provided free marketing materials and cash to referring mortgage brokers employed by Defendant Lenders from 2009 to 2014. These payments were concealed from Plaintiffs and were not disclosed on the Plaintiffs' HUD-1s.

**PARTIES**

4. Plaintiffs bring this action pursuant to Fed. R. Civ. Pro. 23 as a class action on their own behalf ~~of themselves~~ and on behalf of the entire class of ~~persons~~ people similarly situated ~~(hereinafter "Plaintiffs") bring this class action complaint against Genuine Title, LLC (hereinafter "Defendant") for engaging in a systematic and fraudulent scheme to~~

~~exchange illegal fees for referrals during the settlement process involving state and federally related mortgage loans from 2007 to 2011.~~

5.   Plaintiff Damon M. Oliver is a resident of Baltimore City, Maryland.

6.   Plaintiff Betty M. Howard is a resident of Prince William's County, Virginia.

7.   Plaintiff Clayton J. Anthony is a resident of Baltimore County, Maryland.

8.   Plaintiff Janice M. Manuel is a resident of Prince George's County, Maryland.

9.   Plaintiff Eric L. Haynes is a resident of Prince George's County, Maryland.

10. Plaintiff Joseph J. Quinn is a resident of Queen Anne's County, Maryland.

11. Plaintiff Deloris F. Woods is a resident of Carroll County, Maryland.

12. Plaintiffs Jameson and Katherine Cooper are residents of Harford County, Maryland.

13. Plaintiff Geraldine R. Walters is a resident of Baltimore City, Maryland.

14. Plaintiff Steven A. Messina is a resident of Howard County, Maryland.

15. Plaintiff Rose A. Lease is a resident of Baltimore City, Maryland.

16. Plaintiffs James and Dana Pipp are residents of Carroll County, Maryland.

17. Plaintiffs Lawrence and Concetta Crupi are residents of Anne Arundel County, Maryland.

18. Plaintiff Charles Milburn is a resident of Anne Arundel County, Maryland.

19. Plaintiffs Frank and Sammie Cherry are residents of Montgomery County, Maryland.

20. Plaintiff Helen L. Householder is a resident of Alleghany County, Maryland.

21. Plaintiff Barbara J. Boyd is a resident of Baltimore City, Maryland.

22. Plaintiffs Preston and Beatrice Johnson are residents of Harford County, Maryland.

23. Plaintiffs Gerald and Ann Jones are residents of Prince George's County, Maryland.

24. Plaintiffs John and Tinna Mahoney are residents of Washington County, Maryland.

7

25. Plaintiff Patricia Gibson is a resident of Charles County, Maryland.

26. Plaintiffs Bruce and Margaret Eisenstein are residents of Baltimore City, Maryland.

1.27.      Defendant Genuine Title, LLC (hereinafter the "Kickback Scheme")."Genuine Title") is a Maryland corporation headquartered in and maintains its principal place of business in Baltimore County, Maryland. Genuine Title solicits and does business with residents throughout the United States.

28. Defendant Dog Days Marketing, LLC is a Maryland Limited Liability Company with its principal place of business in Baltimore County, Maryland.

29. Defendant Brandon Glickstein, Inc. is a Maryland corporation with its principal place of business in Baltimore County, Maryland.

30. Defendant Competitive Advantage Media Group, LLC is a Maryland Limited Liability Company with its principal place of business in Baltimore County, Maryland.

31. Defendant Wells Fargo Home Mortgage, Inc. is a division of Wells Fargo Bank, N.A. engaged in the business of consumer lending in Maryland and elsewhere. Over the relevant time frame, Wells Fargo Home Mortgage was a licensed mortgage lender in the State of Maryland.

32. Defendant Wells Fargo Bank, N.A. is a member of the national association of banks doing business throughout the United States and existing under the laws of the State of California. Through its wholly owned division Wells Fargo Home Mortgage, it is engaged in the business of consumer lending in Maryland and elsewhere. Over the relevant time frame, Wells Fargo Home Mortgage was a licensed mortgage lender in the State of Maryland.

33. Defendant Maverick Funding Corp. is a foreign corporation headquartered in the State of New Jersey. It is engaged in the business of consumer lending in Maryland and elsewhere. During the relevant time frame, Maverick Funding Corp. was a licensed mortgage lender in the State of Maryland.

34. Defendant West Town Bank & Trust, also known as West Town Savings Bank is a national banking institution formed in the State of Illinois. During the relevant time frame, West Town Bank & Trust was engaged in the business of consumer lending in Maryland and elsewhere and was licensed in the State of Maryland.

35. Defendant Emery Federal Credit Union is a member owned credit union headquartered in the State of Ohio. During the relevant time frame, Emery Federal Credit Union was engaged in the business of consumer lending in Maryland and elsewhere and was licensed in the State of Maryland.

36. Defendant PNC Mortgage is a division of PNC Bank, N.A. and is engaged in the business of consumer lending in Maryland and elsewhere.

37. Defendant PNC Bank, N.A. is a member of the national association of banks doing business throughout the United States and existing under the laws of the State of Delaware. During the relevant time frame, PNC Bank, N.A., through its division PNC Mortgage was engaged in the business of consumer lending in Maryland and elsewhere.

38. Defendant Met Life Home Loans, LLC is a division of MetLife Bank, N.A. and is engaged in the business of consumer lending in Maryland and elsewhere.

39. Defendant Met Life Bank, N.A. is a member of the national association of banks doing business throughout the United States. During the relevant time frame, MetLife Bank

N.A. through its wholly owned division Met Life Home Loans, LLC was engaged in the business of consumer lending in Maryland and elsewhere.

40. Defendant Net Equity Financial, Inc. is a corporation formed in the State of Maryland. During the relevant time frame, Net Equity Financial, Inc. was engaged in the business of consumer lending in Maryland and elsewhere and was licensed in the State of Maryland.

41. Defendant Eagle National Bank is a national banking association based in the State of Pennsylvania. During the relevant time frame, Eagle National Bank was engaged in the business of consumer lending in Maryland and elsewhere and was licensed in the State of Maryland.

42. Defendant E Mortgage Management, LLC is a corporation formed in the State of New Jersey. During the relevant time frame, E Mortgage Management, LLC was engaged in the business of consumer lending in Maryland and elsewhere and was licensed in the State of Maryland.

43. Defendant Bank of America, N.A. is a member of the national association of banks doing business throughout the United States. During the relevant time frame, Bank of America N.A. was engaged in the business of consumer lending in Maryland and elsewhere.

**JURISDICTION AND VENUE**

44. This Court has subject matter over this action pursuant to 28 U.S.C. § 1331.

45. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in Maryland and because Genuine Title systematically and continually transacted business in this District during the applicable time period.

**FACTUAL ALLEGATIONS FOR INDIVIDUAL AND CLASS RELIEF**

10

46. 12 U.S.C. 2607 states in relevant part:

(a) Business Referrals. No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

(b) Splitting charges. No person shall give and no person shall accept any portion, split or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving federally related mortgage loan other than for services actually performed.

47. The purpose of 12 U.S.C. § 2607 is to eliminate payment of unearned fees in connection with settlement services provided in federally related mortgage transactions and to protect consumers from unnecessarily high settlement charges caused by certain abusive practices. See 12 U.S.C. § 2601.

48. Genuine Title is a title services company, licensed under the laws of various states, including Maryland, and regulated by the Maryland Insurance Commissioner.

49. At all times mentioned, the Defendant Lenders' employees and/or agents were licensed mortgage brokers (collectively referred to herein as "Referring Brokers"), and at all relevant times were acting within scope of the business relationship and duties of their employment on behalf of Defendant Lenders, specifically seeking borrowers and securing loans for residential mortgages through Defendant Lenders. Said residential mortgages and the relationships established as a result were for the benefit of Defendant Lenders.

50. In connection with the real estate settlements involved herein, the Defendant Lenders' employees and/or agents received and accepted cash payments, free marketing materials

**Formatted:** List Paragraph, Right: 1", Line spacing: single, No bullets or numbering

and other things of value from Genuine Defendants in exchange for referral of Genuine Title to borrowers for title and settlement services.

**Free Marketing Materials in Exchange for Referrals**

51. Genuine Defendants purchased sales leads and hired printing and/or mailing services to print and mail marketing materials for mortgage brokers in exchange for referrals. The marketing materials would contain the Referring Broker's name and lending institution. The marketing materials included letters to people with mortgages in which the Referring Brokers would suggest refinancing with Defendant Lenders and provide their contact information (hereinafter "Free Marketing Materials").

52. Free Marketing Materials were printed and provided at the expense of Genuine Title to Referring Brokers employed by Defendant Lenders.

53. Specifically, Genuine Defendants paid for the set-up, printing and mailing of letters to persons with mortgages suggesting and/or informing the borrowers of an opportunity to refinance their mortgage with the Referring Brokers. See Exhibit 1. (*an example of a Wells Fargo marketing piece paid for by Genuine Title*).

54. The potential borrowers to whom these letters were addressed were sourced through sales leads purchased by Genuine Defendants and provided to the Printing Companies by Genuine Title for the benefit of the Referring Brokers.  The expense of these letters was another illegal benefit to Referring Brokers for which the Referring Brokers provided no services of value, but instead referrals of clients and/or a promise to refer future clients.

55. Genuine Defendants would instruct the Printing Companies to use a varying number of leads and produce a varying number of mail pieces for each job. Upon information and

belief, the number of leads and pieces Genuine Title requested correlates to the volume of business referred to Genuine Title by the referring broker.

56. Upon completion of the job, the Printing Companies were instructed to mail the marketing pieces directly to the Referring Brokers, an invoice was sent to Genuine Title and Genuine Defendants would remit payment to the Printing Company for the Referring Brokers' marketing materials and for the postage required for the mailing.  See Exhibit 2.

57. Genuine Defendants also provided Free Marketing Materials with an understanding and agreement that the Referring Brokers receiving the Free Marketing Materials would refer borrowers to Genuine Title for real estate settlement services, including performing a title search and procuring title insurance.

**Cash Payments in Exchange for Referrals**

58. Not only did the Genuine Defendants provide Referring Brokers with Free Marketing Materials, Genuine Title Defendants also paid cash directly to the Referring Brokers in exchange for referrals (hereinafter "Referring Cash").

59. Genuine Title paid the Printing Companies for Free Marketing Materials from its operating account. However, to avoid detection, Genuine Title began using sham companies to serve as conduits to make the illegal cash payments in an attempt to avoid detection by regulators, plaintiffs and the public.

60. The payments vary in amount, and upon information and belief, correlate to the volume of referrals to Genuine Title by the Referring Brokers.

61. In order to disguise receipt of Referring Cash payments, some Referring Brokers created shell companies to receive the Referring Cash payments. The shell companies had no business purpose except to service as a conduit for the Referring Cash Payments.

62. When regulators began to investigate Genuine Title, Genuine Title drafted sham Title Services Agreements with the intent to disguise Referring Cash payments as legitimate fees for alleged services provided by Referring Brokers and back-dated said agreements. However, the Referring Cash payments were not made in accordance with the fee schedule in the Title Services Agreements.

63. In some instances, the Referring Cash was paid to Referring Brokers pursuant to sham Title Services Agreements in which Genuine Title agreed to pay the referring brokers for title services that were not, in fact, performed.   The recitation of payment for non-existence title services disguised the fact that the payments were actually for illegal Referring Cash payments.   *See Title Services Agreement attached hereto as Exhibit 3.* These illegal Referring Cash Payments were made to compensate Referring Brokers for referrals received in the past or to induce additional referrals in the future.

64. As previously stated, in an attempt to legitimize this illegal practice, Genuine Title principals contacted Referring Brokers in October 2013, presenting to the Referring Brokers a Title Services Agreement to sign and falsely backdate to the time period in which said Referring Brokers were receiving Referring Cash from Genuine Defendants. See Exhibit 3. (same as previous).

**The Kickback Scheme**

65. Genuine Defendants and the Defendant Lenders through Referring Brokers created an elaborate scheme by which Defendants disguised the kickbacks and the Kickback Scheme.

66. In or about 2006, Brandon Glickstein, one of Genuine Title's marketing and account representatives, formed Brandon Glickstein, Inc. for the purpose of "advertising and

*marketing and to engage in any other lawful purpose and business." See relevant SDAT Records, attached hereto as Exhibit 4.*

67. Brandon Glickstein, Inc. was one of the conduits through which Genuine Title contracted with vendors to provide Free Marketing Materials for Referring Brokers.  From 2010 to 2013, Genuine Title paid Brandon Glickstein, Inc. more than $3,000,000.00 for the use and benefit of Referring Brokers.

68. In turn, Brandon Glickstein, Inc. made numerous payments to printing and direct mailing companies, including but not limited to F&N Mailing Services, Capital Mailing Services, Inc. and Direct Mail Marketing (collectively "Printing Companies").

69. Plaintiffs ~~incorporate~~believe and therefore aver, it was Genuine Title employee, Ken Bartz, and Genuine Title owner, Jay Zuckerberg that most often corresponded with the Printing Companies including approving proofs and instructing the Printing Companies on how many marketing pieces were to be completed for each Referring Broker.

70. Not only did payment for the Free Marketing Materials come from Brandon Glickstein, Inc.'s account, but also Referring Cash. Routinely, payments were made from the Brandon Glickstein, Inc. banking account to individuals who were employed by Defendant Lenders at the time of the payment. The Referring Cash payments varied month to month based on volume of settlements generated by the Referring Brokers.

71. On or about May 21, 2009, Brandon Glickstein formed another sham company, Competitive Advantage Media Group, LLC (hereinafter "CAM"). The Resident Agent for CAM was Jonathan S. Bach, Esq., the in-house attorney for Genuine Title. Additionally, the address for CAM was the same physical address of Genuine Title. However, on or about May 13, 2013, CAM changed its Resident Agent and Resident

15

Agent's address to Michael N. Mercurio at 8171 Maple Lawn Boulevard, Suite 200, Fulton, Maryland 20759. *See relevant SDAT Records and Genuine Title Contact List. collectively attached hereto as Exhibits 5 & 6.*

72. Genuine Title also paid CAM as a conduit for Free Marketing Materials and Referring Cash to various brokers and loan officers employed by Defendant Lenders who were referring federally related mortgage loans to Genuine Title.

73. Upon information and belief, Genuine Title also created and used Defendant Dog Days Marketing Company, LLC as a conduit for paying for Free Marketing Materials and Referring Cash to various brokers and loan officers employed by Defendant Lenders.

74. Brandon Glickstein, Inc., CAM and Dog Days Marketing Company, LLC are sham marketing companies formed by principals of Genuine Title (collectively referred to as "Genuine Sham Marketing Companies"). Plaintiffs believe, and therefore aver that these companies were formed solely to facilitate illegal payments and kickbacks to Referring Brokers employed by Defendant Lenders to compensate them for referring settlements to Genuine Title.

75. The Genuine Sham Marketing Companies did not have their own office space and all of the companies shared a resident agent, principal and/or employee with Genuine Title.

**Injury to Plaintiffs**

76. Plaintiffs were charged for settlement services related to their federally related mortgage by Genuine Title while Defendants were engaging in the Kickback Scheme.

77. Congress enacted RESPA in 1974 as a response to the abuses in the real estate settlement process. Congress found that kickbacks and unearned fees in the settlement process resulted in unnecessarily high settlement charges.

78. As a result of the Kickback Scheme in the instant case, Plaintiffs were deprived of kickback free settlement services and process as required by 12 U.S.C. § 2607.

79. 12 U.S.C. § 2607(d)(2) states in relevant part:

"Any person or persons who violate the prohibitions or limitations of [12 USC § 2607] shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service."

80. 12 U.S.C. § 2607(d)(5) further states:

"In any private action brought pursuant to this subsection, the court may award to the prevailing party the court costs of the action together with reasonable attorneys' fees."

## FACTS FOR INDIVIDUAL CLASS REPRESENTATIVES

81. Each Plaintiff in this case was a victim of the Kickback Scheme as described in the above stated paragraphs.

82. All Plaintiffs learned of the illegal kickbacks less than one year prior to filing of the Complaint and could not have known about the Kickback Scheme until contacted by undersigned counsel.

83. The transactions of the Plaintiffs and the course of events thereafter exemplify the working of the Kickback Scheme, and are typical of the transactions involving all members of the proposed class.

**Wells Fargo Home Mortgage, Inc. and Wells Fargo Bank, N.A.**

84. From 2009 until approximately early 2014, licensed mortgage brokers employed by Wells Fargo Bank, N.A. and Wells Fargo Home Mortgage Division (Defendants collectively referred to herein as "Wells Fargo") received Free Marketing Materials and/or Referring Cash from Genuine Defendants in exchange for referrals of Wells Fargo

borrowers to Genuine Title for settlement services. See Exhibit 7. (*Sample of Marketing Materials printed for Wells Fargo brokers*).

85. In exchange for referrals, Genuine Defendants remitted payment for Wells Fargo mortgage brokers' marketing materials in violation of RESPA. See Exhibit 7. (same as last Exhibit).

86. In addition to Free Marketing Materials, Wells Fargo brokers, including, but not limited to Todd Cohen and Marcus Nole, received Referring Cash from Genuine Defendants in exchange for referrals. *See Exhibit 8.*

87. In or about October 2013, Damon M. Oliver obtained a residential mortgage loan from Wells Fargo. Plaintiff Oliver was referred to and settled with Genuine Title on October 24, 2013.

88. In or about November 2013, Betty M. Howard obtained a residential mortgage loan from Wells Fargo. Plaintiff Howard was referred to and settled with Genuine Title on November 19, 2013.

89. In or about October 2013, Clayton J. Anthony obtained a residential mortgage loan from Wells Fargo. Plaintiff Anthony was referred to and settled with Genuine Title on October 4, 2013.

90. Wells Fargo arranged for Plaintiffs Oliver, Howard, and Anthony to use Genuine Title for title and settlement services in accordance with Genuine Title and Wells Fargo brokers' understanding that the brokers would receive Free Marketing Materials and/or Referring Cash in exchange for referrals to Genuine Title for title and settlement services.

91. Plaintiffs Oliver, Howard, and Anthony did, in fact use Genuine Title for settlement services and Plaintiffs paid for said settlement services.

92. As a direct and proximate cause of the actions of the Defendants, Plaintiffs Oliver, Howard, and Anthony and other Class Members similarly situated were deprived of impartial and fair competition.

**Maverick Funding Corp.**

93. From 2009 until approximately early 2014, licensed mortgage brokers employed by Maverick Funding Corp. ("Maverick"), a mortgage lender providing residential lending to borrowers, received Free Marketing Materials and/or Referring Cash from Genuine Defendants in exchange for referrals of Maverick borrowers to Genuine Title for settlement services.

94. Since 2009, William "Bill" Richardson was employed as a licensed mortgage broker by Maverick.

95. In 2012 and 2013, Mr. Richardson received more than $168,000 in payments from Genuine Title for referrals to Genuine Title. Mr. Richardson also received payment from Sham Marketing Companies in the form of cash and/or payment for tickets to Ravens football games. *See Exhibit 9 (checks showing payment from Brandon Glickstein, Inc. to Bill Richardson for referrals to Genuine Title).*

96. Genuine Title paid Mr. Richardson Referring Cash in exchange for Mr. Richardson sending Maverick borrowers to Genuine Title for settlement and title services.

97. Neither Maverick nor Mr. Richardson actually provided any material work or title services for Genuine Title reasonably related to the compensation, the compensation was in fact for the referrals.

19

98. In or about November 2013, Janice Manuel obtained a residential mortgage loan from Maverick. Plaintiff Manuel was referred to and settled with Genuine Title on November 22, 2013.

99. In or about March 2013, Eric Haynes obtained a residential mortgage loan from Maverick. Plaintiff Haynes was referred to and used Genuine Title for title and settlement services. Plaintiffs Haynes settled with Genuine Title on March 19, 2013.

100. In or about September 2012, Joseph J. Quinn obtained a residential mortgage loan from Maverick. Plaintiff Quinn was referred to and used Genuine Title for title and settlement services. Plaintiff Quinn settled on September 29, 2012.

101. Maverick arranged for Plaintiffs Manuel, Haynes and Quinn to use Genuine Title for title and settlement services in accordance with Genuine Title and Maverick brokers' understanding that brokers would receive Free Marketing Materials and/or Referring Cash as quid pro quo for referrals to Genuine Title.

102. Plaintiffs Manuel, Haynes and Quinn did, in fact use Genuine Title for settlement services and Plaintiffs paid for said settlement services.

103. As a direct and proximate cause of the actions of the Defendants, Plaintiffs Manuel, Haynes and Quinn and other Class Members similarly situated were deprived of impartial and fair competition between settlement service providers in violation of RESPA.

**West Town Bank & Trust, a/k/a West Town Savings Bank**

104. From 2009 until approximately early 2014, licensed mortgage brokers employed by West Town Savings Bank & Trust, also known as West Town Savings Bank ("West Town"), a mortgage lender providing residential lending to borrowers, received Free Marketing

Materials and/or Referring Cash from Genuine Defendants in exchange for referrals of West Town borrowers to Genuine Title for settlement services.

105.   Christopher S. Casazza and Brent Erickson were employed as licensed mortgage brokers by West Town. Casazza and Erickson had been employed by West Town since 2010.

106.   Casazza and Erickson received Referring Cash payments from Genuine Sham Marketing Companies. *See Exhibit 10 (checks showing payment from Brandon Glickstein, Inc. to Chris Casazza and Jani Erickson paid to the order of Brent Erickson).*

107.   Genuine Title paid Casazza and Erickson Referring Cash in exchange for referring West Town borrowers to Genuine Title for settlement and title services.

108.   In 2013, Genuine Title paid $10,000.00 to West Town broker Craig Arman, paid to the order of Robin Arman[1], in exchange for referring West Town borrowers to Genuine Title for settlement and title services.

109.   West Town, Casazza, Erickson or Arman did not actually provide material work or title services for Genuine Title reasonably related to the compensation.

110.   In or about May 2011, Deloris F. Woods obtained a residential mortgage loan from West Town. Plaintiff Woods used Genuine Title for title and settlement services. Plaintiff Woods settled May 23, 2011.

111.   In or about January 2011, Jameson and Katherine Cooper obtained a residential mortgage loan from West Town. Plaintiffs Cooper used Genuine Title for title and settlement services. Plaintiffs Cooper settled January 4, 2011.

---

[1] Upon information and belief, Robin Arman is Mr. Arman's spouse.

112.   In or about August 2011, Geraldine Walters obtained a residential mortgage loan from West Town. Plaintiff Walters used Genuine Title for title and settlement services. Plaintiff Walters settled August 20, 2011.

113.   West Town arranged for Plaintiffs Woods, Cooper and Walters to use Genuine Title for title and settlement services in accordance with Genuine Title and West Town brokers' understanding that brokers would receive Free Marketing Materials and/or Referring Cash as quid pro quo for referrals to Genuine Title.

114.   Plaintiffs Woods, Cooper and Walters did, in fact use Genuine Title for settlement services and Plaintiffs paid for said settlement services.

115.   As a direct and proximate cause of the actions of the Defendants, Plaintiffs Woods, Cooper and Walters and other Class Members similarly situated were deprived of impartial and fair competition between settlement service providers in violation of RESPA.

**Emery Federal Credit Union**

Comment [NM1]:

Comment [NM2]:

Comment [NM3]:

116.   From 2009 until approximately early 2014, licensed mortgage brokers employed by Emery Federal Credit Union ("Emery"), a mortgage lender providing residential lending to borrowers, received Free Marketing Materials and/or Referring Cash from Genuine Defendants in exchange for referrals of Emery borrowers to Genuine Title for settlement services.

117.   During the relevant time period, Adam Mandelberg, Gary Klopp and Paul Ellis were employed as mortgage brokers for Emery.

118.   In 2005, Adam Mandelberg created R&R Marketing Group. Genuine Title paid Adam Mandelberg via R&R Marketing Group, LLC approximately $36,000 in 2011, $127,000

in 2012 and approximately $23,000 in 2013 for referrals received by Genuine Title from Emery Federal Credit Union and Adam Mandelberg.

119. In 2009, Gary Klopp created Carroll Abstracts, Inc. The resident agent of said Maryland Corporation was Jonathan S. Bach, Esq., Genuine Title's Title Attorney. Gary Klopp was the sole director of Carroll Abstracts, Inc. Genuine Title paid Carroll Abstracts, Inc. approximately $58,000 in 2011 and approximately $185,000 in 2012. Carroll Abstracts, Inc. was forfeited in 2011. In 2012, Gary Klopp created All County Settlements, LLC. In 2013, Genuine Title paid All County Settlements, LLC approximately $54,000.

120. Adam Ellis created Mystion Abstract Inc. in 2012. In 2012, Genuine Title paid Mystion Abstracts more than $70,000.

121. R&R Marketing, LLC, Carroll Abstracts, Inc., All County Settlements, LLC and Mystion Abstracts Inc. were sham companies created by Emery brokers, Mandelberg, Klopp, and Ellis for the purpose of disguising illegal kickbacks as legitimate payments for title services when in fact, they were not providing any material work or services for Genuine Title.

122. In addition to Mandelburg, Klopp and Ellis, Genuine Title Defendants paid other Emery brokers Referring Cash in exchange for referrals, including, but not limited to Oday Marogi and William Furgione in 2012.

123. In or about May 2012, Steven A. Messina obtained a residential mortgage loan from Emery.

124. Emery arranged for Plaintiff Messina to use Genuine Title for title and settlement services in accordance with Genuine Title and Emery brokers' understanding that brokers

would receive Free Marketing Materials and/or Referring Cash as quid pro quo for referrals to Genuine Title.

125.   Plaintiff Messina was referred to and used Genuine Title for title and settlement services. Plaintiff Messina settled on May 17, 2012. Plaintiff Messina paid Genuine Title for those settlement and title services.

126.   As a direct and proximate cause of the actions of the Defendants, Plaintiff Messina and other Class Members similarly situated were deprived of impartial and fair competition between settlement service providers in violation of RESPA.

**PNC Mortgage and PNC Bank, N.A.**

Comment [NM4]:

127.   From 2009 until approximately early 2014, licensed mortgage brokers employed by PNC Mortgage and PNC Bank, N.A. (Defendants collectively referred to herein as "PNC"), a mortgage lender providing residential lending to borrowers, received Free Marketing Materials and/or Referring Cash from Genuine Defendants in exchange for referrals of PNC borrowers to Genuine Title for settlement services.

128.   During the relevant time period, Thomas Bowen was employed as a licensed mortgage broker by PNC.

129.   Mr. Bowen received Free Marketing Materials from Genuine Defendants in exchange for referrals to Genuine Title. *See Exhibit 11 (Sample of a Marketing Material printed for Thomas Bowen).*

130.   Genuine Defendants remitted payment for Mr. Bowen's marketing materials in violation of RESPA. *See Exhibit 12 (Invoice for Thomas Bowen marketing materials and payment for same by Genuine Title).*

131.   In or about June 2010, Rose A. Lease obtained a residential mortgage loan from PNC.

24

132.   PNC arranged for Plaintiff Lease to use Genuine Title for title and settlement services in accordance with Genuine Title and PNC's brokers' understanding that the brokers would receive Free Marketing Materials and/or Referring Cash in exchange for referrals to Genuine Title for title and settlement services.

133.   Plaintiff Lease did, in fact use Genuine Title for settlement services and settled on June 23, 2010. Plaintiff Lease paid Genuine Title for those settlement and title services.

134.   As a direct and proximate cause of the actions of the Defendants, Plaintiff Lease and other Class Members similarly situated were deprived of impartial and fair competition between settlement service providers in violation of RESPA.

**MetLife Home Loans, LLC and MetLife Bank, N.A.**

> Comment [NM5]:

135.   From 2009 until approximately early 2014, licensed mortgage brokers employed by MetLife Home Loans, LLC and MetLife Bank, N.A. (Defendants collectively referred to herein as "MetLife") received Free Marketing Materials and/or Referring Cash from Genuine Defendants in exchange for referrals of MetLife borrowers to Genuine Title for settlement services.

136.   During the relevant time period, John Folino was employed as a licensed mortgage broker by MetLife.

137.   Folino received Free Marketing Materials from Genuine Defendants in exchange for referrals to Genuine Title. *See Exhibit 13.* (*Sample of a Marketing Material printed for Folino*)

138.   In exchange for referrals, Genuine Defendants remitted payment for Folino's marketing materials in violation of RESPA. *See Exhibit 14.* (*Invoice for Folino marketing materials and payment for same by Genuine Title*).

139.   In or about February 2011, James and Dana Pipp obtained a residential mortgage loan from MetLife.

140.   In or about October 2009, Lawrence and Concetta Crupi obtained a residential mortgage loan from Metlife.

141.   In or about July 2010, Charles Milburn obtained a residential mortgage loan from Metlife.

142.   MetLife arranged for Plaintiffs Pipp, Crupi and Milburn to use Genuine Title for title and settlement services in accordance with Genuine Title and MetLife brokers' understanding that the brokers would receive Free Marketing Materials and/or Referring Cash in exchange for referrals to Genuine Title for title and settlement services.

143.   Plaintiffs Pipp did, in fact use Genuine Title for settlement services and settled on February 8, 2011. Plaintiffs Pipp paid Genuine Title for those settlement and title services.

144.   Plaintiffs Crupi did, in fact use Genuine Title for settlement services and settled on October 19, 2009. Plaintiffs Crupi paid Genuine Title for those settlement and title services.

145.   Plaintiff Milburn did, in fact use Genuine Title for settlement services and settled on July 22, 2010. Plaintiff Milburn paid Genuine Title for those settlement and title services.

146.   As a direct and proximate cause of the actions of the Defendants, Plaintiffs Pipp, Crupi, Milburn and other Class Members similarly situated were deprived of impartial and fair competition between settlement service providers in violation of RESPA.

**Net Equity Financial, Inc.**

147.   During the relevant time period, William J. Peterson III was the President of Net Equity Financial, Inc. ("Net Equity").

148.   In 2011, Mr. Peterson created BTS Management and Consulting, LLC ("BTS"). In 2012, Genuine Title paid BTS approximately $49,000.

149.   Genuine Title made payments to BTS instead of Mr. Peterson in an attempt to disguise illegal kickbacks as legitimate payments for title services when in fact, neither BTS nor Mr. Peterson were not providing any material work or title services for Genuine Title.

150.   In 2010 to 2011, another licensed mortgage broker, Kate Estep, was employed by Net Equity. In 2011, Kate Estep received Free Marketing materials from Genuine Title.

151.   In or about June 2013, Frank and Sammie Cherry obtained a residential mortgage loan from Net Equity.

152.   Net Equity arranged for Plaintiffs Cherry to use Genuine Title for title and settlement services in accordance with Genuine Title and Net Equity brokers' understanding that brokers would receive Free Marketing Materials and/or Referring Cash as quid pro quo for referrals to Genuine Title.

153.   Plaintiffs Cherry used Genuine Title for title and settlement services and settled June 17, 2013.

154.   In or about April 2012, Helen L. Householder obtained a residential mortgage loan from Net Equity.

155.   Net Equity arranged for Plaintiff Householder to use Genuine Title for title and settlement services in accordance with Genuine Title and Net Equity brokers' understanding that brokers would receive Free Marketing Materials and/or Referring Cash as quid pro quo for referrals to Genuine Title.

27

156.   Plaintiff Householder used Genuine Title for title and settlement services and settled April 30, 2012.

157.   In or about February 2012, Barbara Boyd obtained a residential mortgage loan from Net Equity.

158.   Net Equity arranged for Plaintiff Boyd to use Genuine Title for title and settlement services in accordance with Genuine Title and Net Equity brokers' understanding that brokers would receive Free Marketing Materials and/or Referring Cash as quid pro quo for referrals to Genuine Title.

159.   Plaintiff Boyd used Genuine Title for title and settlement services and settled February 28, 2012.

160.   Plaintiffs Cherry, Householder and Boyd did, in fact use Genuine Title for settlement and title services and Plaintiffs Cherry, Householder and Boyd paid for said settlement and title services.

161.   As a direct and proximate cause of the actions of the Defendants, Plaintiffs Cherry, Householder and Boyd and other Class Members similarly situated were deprived of impartial and fair competition between settlement service providers in violation of RESPA.

**Eagle National Bank**

162.   Beginning in 2009 and upon information and belief continuing until on or about early 2014 based upon Genuine Defendants' continuing pattern of practice, licensed mortgage brokers employed by Eagle National Bank (hereinafter "Eagle National"), a mortgage lender providing residential lending to borrowers, received Free Marketing Materials

from Genuine Defendants in exchange for referrals of Eagle National borrowers to Genuine Title for settlement services.

163. In or about October, 2010, Edward & Vickie Fangman obtained a residential mortgage loan from Eagle National in relation to the refinancing of their home.

164. Eagle National referred Plaintiffs Fangman to Genuine Title for title and settlement services.  On the basis of this recommendation, Plaintiffs Fangman used Genuine Title for the title and settlement services for the refinancing of their home.  Plaintiffs Fangman settled on or about October 22, 2012. Plaintiffs Fangman paid Genuine Title for those title and settlement services.

165. In exchange for referrals, Genuine Title provided Free Marketing Materials to Eagle National referring brokers in violation of RESPA. *See Exhibit 15.*

**E Mortgage Management, LLC**

166. Beginning in 2009 and upon information and belief continuing until on or about early 2014 based upon Genuine Defendants' continuing pattern of practice, E Mortgage Management, LLC ("E Mortgage") received Free Marketing Materials from Genuine Defendants in exchange for referrals of E Mortgage borrowers to Genuine Title for title and settlement services. *See Exhibit 16.*

167. In or about October 2011, Plaintiffs Preston and Beatrice Johnson obtained a residential mortgage loan from E Mortgage.

168. Plaintiffs Johnson were referred to and used Genuine Title for title and settlement services and settled on October 12, 2011.

169. In or about September 2011, Plaintiffs Ann and Gerald Jones obtained a residential mortgage loan from E Mortgage.

29

170.   Plaintiffs Jones were referred to and used Genuine Title for title and settlement services and settled on September 9, 2011.

171.   In or about June 2012, Plaintiffs Tinna and John Mahoney obtained a residential mortgage loan from E Mortgage.

172.   Plaintiffs Mahoney were referred to and used Genuine Title for title and settlement services and settled on June 25, 2012.

173.   Net Equity arranged for Plaintiffs Johnson, Jones and Mahoney to use Genuine Title for title and settlement services in accordance with Genuine Title and Net Equity brokers' understanding that brokers would receive Free Marketing Materials and/or Referring Cash as quid pro quo for referrals to Genuine Title.

174.   Plaintiffs Johnson, Jones and Mahoney did, in fact use Genuine Title for settlement and title services and paid Genuine Title for those services.

175.   As a direct and proximate cause of the actions of the Defendants, Plaintiffs Johnson, Jones, and Mahoney and other Class Members similarly situated were deprived of impartial and fair competition between settlement service providers in violation of RESPA.

**Bank of America, N.A.**

176.   Beginning in 2009 and upon information and belief continuing until on or about early 2014 based upon Genuine Defendants' continuing pattern of practice, licensed mortgage brokers employed by Bank of America, N.A. ("Bank of America"), a mortgage lender providing residential lending to borrowers, received Free Marketing Materials and/or Referring Cash from Genuine Defendants in exchange for referrals of Bank of America borrowers to Genuine Title for settlement services.

177.   Upon information and belief, Erika Parker was employed by Bank of America during the relevant time period.

178.   Parker received Referring Cash payments from Genuine Sham Marketing Companies. *See Exhibit 17.* (*checks showing payment from Brandon Glickstein, Inc. and Competitive Advantage Media Group to Parker paid to the order of Erika Parker.*)

179.   In or about May 2009, Patricia Gibson obtained a residential mortgage loan from Bank of America in relation to the refinancing of her home.

180.   Bank of America referred Plaintiff Gibson to Genuine Title for title and settlement services.  On the basis of this recommendation, Plaintiff Gibson used Genuine Title for the title and settlement services for the refinancing of their home.  Plaintiff Gibson settled on or about May 21, 2009. Plaintiff Gibson paid Genuine Title for those title and settlement services.

181.   In or about October, 2010, Bruce and Margaret Eisenstein obtained a residential mortgage loan from Bank of America in relation to the refinancing of their home.

182.   Bank of America referred Plaintiffs Eisenstein to Genuine Title for title and settlement services.  On the basis of this recommendation, Plaintiffs Eisenstein used Genuine Title for the title and settlement services for the refinancing of their home.  Plaintiffs Eisenstein settled on or about October 20, 2010. Plaintiffs Eisenstein paid Genuine Title for those title and settlement services.

183.   As a direct and proximate cause of the actions of the Defendants, Plaintiffs Gibson, and Eisenstein and other Class Members similarly situated were deprived of impartial and fair competition between settlement service providers in violation of RESPA.

## CLASS ACTION ALLEGATIONS

31

2.184. The allegations in the above stated paragraphs are incorporated by reference as if fully restated herein.

3.   Class Plaintiffs are residents of Carroll County, MD.

185.   Class definition: The Plaintiffs and Class Members are borrowers who retained Genuine Title for settlement and title services and Defendant Lenders on the purchase and/or refinance of their residence from 2009 to 2014.

4.186. The Plaintiffs bring this action pursuant to Maryland Rule 2-231 as a class action on his own behalf and on behalf of the entire class of people themselves and all other similarly situated. individuals pursuant to Fed. R. Civ. P. 23.

5.   Genuine Title, LLC (hereinafter "Genuine Title") is headquartered and maintains its principal place of business in Baltimore County, MD.

6.   Jurisdiction and venue are proper in this court pursuant to 4-401(d)(1)(ii), 6-102, 6-103 and 6-201 of the Courts and Judicial Proceedings Article, Annotated Code of Maryland.

MAINTAINABILITY AND DESIRABILITY OF CLASS ACTION

7.   Plaintiffs incorporate the above stated paragraphs as if restated herein.

187.   There are common The questions of law or and fact in this action that are uniquely common to all members of the Class.

8.188. There are questions of law and fact which are not only common to the class, most notably that each member was either involved in or charged excess fees associated with the Kickback Scheme, Class, but which predominate over any questions solely question affecting only individual members of the Class. Class members.   The predominating questions include, but are not limited to:

a.   Whether Defendant Lenders and their agents and/or representatives received unearned fees and illegal kickbacks from Genuine Title and Sham Marketing Companies for referral of business to Genuine Title;

32

  b. Whether payments to Defendant Lenders and their agents and/or representatives violated RESPA;

  c. Whether Defendants actively concealed the Kickback Scheme to avoid detection by Plaintiffs and Class Members;

  d. Whether the Plaintiffs and the Class are entitled to treble damages under RESPA;

  e. Whether the Plaintiffs and the Class are entitled to attorneys' fees and expenses under RESPA.

189. The claims of the ~~Class~~ Plaintiffs ~~as a representative party~~ are typical ~~to the claim of the class.~~ of the claims or defenses of the respective Class Members.

~~9.~~190. The ~~Class~~ Plaintiffs / Class Representatives will fairly and adequately protect the interests of the ~~class~~Class. The interests of the named Plaintiffs and all other members of the Class are identical.

> **Formatted:** Justified, Indent: Hanging: 0.44", Line spacing: Double

191. ~~This action is properly maintained as a class action under Maryland Rule 2-231(b)(1)(A) in that separate~~Plaintiffs' counsel have combined substantial experience in complex litigation and class action proceedings and will adequately represent the Class's interests.

192. The Class consists, upon information and belief, of approximately 4,000 to 5,000 individuals, and thus are so numerous that joinder of all members is impracticable.

~~10.~~193. Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for ~~Genuine Title~~Defendants.

> **Formatted:** Justified, Indent: Hanging: 0.44", Line spacing: Double

~~11.~~ This action ~~is also properly maintainable as a class action pursuant to Maryland Rule 2-231(b)(1)(B) in that separate actions by individual members of the class would create a risk of adjudications with respect to individual members of the class which would, as a~~

practical matter, be dispositive of the interests of other members not party to the adjudications, or would substantially impair or impede their ability to protect themselves.

~~12.~~194.   This action also is properly maintained under Maryland Rule 2-231(b)(3), in ~~that~~entails questions of law ~~or~~and fact common to Class members ~~of the class~~that predominate over any questions affecting only individual ~~members~~Plaintiffs, and, therefore, a class action is superior to other available methods ~~for the~~of fair and efficient adjudication of this ~~controversy between the class and Defendant Genuine Title.~~ litigation.

~~13. The members of Plaintiffs' class are so numerous that their joinder is impracticable.  The Class consists of all persons who received and were charged for real estate settlement services from Genuine Title between 2007 and 2011.~~

~~14.  Plaintiffs believe and therefore aver that their claims are typical of the Class in that all members were charged for real estate settlement services provided by Genuine Title during the Kickback Scheme.~~

~~15. This action is properly maintained as a call action under Maryland Rule 2-231(b)(2) in that Defendant Genuine Title has acted or refused to act as hereinafter more specifically alleged, on grounds which are generally applicable to the class.~~

195.   ~~Plaintiffs believe and therefore aver that a class action is superior to other available methods of adjudicating the alleged controversy, especially considering the size and common interests~~Most members of the Class are unaware of their rights to prosecute a claim against Defendants.

~~16.~~   No member of the Class~~, as well as the fact that the amount at stake for individual class members makes it unlikely that said individuals will pursue a separate action.~~ has a substantial

~~17.~~196.   ~~The~~commonality of issues of law and fact substantially diminishes the interest ~~of members of the class~~in individually controlling the prosecution of ~~separate actions. Many of the members are unaware of their rights to prosecute a claim against Defendant Genuine Title.  There has been little, if any, litigation already commenced by members of~~

34

the class to determine the questions presented herein. It is desirable that the claims be concentrated in this forum due to the fact that many witnesses reside in this jurisdiction. This class action can be managed without undue difficultly because Plaintiffs will vigorously pursue the interests of the class by virtue of its experience with Genuine Title, as well as the specific damages they incurred as result of the Kickback Scheme. a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

### CLAIMS OF INDIVIDUAL PLAINTIFFS

18. Plaintiffs incorporate the above stated paragraphs as if restated herein.

19. On or about October 22, 2010, Plaintiffs obtained a residential mortgage loan from Eagle National Bank of 3 Dickenson Drive, Suite 200, Chaddis Ford, PA, 19317 (hereinafter "Eagle National").

20. During the settlement process for the aforementioned loan, Genuine Title performed certain settlement services, including performing a title search and procuring title insurance, and payment for these services was provided by Plaintiffs.

21. Plaintiffs believe and therefore aver that, prior to its providing of real estate settlement services to Plaintiffs and Class members, Genuine Title entered into an agreement with CAM marketing (hereinafter "CAM").

22. Plaintiffs believe and therefore aver that Genuine Title paid CAM to produce marketing materials for free or at a drastically-reduced rate (collectively "Free Marketing Materials") for various loan officers who were part of the mortgage lending process.

23. Plaintiffs believe and therefore aver that, in return for the Free Marketing Materials, the aforementioned loan officers would refer individuals, including Plaintiffs and Class members, to Genuine Title, which would then provide real estate settlement services.

24. Plaintiffs believe and therefore aver that on many occasions Genuine Title would actually pay cash directly to loan officers in return for referrals.

25. Plaintiffs believe and therefore aver that Genuine Title artificially inflated the settlement charges paid by Plaintiffs to cover the cost of the Kickback Scheme.

26. Genuine Title did not disclose to Plaintiffs the purpose for the inflated settlement charges, nor did it disclose its relationship with CAM or others involved in the Kickback Scheme.

27. No service or thing of value was provided in exchange for the inflated settlement charges, other than as a kickback for the referral of business to Genuine Title.

## COUNT I
### Violation of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2607(a) and (b) and MD Code, Real Property § 14-127

28.1.   Plaintiffs incorporate the above stated paragraphs as if restated herein.

197.   Plaintiffs incorporate the above stated paragraphs as if restated herein.

198.   All transactions at issue in the instant complaint are incident to or part of real estate settlement services involving federally related mortgage loans and thereby are subject to the provisions of RESPA, 12 U.S.C. § 2601, et seq.

199.   As a title service provider, Genuine Title is subject to the provisions of RESPA, 12 U.S.C. § 2601, et seq.

200.   As lenders and/or servicers of federally related mortgage loans, Defendant Lenders are subject to the provisions of RESPA, 12 U.S.C. § 2601, et seq.

201.   Genuine Defendants paid kickbacks to CAM, loan officers, and other individualsDefendant Lenders Referring Cash and/or provided Free Marketing materials in exchange for referrals of business to Genuine Title in violation of RESPA, 12. U.S.C. § 2607(a) and (b).

29.202.   Defendant Lenders by and through their agents and/or employees received Free Marketing Materials and/or Referring Cash for referrals of business as part of real estate settlement services provided to Plaintiffs and Class members, in violation of RESPA, 12 U.S.C. § 2607(a) and (b), and MD Code, Real Property § 14-127.

30.203.     All loans referred to Genuine Title as part of the Kickback Scheme were secured by first or subordinate liens on residential real property and were made in whole or in part by a lenderDefendant Lenders and/or their affiliates whose deposits or accounts are insured by the Federal Government and/or who is regulated by an agency of the Federal Government.

204.   The payment and/or arranging of payment of kickbacks to the Defendant Lenders by Genuine Defendants and Defendant Lenders' receipt thereof constituted a violation of 8(a) of RESPA, which prohibits the payment of referral fees or kickbacks in connection with the origination of federally-related mortgage loans.

205.   Payments by Genuine Defendants to Defendant Lenders and Defendant Lenders' receipt thereof constituted a violation of 8(b), which prohibits the splitting of fees in connection with the origination of federal related mortgage loans.

206.   On or around the time of settlement, the kickbacks were paid by Genuine Title were through Genuine Sham Marketing Companies or pursuant to sham title services agreements drafted to conceal the Kickback Scheme.

31.207.     The kickbacks paid by Genuine Defendants to Defendant Lenders were also made solely for the purpose of Genuine Title receiving referrals, and no other service wastitle services were actually performed by Defendant Lenders or Genuine Sham Marketing Companies in connection with these payments and/or materials, in violation of 12 U.S.C. § 2607(b).

208.   Genuine Title's relationships with CAM,Title actively concealed the loan officers, kickbacks paid to Referring Brokers from Plaintiffs and other individuals involved in Class Members, as set forth above.

32.209.      Despite exercising due diligence, the Plaintiffs and Class Members could not have known about the Kickback Scheme do not qualify as affiliated business arrangements, as defineduntil contacted by 12 U.S.C. § 2602undersigned counsel.

33.210.      Even if any or allAs a direct and proximate cause of Genuine Title's relationships were considered an affiliated business arrangement, no disclosure of such an arrangement was made toactions, the Plaintiffs orand Class members, as required by 12 U.S.C.Members used Genuine Title for title and settlement services, paid for said services and were deprived of impartial and fair competition in violation of § 2607(e). of RESPA and MD Code, Real Property § 14-127.

WHEREFORE:

WHEREFORE:

a.   Class Plaintiffs respectfully demand this Court to certify this class action pursuant to Federal Rule of Civil Procedure 23 and set this matter for trial; and

b.   Demand judgment for Plaintiffs and membersMembers of this classClass against Defendant in excess of Seventy-Five Thousand Dollars ($75,000.00) in compensatory and punitiveDefendants and award the Plaintiffs and Class Members an amount equal to:

   1.   Compensatory damages, with totaling $10,000,000.00;

   2.   Treble damages for settlement services charged by Genuine Title, including, but not limited to, title insurance premiums, in an amount equal to three times the amount of any charge paid for such settlement services, pursuant to 12 U.S.C. § 2607(d)(2);

   3.   Reasonable attorneys' fees, interest, and costs; and such

   b.4.Such other and further relief as this Court deems proper.

## COUNT II

38

**Violation of the Maryland Consumer Protection Act (MDCPAMCPA)**

211. Plaintiffs incorporate the above stated paragraphs as if restated herein.

34. Plaintiffs incorporate the above stated paragraphs as if restated herein.

212. Genuine Defendants and Defendant Lenders knowingly concealed payment of kickbacks and their relationships from Plaintiffs and Class Members.

35.213. Genuine Title willfully and deliberately misrepresented costs associated with the settlement process and charged fees to Plaintiffs and Class membersMembers, which were later used to further the Kickback Scheme.

214. Genuine Title's misrepresentationsGenuine Title and Defendant Lenders failed to disclose to Plaintiffs and Class Members that Genuine Title was participating in referring loan officers/banks and Genuine Sham Marketing companies and failed to disclose their affiliated business relationships among other things.

36.215. These omissions constituted unfair and/or deceptive trade practices as defined by MDMaryland Annotated Code, Commercial Law § 13-301.

216. Despite exercising reasonable diligence, the Plaintiffs and Class Members did not, and could not have learned of the illegal kickbacks until contacted by counsel.

37.217. But for Genuine Title's Kickback Scheme, Plaintiffs and Class members were deprived of impartial and fair competition and the costs paid by Plaintiffs and Class members to Genuine Title for settlement services would have been much lower.

38.218. Genuine Title's unfair and/or deceptive trade practices were a direct and proximate cause of the damages sought by Plaintiffs and Class members.

WHEREFORE:

e.a.Class Plaintiffs respectfully demand this Court to certify this class action pursuant to Federal Rule of Civil Procedure 23 and set this matter for trial; and

39

d.b.Demand judgment for Plaintiffs and ~~members~~Members of this ~~class~~Class against ~~Defendant in excess of Seventy-Five Thousand Dollars ($75~~Defendants and award the Plaintiffs and Class Members $10,000,000.00~~)~~ in ~~compensatory and punitive~~ damages, with reasonable attorneys' fees, interest, costs and such other and further relief as this Court deems proper.

~~COUNT III~~

~~Mortgage Fraud~~

~~39. Plaintiffs incorporate the above stated paragraphs as if restated herein.~~

~~40. Genuine Title's willful and deliberate misrepresentations of costs associated with the settlement process and charged to Plaintiffs and Class members were made with the intent that the misrepresentations be relied upon by Plaintiffs and Class members.~~

~~41. Upon information and belief, Genuine Title's misrepresentations occurred during the mortgage lending process, as defined by MD Code, Real Property § 7-401.~~

~~WHEREFORE:~~

~~e.   Class Plaintiffs respectfully demand this Court to certify this class action and set this matter for trial; and~~

~~f.   Demand judgment for Plaintiffs and members of this class against Defendant in excess of Seventy-Five Thousand Dollars ($75,000.00) in compensatory and punitive damages, with interest, costs and such other and further relief as this Court deems proper.~~

~~COUNT IV~~

~~Fraud/Deceit~~

42.1.   ~~Plaintiffs incorporate the above stated paragraphs as if restated herein.~~

~~43. Upon information and belief, Genuine Title made a false representation of a material fact by charging for and failing to disclose the nature of elevated fees which were used to further the Kickback Scheme.~~

~~44. Genuine Title willfully and deliberately misrepresented a material fact and knew of the falsity of the misrepresentation.~~

~~45. Genuine Title intended for Plaintiffs and Class members to rely on its misrepresentations.~~

~~46. Plaintiffs and Class members did so rely and suffered damages as a result.~~

**Formatted:** Body Text, Justified, Line spacing: single

**Formatted:** Justified, Indent: Hanging: 0.44", Line spacing: Double

WHEREFORE:

g.   Class Plaintiffs respectfully demand this Court to certify this class action and set this matter for trial; and

h.   Demand judgment for Plaintiffs and members of this class against Defendant in excess of Seventy-Five Thousand Dollars ($75,000.00) in compensatory and punitive damages, with interest, costs and such other and further relief as this Court deems proper.

## COUNT V
### Constructive Fraud

47. Plaintiffs incorporate the above stated paragraphs as if restated herein.

48. Plaintiffs and Class members employed Genuine Title to provide real estate settlement services on their behalf.

49. Plaintiffs and Class members placed confidence and trust in Genuine Title to act in good faith and with due regard for their interests.

50. By virtue of this relationship, Genuine Title owed a fiduciary duty to Plaintiffs and Class members.

51. Genuine Title breached its fiduciary duty intentionally, with malice, and/or with reckless disregard for Plaintiffs and Class members' rights by failing to disclose the nature of settlement fees, failing to provide information to Plaintiffs and Class members regarding any business affiliations and/or failing to provide something of value in exchange for inflated settlement fees.

52. As a result of the breach of Genuine Title's fiduciary duty, Plaintiffs and Class members suffered damages.

WHEREFORE:

i.   Class Plaintiffs respectfully demand this Court to certify this class action and set this matter for trial; and

j.   Demand judgment for Plaintiffs and members of this class against Defendant in excess of Seventy-Five Thousand Dollars ($75,000.00) in compensatory and punitive damages, with interest, costs and such other and further relief as this Court deems proper.

## COUNT VI
### Civil Conspiracy

53. Plaintiffs incorporate the above stated paragraphs as if restated herein.

41

54. Upon information and belief that Genuine Title made its agreements with CAM, the loan officers and the financial institutions for whom they worked and other individuals in order to accomplish an unlawful or tortious act, including but not limited to the allegations alleged herein.

55. Genuine Title's actions and/or means used to accomplish the unlawful or tortious acts alleged herein resulted in damage to Plaintiffs and Class members.

WHEREFORE:

k.  Class Plaintiffs respectfully demand this Court to certify this class action and set this matter for trial; and

l.  Demand judgment for Plaintiffs and members of this class against Defendant in excess of Seventy-Five Thousand Dollars ($75,000.00) in compensatory and punitive damages, with interest, costs and such other and further relief as this Court deems proper.

Respectfully submitted,

_____ /s/
Michael Paul Smith, Esq. #23685
Natalie Mayo, Esq. #19056
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, MD 21204
(410) 821-0070 / (410) 821-0071 (fax)
Email: nmayo@sgs-law.com
Attorneys Co-Counsel for Class Plaintiff Plaintiffs

_____ /s/
Timothy F. Maloney, Esq. #03381
Joseph, Greenwald & Laake
6404 Ivy Lane
Suite 400

42

Greenbelt, Maryland 20770
(301) 220-2200 / (301) 220-1214 (fax)
Email: tmaloney@jgllaw.com
*Co-Counsel for Plaintiffs*

## **PRAYER FOR JURY TRIAL**

> Formatted: Line spacing: Double

The Plaintiffs hereby request a trial by jury on the foregoing complaintAmended

> Formatted: Line spacing: Double

Complaint.

> Formatted: Line spacing: single

_____   /s/

Michael Paul Smith, Esq. #23685
Natalie Mayo, Esq. #19056
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, MD 21204
(410) 821-0070 / (410) 821-0071 (fax)

Email: nmayo@sgs-law.com

/s/
Timothy F. Maloney, Esq. #03381
Joseph, Greenwald & Laake
6404 Ivy Lane
Suite 400
Greenbelt, Maryland 20770
(301) 220-2200 / (301) 220-1214 (fax)
Email: tmaloney@jgllaw.com
*Co-Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify, this 2nd day of January, 2015, that I served copies of the foregoing First Amended Class Action Complaint, Exhibits and Demand for Jury Trial via this Court's CM/ECF system to counsel of record for the parties.

_____/s/_____
Michael Paul Smith, Esq. #23685
Natalie Mayo, Esq. #19056
Timothy F. Maloney, Esq. #03381

**Formatted:** Font: 11 pt

**Formatted:** Normal, Left, Indent: Left: 0", First line: 0", Line spacing: Double