FILED
LODGED
ENTERED
RECEIVED

MAY 2 4 2016

CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
DEPUTY

United States District Court for
the District of Maryland
Civil Action No. RDB-14-0081

Argued: March 31, 2016

IN THE COURT OF APPEALS

OF MARYLAND

Misc. No. 19

September Term, 2015

EDWARD J. AND VICKI FANGMAN, ET
AL.

v.

GENUINE TITLE, LLC, ET AL.

Barbera, C.J.
*Battaglia
Greene
Adkins
McDonald
Watts
Hotten,

JJ.

Opinion by Watts, J.

Filed: May 20, 2016

*Battaglia, J., now retired, participated in the
hearing and conference of this case while an
active member of this Court; after being recalled
pursuant to the Constitution, Article IV, Section
3A, she also participated in the decision and
adoption of this opinion.

This case involves a purported class action lawsuit in the United States District Court for the District of Maryland ("the federal court") against a settlement and title services company, various mortgage lenders, and alleged sham companies that were formed by the settlement and title services company, for allegedly engaging in a home mortgage kickback scheme in which the settlement and title services company, by itself and through the sham companies, provided cash payments and marketing materials to mortgage brokers who referred clients to the settlement and title services company for settlement services. The federal court certified to this Court the following question of law: "Does Md. Code Ann., Real Prop. [(1974, 2015 Repl. Vol.) ("RP")] § 14-127 imply a private right of action?"

We answer the certified question of law "no" and hold that RP § 14-127 does not contain an express or implied private right of action, as neither RP § 14-127's plain language, legislative history, nor legislative purpose demonstrates any intent on the General Assembly's part to create a private right of action.

## BACKGROUND

In a memorandum opinion accompanying the certification order, the federal court stated the following facts,[1] which we summarize.

---

[1] "Where another court certifies a question of law to this Court, this Court accepts the statement of facts in the certification order." NVR Mortg. Fin., Inc. v. Carlsen, 439 Md. 427, 429 n.2, 96 A.3d 202, 203 n.2 (2014) (citation, brackets, and internal quotation marks omitted)). See also Parler & Wobbler v. Miles & Stockbridge, 359 Md. 671, 681, 756 A.2d 526, 531 (2000) ("[W]e accept the facts as submitted by the certifying court." (Citations omitted)).

Edward J. Fangman and Vicki Fangman (collectively "the Fangmans") seek to represent a class of approximately 4,000 to 5,000 individuals (collectively "Appellants") who, from 2009 to 2014, retained Genuine Title, LLC ("Genuine Title") for settlement and title services and utilized various lenders (collectively "the Lender Appellees") (together with Genuine Title, "Appellees")[2] for the purchase and/or refinancing of their residences. All Appellants allegedly used Genuine Title's settlement and title services as a result of referrals from the Lender Appellees. All of the Lender Appellees are servicers of federally related mortgage loans.

In the second amended complaint,[3] the Fangmans alleged that they and all other class members "were victims of an illegal kickback scheme" in which the Lender Appellees received unearned fees and kickbacks from Genuine Title and "sham companies" that were created by Genuine Title (collectively, "the Genuine Title Appellees") for the purpose of

---

[2]For purposes of proceedings in this Court, the Fangmans and other purported class members have been designated as "Appellants" and Genuine Title and the Lender Appellees have been designated as "Appellees." The Lender Appellees include: Wells Fargo Home Mortgage, Inc.; Wells Fargo, N.A.; West Town Bank & Trust; Emery Federal Credit Union; PNC Mortgage; PNC Bank, N.A.; MetLife Home Loans, LLC; MetLife Bank, N.A.; Net Equity Financial; Eagle National Bank; E Mortgage Management; and JP Morgan Chase Bank.

[3]In the federal court, the Fangmans have filed three amended complaints, adding various plaintiffs and defendants.   The third amended complaint corrected one typographical error and removed allegations against two defendants. As the federal court stated, however, the second amended complaint is the operative complaint because it was the subject of eleven pending motions to dismiss. The motions to dismiss are discussed below. In the second amended complaint, the Fangmans also identified Maverick Funding Corp. and Bank of America, N.A. as defendants; claims against those two defendants, however, were dismissed by separate orders.

distributing the kickbacks.[4]   According to the second amended complaint, the Lender Appellees' employees and/or agents received and accepted cash payments, free marketing materials, and other things of value from the Genuine Title Appellees in exchange for referring borrowers to Genuine Title for settlement and title services.[5]   The Genuine Title Appellees and Lender Appellees allegedly concealed these payments from Appellants and failed to disclose the payments on Appellants' HUD-1 settlement statements. , Additionally, Appellants alleged that Genuine Title and the Lender Appellees failed to disclose that Genuine Title was participating with referring loan officers/banks and with the Genuine Title Appellees, and also failed to disclose their affiliated business relationships.

As some point, regulators began to investigate the alleged scheme.  Appellants alleged that, once the investigation began, Genuine Title drafted and back-dated sham title services agreements for the purpose of disguising cash payments as legitimate fees for alleged services provided.  Appellants alleged that cash payments were not made in accordance with the fee schedule contained in the title services agreement.  For example, in some instances, pursuant to the sham title services agreements, Genuine Title agreed to

---

[4]The alleged sham companies that were created by Genuine Title, also Appellees in this case, include: Brandon Glickstein, Inc.; Dog Days Marketing, LLC; and Competitive Advantage Marketing Group, LLC.  In the second amendment complaint, the Fangmans alleged that these companies do not have their own office space, and that they share a resident agent, principal, and/or employee with Genuine Title.

[5]In the second amended complaint, for all but one of the Lender Appellees, Appellants specifically identified by name at least one referring mortgage broker who they alleged received payments and marketing materials from Genuine Title through the kickback scheme.

make cash payments to referring mortgage brokers for title services that were not actually performed. Appellants alleged that, as a result of the kickback scheme, they were deprived of "kickback[-]free settlement services and process" and their settlement fees would have been "much lower" had the kickback scheme not been in place.

On December 6, 2013, the Fangmans filed in the Circuit Court for Baltimore County an initial class action complaint against Genuine Title. Genuine Title then removed the case to the federal court.[6]  On January 2, 2015, the Fangmans, along with thirty other Appellants, filed the first amended complaint on behalf of themselves and the alleged class, adding as defendants the Genuine Title Appellees and all but one of the Lender Appellees. On May 20, 2015, Appellants filed the second amended complaint, adding as a defendant one Lender Appellee and adding sixteen additional plaintiffs.[7]  In the second amended complaint, Appellants alleged that the Genuine Title Appellees and Lender Appellees violated 12 U.S.C. § 2607(a) and (b), part of the Real Estate Settlement Procedures Act ("RESPA");[8] RP § 14-127; and Md. Code Ann., Com. Law (1975, 2013 Repl. Vol.) ("CL")

---

[6]The federal court's docket, included in the record in this case, states that the notice of removal to the federal court was filed in the federal court on January 10, 2014.

[7]Thus, there were forty-eight identified plaintiffs—the Fangmans and forty-six other plaintiffs.

[8]12 U.S.C. § 2607(a) and (b) of RESPA provide:

(a) Business referrals
No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

(b) Splitting charges

§ 13-301, part of the Maryland Consumer Protection Act.[9]

In response to the second amended complaint, the Genuine Title Appellees and Lender Appellees filed in the federal court eleven separate motions to dismiss. On November 24, 2015, the federal court conducted a hearing on the motions to dismiss.[10] On December 9, 2015, the federal court issued a memorandum opinion in which the federal court, with one exception,[11] denied the motions to dismiss the RESPA claims, granted the motions to dismiss the Maryland Consumer Protection Act claims, and stayed the motions to dismiss the RP § 14-127 claims so that this Court could determine whether RP § 14-127 permits a private right of action.[12] As to the RP § 14-127 claims, the federal court observed "that no Maryland state court decision has resolved the present issue," and thus it was certifying the question of law to this Court. On the same day, December 9, 2015, the

---

No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

[9]CL § 13-301(k) of the Maryland Consumer Protection Act defines unfair or deceptive trade practices.

[10]Genuine Title was not represented at the hearing. Apparently, Genuine Title has ceased doing business. Appellants alleged that Jay Zuckerberg was the owner of Genuine Title. According to the federal court, Zuckerberg is listed as an interested party in the case.

[11]Because Bank of America, N.A. had previously been dismissed from the case, the federal court denied Bank of America, N.A.'s motion to dismiss as moot.

[12]The federal court noted that Appellants and three Appellees—Wells Fargo Home Mortgage, Inc., Wells Fargo, N.A., and JP Morgan Chase Bank—filed joint consent motions to suspend consideration of the respective Appellees' "pending motions while they document a proposed resolution to the claims asserted against" those Appellees. The federal court granted in part and denied in part the joint consent motions, suspending consideration of "all pending motions" filed by Appellees, staying the motions to dismiss as to the RP § 14-127 claims, and granting the motions to dismiss as to the Maryland Consumer Protection Act claims.

federal court issued a certification order and stayed Appellants' claims as to RP § 14-127 in the federal court pending this Court's response.

## DISCUSSION

### The Parties' Contentions

Appellants contend that RP § 14-127 provides an implied private right of action. Appellants argue that RP § 14-127 was enacted to protect a narrow class of individuals—namely, consumers of residential title and settlement services—and that Appellants are in that class for whose benefit RP § 14-127 was enacted; *i.e.*, they are consumers of residential title and settlement services. Appellants assert that the injuries that they suffered—including overcharges, lack of impartiality in the referral, and a reduction of competition among settlement service providers—constitute the exact type of harm that RP § 14-127 was designed to prevent. Appellants maintain that RP § 14-127's language focuses on, and RP § 14-127's purpose is, the protection of consumers in real estate transactions involving land in Maryland. According to Appellants, implying a private right of action under RP § 14-127 is consistent with RP § 14-127's language and purpose.

Appellees[13] respond that there is no evidence that the General Assembly intended to create a private right of action under RP § 14-127 and that there is no basis in law or fact for implying a private right of action. Appellees contend that RP § 14-127 neither identifies

---

[13]As mentioned above, see *supra* note 10, Genuine Title apparently has ceased doing business. As such, we note that the following Appellees filed in this Court a joint brief: Eagle National Bank; PNC Bank, N.A.; Brandon Glickstein, Inc.; Competitive Advantage Media Group, LLC; Dog Days Marketing, LLC; MetLife Bank, N.A.; MetLife Home Loans, LLC; West Town Bank and Trust a/k/a West Town Savings Bank; and Net Equity Financial, Inc. We now refer to these parties as "Appellees."

a specific class of protected individuals nor confers a beneficial right on any specific class of individuals, let alone Appellants. Appellees argue that, on its face, RP § 14-127 does not confer any right at all, and instead is a broad prohibition on individuals who are involved in real estate transactions in Maryland from paying or receiving anything in exchange for settlement business. According to Appellees, RP § 14-127 simply prohibits a certain type of conduct and is designed to protect the public at large, not a narrow, specific class of individuals. Appellees assert that neither RP § 14-127's plain language nor its legislative history supports the position that RP § 14-127's purpose was to create a private right of action. Appellees point out that, when RP § 14-127 was amended in 2010, the General Assembly was aware that RESPA provided a private right of action, yet chose not to provide a similar private right of action under RP § 14-127. Appellees maintain that RP § 14-127's purpose is to criminalize certain conduct; in other words, according to Appellees, RP § 14-127 is a criminal statute with no private right of action.

### Standard of Review

Pursuant to the Maryland Uniform Certification of Questions of Law Act, Md. Code Ann., Cts. & Jud. Proc. (1973, 2013 Repl. Vol.) ("CJP") §§ 12-601 to 12-613, this Court has the power to "answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State." CJP § 12-603. In considering a certified question of law, "this Court's statutorily prescribed role is to determine only questions of Maryland law, not questions of fact. . . . [And], we confine our legal analysis and final determinations of Maryland law to the

questions certified." Parler & Wobbler v. Miles & Stockbridge, 359 Md. 671, 681, 756

A.2d 526, 531 (2000) (citations omitted).

As to statutory interpretation, in Montgomery Cnty. v. Phillips, 445 Md. 55, 62-63,

124 A.3d 188, 192 (2015), we stated that "[t]he cardinal rule of statutory construction is to

ascertain and effectuate the intent of the General Assembly[,]" explaining:

> [T]o determine that purpose or policy, we look first to the language of the
> statute, giving it its natural and ordinary meaning. . . . When the statutory
> language is clear, we need not look beyond the statutory language to
> determine the General Assembly's intent.   If the words of the statute,
> construed according to their common and everyday meaning, are clear and
> unambiguous and express a plain meaning, we will give effect to the statute
> as it is written.  In addition, we neither add nor delete words to a clear and
> unambiguous statute to give it a meaning not reflected by the words the
> General Assembly used or engage in forced or subtle interpretation in an
> attempt to extend or limit the statute's meaning. . . .
>
> If the language of the statute is ambiguous, [] then courts consider not
> only the literal or usual meaning of the words, but their meaning and effect
> in light of the setting, the objectives and purpose of the enactment under
> consideration. . . .
>
> If the true legislative intent cannot be readily determined from the
> statutory language alone, [] we may, and often must, resort to other
> recognized indicia—among other things, the structure of the statute,
> including its title; how the statute relates to other laws; the legislative history,
> including the derivation of the statute, comments and explanations regarding
> it by authoritative sources during the legislative process, and amendments
> proposed or added to it; the general purpose behind the statute; and the
> relative rationality and legal effect of various competing instructions.

(Citation and brackets omitted).

## RP § 14-127

Unabridged, RP § 14-127 currently provides:

(a) *Definitions*. — (1) In this section the following words have the meanings
indicated.

(2) "Consideration" includes:

      (i) A fee;

      (ii) Compensation;

      (iii) A gift, except promotional or advertising materials for general distribution;

      (iv) A thing of value;

      (v) A rebate;

      (vi) A loan; or

      (vii) An advancement of a commission or deposit money.

(3) "License" has the meaning stated in § 10-101 of the Insurance Article.

(4) "Residential real estate transaction" means a transaction involving a federally related mortgage loan as defined in 12 U.S.C. § 2602 and 12 C.F.R. § 1024.2.

(5) "Title insurance producer" has the meaning stated in § 10-101 of the Insurance Article.

(b) *Scope of section.* — This section does not prohibit:

(1) The payment of a commission to a title insurance producer who has a license; or

(2) The referral of a real estate settlement business or a professional fee arrangement between attorneys, if the referral or professional fee arrangement does not violate § 17-605 of the Business Occupations and Professions Article.

(c) *Payment or receipt of consideration prohibited.* — (1) A person who has a connection with the settlement of real estate transactions involving land in the State may not pay to or receive from another any consideration to solicit, obtain, retain, or arrange real estate settlement business.

(2) A person may not be considered to be in violation of paragraph (1) of this subsection solely because that person is a participant in an affiliated business arrangement, as defined in 12 U.S.C. § 2602, and receives consideration as a result of that participation as long as that person complies with 12 U.S.C. § 2607(c)(4), 12 C.F.R. § 1024.15, and Appendix D to 12 C.F.R. Part 1024.

(d) *Compliance with federal law regarding disclosure.* — A person who offers settlement services in connection with residential real estate transactions involving land in the State shall comply with 12 U.S.C. § 2607(c)(4), 12 C.F.R. § 1024.15, and Appendix D to 12 C.F.R. Part 1024, as applicable, regarding disclosures of affiliated business arrangements, as defined in 12 U.S.C. § 2602.

(e) *Violation; penalties.* — A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 6 months or a fine not exceeding $ 1,000 or both.

(f) *Separate violations.* — Each violation of this section is a separate violation.

## Implied Private Rights of Action

In Baker v. Montgomery Cnty., 427 Md. 691, 708-11, 50 A.3d 1112, 1122-23

(2012), we discussed in detail how to assess whether a State statute contains an implied

private right of action, stating:

> A private cause of action in favor of a particular plaintiff or class of plaintiffs does not exist simply because a claim is framed that a statute was violated and a plaintiff or class of plaintiffs was harmed by it. Rather, the issue is a matter of statutory construction. . . .
>
> The U.S. Supreme Court fashioned the prevailing test for determining whether a statute contains implicitly a private cause of action:
>
> > In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff one of the class for whose especial benefit the statute was enacted[?]   Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?   Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?
>
> *Cort v. Ash*, 422 U.S. 66, 78, 95 S. Ct. 2080, 2087-88, 45 L.Ed.2d 26, 36 (1975) (internal citations omitted).   This Court utilized the *Cort* test in *Erie Ins[.] Co[. v. Chops]*, 322 Md. [79,] 90-91, 585 A.2d [232,] 237 [(1991)], which dealt with a Maryland statute. . . .

> *Touche Ross* [*& Co. v. Redington*, 442 U.S. 560, 575-76 (1979)]
> emphasized that the central inquiry remains whether the legislative body
> intended to create, either expressly or by implication, a private cause of
> action. Courts discern . . . whether a private cause of action was intended by
> analyzing the language of the statute to identify its purpose and intended
> beneficiaries, reviewing the statute's legislative history, and determining
> whether the statute provides otherwise an express remedy. As a result, in a
> case in which neither the statute nor the legislative history reveals a
> legislative intent to create a private right of action for the benefit of the
> plaintiff, we need not carry the *Cort v. Ash* inquiry further.
>
> Thus, our analysis begins with the language of the statute at hand and
> whether it confers a beneficial right upon a particular class of persons. If a
> statute's language provides a right to a particular class of persons, there is a
> strong inference that the legislature intended the statute to carry an implied
> cause of action. Conversely, that inference becomes attenuated when the
> statute is framed as a general prohibition or a command to a governmental
> entity or other group or confers a generalized benefit. For example, in
> *Cannon* [*v. Univ. of Chicago*, 441 U.S. 677, 693 n.13 (1979),] the Supreme
> Court listed several statutory schemes that conferred a right on a class of
> persons and created an implied private cause of action: "All citizens of the
> United States shall have the same right . . . as is enjoyed by white citizens
> thereof," "no person shall be denied the right to vote," and "employees shall
> have the right to organize and bargain collectively."

(Internal quotation marks, footnote, brackets, and most citations omitted) (last ellipsis in

original).[14] To reiterate, in assessing whether a State statute contains an implied private

right of action, we are concerned with three specific inquiries: (1) Is the plaintiff one of the

class for whose special benefit the statute was enacted? (2) Is there any indication of

---

[14] In <u>Baker</u>, 427 Md. at 709 n.15, 50 A.3d at 1122 n.15, this Court noted that, "[w]hen
a court determines whether a federal statute contains a private cause of action, there is
a fourth factor . . . : 'Is the cause of action one traditionally relegated to state law, in an area
basically the concern of the States, so that it would be inappropriate to infer a cause of
action based solely on federal law.'" (Quoting <u>Cort</u>, 422 U.S. at 78) (brackets omitted).
This fourth factor is not implicated in this case because this case does not involve
determining whether a federal statute contains an implied private right of action.

legislative intent, explicit or implicit, either to create such a remedy or to deny one? (3) Is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? Baker, 427 Md. at 709, 50 A.3d at 1122; see also Scull v. Groover, Christie & Merritt, P.C., 435 Md. 112, 122, 76 A.3d 1186, 1191 (2013).

This Court has applied the three-factor test from Cort in several cases to determine whether an implied private right of action existed. For example, in Erie Ins. Co., 322 Md. at 91-92, 83, 585 A.2d at 238, 233, we held that there was no express or implied private right of action under Md. Code Ann., Transp. (1977, 1987 Repl. Vol.) ("TR") § 17-106(b), which provided: "After July 1, 1983, each insurer or other provider of required security immediately shall notify the [Motor Vehicle] Administration [("the MVA")] of only those terminations or other lapses that are final and occur within the first 6 months of any required security issued to or provided for a resident of this State." In Erie Ins. Co., 322 Md. at 81, 585 A.2d at 233, a husband and wife, the Chopses, were injured in an automobile accident that occurred in West Virginia; the accident was solely the fault of Carol Iser ("Iser"), who was driving a vehicle that she owned and that was registered in Maryland. At the time of the accident, Iser's vehicle was uninsured because, two months prior to the accident, Erie Insurance Company ("Erie") had cancelled Iser's automobile liability insurance policy for nonpayment of the premium. See id. at 81-82, 585 A.2d at 233. Despite the lack of insurance, the Chopses sued Erie, alleging that Erie was liable because it had breached the duty that it owed under TR § 17-106(b) to notify the MVA that it had cancelled Iser's automobile liability insurance policy. See Erie Ins. Co., 322 Md. at 82, 585 A.2d at 233. In the trial court, the Chopses argued that Erie's violation of TR § 17-106(b) made it liable

as though Iser's automobile liability insurance policy had not been cancelled or, alternatively, that Erie's violation of TR § 17-106(b) was evidence of negligence that was a proximate cause of the Chopses' damages. See Erie Ins. Co., 322 Md. at 82, 585 A.2d at 233. Following a trial, the Chopses were granted judgment against Erie; Erie appealed; and, before the case was considered by the Court of Special Appeals, this Court issued a writ of *certiorari* on its own motion. See id. at 82, 585 A.2d at 233.

Upon review, we determined that, because Erie did not notify the MVA until forty days after it cancelled Iser's policy, the evidence supported the trial court's finding that Erie had failed to notify the MVA of the cancellation of Iser's policy within the time required by TR § 17-106(b), which required immediate notification. See Erie Ins. Co., 322 Md. at 83-84, 585 A.2d at 234. Nonetheless, this Court held that the duty that was imposed on Erie by TR § 17-106(b) was not a "tort duty" because TR § 17-106(b) "did not create a legally cognizable duty running from Erie to all persons who might thereafter suffer economic damage by reason of involvement in an accident with an uninsured motorist upon Erie's failure to give immediate notice to the MVA of the termination of coverage." Erie Ins. Co., 322 Md. at 86, 585 A.2d at 235. We also held that the General Assembly "did not intend to create a new cause of action imposing strict liability on an insurer who failed to give immediate notice of cancellation to the MVA." Id. at 86, 585 A.2d at 235. As to the latter holding, applying the test set forth in Cort, we explained:

> Although the Chops[es] may properly be said to be within the class of persons in whose favor [TR § 17-106(b)] was intended, it seems equally apparent that the principal focus of the uninsured motorist laws is for the general protection of the public. Additionally, while permitting recovery by the [Chopses] would not be inconsistent with the underlying purpose of the

- 13 -

legislative scheme, we do not believe such a broad extension of existing laws is necessary to properly implement the legislation. We note that the [General Assembly] has provided other remedies for those who are involved in accidents with uninsured motorists, including the requirement of uninsured motorist coverage in every automobile liability policy issued, sold, or delivered in this State, and the establishment of a fund for payment of claims arising out of accidents with uninsured motorists occurring in this State. Finally, as we have noted, the [General Assembly] did not expressly or impliedly establish the sanction sought by the [Chopses], even though the [General Assembly] has done so in other related matters involving insurance.

Erie Ins. Co., 322 Md. at 91-92, 585 A.2d at 238 (citations omitted). Indeed, as to TR §

17-106(b)'s legislative history, we stated that TR § 17-106(b) and other related statutes

sought "to insure that there w[ould] be at least minimum limits of financial responsibility

in the event [that] an accident [] occur[red,]" and that "the principal risk against which [TR

§ 17-106(b) was] directed [was] the risk of economic loss, and not the risk of personal

injury." Erie Ins. Co., 322 Md. at 87, 585 A.2d at 236. We stated that there was "no

suggestion that the [General Assembly] intended the application of a strict sanction [that]

it did not spell out" in TR § 17-106(b); thus, we concluded that, in light of TR § 17-106(b)'s

legislative history, "no such sanction should be implied[.]" Erie Ins. Co., 322 Md. at 90,

585 A.2d at 237.

As another example, in Baker, 427 Md. at 697-98, 699-700, 50 A.3d at 1115, 1117,

we held that there was no express or implied private right of action under TR § 21-809(j),[15]

which provided: "If a contractor operates a speed monitoring system on behalf of

Montgomery County, the contractor's fee may not be contingent on the number of citations

---

[15]In Baker, 427 Md. at 696, 50 A.3d at 1115, we cited the 2009 Replacement Volume of the Transportation Article.

issued or paid." In Baker, 427 Md. at 695-96, 50 A.3d at 1114, certain local governments of Montgomery County, including Montgomery County itself, established speed cameras, which recorded, among many others, the plaintiffs traveling in their vehicles at least ten miles per hour over posted speed limits on certain roads. The local governments issued citations to the plaintiffs, each carrying a maximum civil penalty of $40. See id. at 696, 50 A.3d at 1114. The plaintiffs paid the penalties and then filed a complaint against the local governments, asserting that the local governments' contracts with the speed monitoring system contractor, ACS State and Local Solutions, Inc. ("ACS"), violated TR § 21-809(j). See Baker, 427 Md. at 696, 50 A.3d at 1114-15. The trial court concluded that the local governments, not ACS, operated the speed cameras within the meaning of TR § 21-809(j), and that, in any event, TR § 21-809(j) applied only to Montgomery County, not the other local governments. See Baker, 427 Md. at 696, 50 A.3d at 1115. The trial court also concluded that, even if ACS operated the speed cameras, TR § 21-809(j) did not contain a private right of action to support the plaintiffs' tort claims. See Baker, 427 Md. at 696, 50 A.3d at 1115. The trial court further concluded that the plaintiffs had waived their ability to file a complaint when they voluntarily paid the penalties; accordingly, the trial court granted summary judgment in the local governments' favor. See id. at 696, 50 A.3d at 1115. The plaintiffs appealed; the Court of Special Appeals affirmed; and this Court granted certiorari. See id. at 696, 50 A.3d at 1115.

We affirmed, holding in relevant part that TR § 21-809(j) did "not provide an express or implied private cause of action in tort" for two reasons: (1) TR § 21-809(j) "is a general welfare statute that does not benefit a particular class of persons, let alone" the

- 15 -

plaintiffs; and (2) TR § 21-809(j) "provides a remedy in the District Court for challenging speed monitoring system citations." Baker, 427 Md. at 697, 50 A.3d at 1115.  We explained that these two reasons, "combined with the lack of supporting legislative history endorsing an implied private right of action, establish[ed] that [TR] § 21-809(j) does not create a private cause of action." Baker, 427 Md. at 697-98, 50 A.3d at 1115.  In so concluding, we applied the three factors set forth in Cort.  See Baker, 427 Md. at 711-15, 50 A.3d at 1123-26. As to whether the plaintiffs were members of a class for whose benefit TR § 21-809(j) was enacted, we determined that TR § 21-809(j) was "framed as a prohibitive command and d[id] not confer rights on a class of persons" and did not "unmistakably focus on a particular class of persons who benefit from it." Baker, 427 Md. at 711-12, 50 A.3d at 1123-24 (citation, footnote, and internal quotation marks omitted). Moreover, TR § 21-809(j)'s legislative history "fail[ed] to reveal an intent to benefit a particular class of persons." Baker, 427 Md. at 712, 50 A.3d at 1124.  We stated that, even if the General Assembly had intended TR § 21-809(j) "to benefit recipients of citations, issued according to speed monitoring systems established pursuant to the statutory scheme, whether it intended also that [TR] § 21-809(j) create an implied private cause of action [was] a separate issue." Baker, 427 Md. at 712, 50 A.3d at 1124.

As to TR § 21-809's purpose, we concluded that TR § 21-809(j) "create[d] rules and procedures for Montgomery County (and perhaps its municipalities) to operate a speed monitoring system" and established "a remedy for challenging a speed monitoring system citation." Baker, 427 Md. at 713, 50 A.3d at 1124.  TR § 21-809(j) did not expressly provide a private right of action, and instead set forth provisions under which citation

recipients could challenge the citation on the basis that the local government had violated TR § 21-809(j). See Baker, 427 Md. at 713, 50 A.3d at 1124-25. Finally, as to TR § 21-809's legislative history, we determined that the legislative history failed to reveal any intent on the General Assembly's part to create an implied private right of action. See Baker, 427 Md. at 714, 50 A.3d at 1125. We concluded by explaining:

> [T]he lack of discernible legislative intent to create an implied cause of action in the plain language and structure of the statute, its legislative history, or some other legitimate and reliable source cements the conclusion that the [General Assembly], in enacting [TR] § 21-809, did not contemplate an implied private cause of action. Our conclusion is reinforced by the assumption that legislative bodies know how to "salt the mine" for the enablement of implied private causes of action.

Baker, 427 Md. at 714-15, 50 A.3d at 1126 (citations omitted).

More recently, in Scull, 435 Md. at 115, 76 A.3d at 1187, we held that there was no implied private right of action under the Maryland Health Maintenance Organization ("HMO") Act, Md. Code Ann., Health-Gen. ("HG") §§ 19-701 to 19-735, where an HMO member has been billed by a health care provider for a covered service. In particular, HG § 19-710(p) of the HMO Act prohibited a health care provider from billing an HMO member for amounts beyond those that were provided in the HMO's plan, a practice commonly known as "balance billing," providing: "A health care provider or any representative of a health care provider may not collect or attempt to collect from any subscriber or enrollee any money [that is] owed to the health care provider by a[n HMO that has been] issued a certificate of authority to operate in this State." Scull, 435 Md. at 119-20, 76 A.3d at 1190. In Scull, id. at 115, 76 A.3d at 1187-88, the plaintiff, an HMO member, visited Groover, Christie & Merritt, P.C. ("GCM") for a knee x-ray, and nearly a

year later, GCM sent the plaintiff a bill for $121 for the x-ray. The plaintiff sued GCM, alleging that the bill from GCM was "an illegal attempt to 'balance bill' an HMO member in violation of State law." Id. at 116-17, 76 A.3d at 1188. In the first count of the complaint, the plaintiff sought judicial recognition of an implied private right of action under HG § 19-710(p). See Scull, 435 Md. at 117, 76 A.3d at 1188. GCM filed a motion to dismiss the complaint, which the trial court granted; the plaintiff filed an amended complaint, and the trial court dismissed the amended complaint with prejudice. See id. at 117, 76 A.3d at 1188-89. The plaintiff appealed; the Court of Special Appeals affirmed; and this Court granted *certiorari*. See id. at 118, 76 A.3d at 1189.

We held, in pertinent part, "that there is not an implied private right of action under the HMO [Act]." Id. at 118, 76 A.3d at 1189. We began our analysis by observing that the HMO Act did not provide an express private right of action for an HMO member who was allegedly harmed by a violation of the prohibition against balance billing; thus, we turned to whether there was an implied private right of action. See id. at 121, 76 A.3d at 1191. We then applied and analyzed the three factors set forth in Cort in the context of the HMO Act. See Scull, 435 Md. at 122-24, 76 A.3d at 1191-92. As to whether the plaintiff was a member of the class for whose benefit HG § 19-710(p) was enacted, we stated that, on its face, HG § 19-710(p) "strongly suggest[ed] an intent to protect a specific class of persons, namely enrollees and subscribers of HMOs, from the practice of balance billing." Scull, 435 Md. at 122, 76 A.3d at 1191. Thus, as an HMO member, the plaintiff was a member of the class that was intended to be protected by HG § 19-710(p). Scull, 435 Md. at 122, 76 A.3d at 1191.

Nonetheless, despite the plaintiff's being a member of the class that was intended

to be protected by HG § 19-710(p), we concluded that the legislative intent and statutory

scheme or purpose militated against implying a private right of action. Scull, 435 Md. at

122-24, 76 A.3d at 1191-93.  As to legislative intent to create or deny a remedy, we

reiterated that there was nothing expressly in HG § 19-710(p) concerning a private right of

action for a violation of the prohibition against balance billing; and, we further concluded

that "nothing in the text of the balance billing prohibition in HG § 19-710(p) suggest[ed]

that the [General Assembly] believed that it was creating a new cause of action on behalf

of HMO subscribers against health care providers—as opposed to creating a structure to

foster HMO plans." Scull, 435 Md. at 122, 76 A.3d at 1191-92. We also observed that

HG § 19-710(p)'s legislative history was "devoid of any mention of an intent to create a

private cause of action on behalf of patients against health care providers"; i.e., the

legislative history was silent on the matter. Scull, 435 Md. at 122-23, 76 A.3d at 1192

(footnote omitted).  Finally, as to the statutory scheme and legislative purpose, we

explained:

> [T]he statutory scheme largely concerns the structure and operation of
> [HMO]s, not the billing practices of health care providers. In that sense, the
> statute is intended to confer a general benefit on the public at large by
> providing a foundation for a particular form of health care coverage. The
> [HMO] Act is primarily focused on the operation and regulation of an HMO
> and its relationship with the providers that serve its members. Notably, the
> explicit private cause of action that does appear in the [HMO] Act is on
> behalf of a health care provider against an HMO that fails to carry out the
> HMO's obligations under the [HMO] Act. While the prohibition against
> balance billing of HMO members is an important part of the overall scheme,
> the [HMO] Act provides for its enforcement through "hold harmless"
> contract provisions required by [the HMO Act]. And there is already in place
> a cause of action for a patient to obtain relief for violations of unlawful billing

practices[, namely, under the Maryland Consumer Protection Act.]

Id. at 123-24, 76 A.3d at 1192 (citations omitted).  Accordingly, we held "that an HMO

member does not have an implied private right of action under the HMO [Act] with respect

to a violation of the balance billing prohibition."  Id. at 124, 76 A.3d at 1192 (footnote

omitted).

### Analysis

Returning to the instant case, we hold that RP § 14-127 does not provide an express

or implied private right of action.  As stated above, RP § 14-127(c)(1) prohibits "[a] person

who has a connection with the settlement of real estate transactions involving land in the

State" from "pay[ing] to or receiv[ing] from another any consideration to solicit, obtain,

retain, or arrange real estate settlement business."  Nothing within RP § 14-127 generally,

or RP § 14-127(c)(1) specifically, expressly provides a private right of action for anyone

who is allegedly harmed by a violation of RP § 14-127(c)(1).  Thus, the key question in

this case—indeed, the question that the federal court certified to this Court—is whether RP

§ 14-127 contains an implied private right of action.  We hold that it does not, as neither

RP § 14-127's plain language, legislative history, nor legislative purpose demonstrates any

intent on the General Assembly's part to create a private right of action.

### *Class*

As to whether Appellants are members of the class for whose benefit RP § 14-127

was enacted, RP § 14-127(c)(1) provides that "[a] person who has a connection with the

settlement of real estate transactions involving land in the State may not pay to or receive

from another any consideration to solicit, obtain, retain, or arrange real estate settlement

business." On its face, RP § 14-127(c)(1) does not specifically identify a class for whose benefit it was enacted. Nonetheless, there is a group who could receive the benefit of RP § 14-127—consumers of residential and commercial settlement services.[16] In other words, RP § 14-127(c)(1) could inure to the benefit of consumers or members of the public who use residential and commercial settlement services because the prohibition in RP § 14-127(c)(1) could theoretically keep costs down by eliminating hidden costs and excess fees that may be associated with the solicitation, obtainment, or arrangement of real estate settlement business. As consumers of settlement services, Appellants are members of a class that would conceivably benefit from RP § 14-127, although there is no evidence that RP § 14-127 was designed specifically to protect consumers of settlement services.

Our conclusion that RP § 14-127(c)(1) inures to the benefit of consumers of residential and commercial settlement services is consistent with an opinion from the Maryland Attorney General concerning whether RP § 14-127's predecessor, Md. Code Ann., Art. 27 ("Art. 27"), § 465A, had been preempted by the revised Regulation X of the

---

[16]For two reasons, we identify the class as including consumers of both residential and commercial settlement services, and not just consumers of residential settlement services, such as Appellants. First, RP § 14-127(c)(1) does not limit the prohibition against paying or receiving "any consideration to solicit, obtain, retain, or arrange real estate settlement business" to residential real estate settlement business. Instead, RP § 14-127(c)(1) refers broadly to "real estate transactions" and "real estate settlement business" without specifying only residential real estate transactions and residential real estate settlement business. Second, in contrast to RP § 14-127(c)(1), RP § 14-127(d) applies only to "residential real estate transactions[,]" which RP § 14-127(a)(4) defines as "a transaction involving a federally related mortgage loan as defined in 12 U.S.C. § 2602 and 12 C.F.R. § 1024.2." In other words, had the General Assembly intended the prohibition in RP § 14-127(c)(1) to apply only to residential real estate transactions, it would have said so, as evidenced by RP § 14-127(d); however, the General Assembly did not limit RP § 14-127(c)(1) in such a manner.

United States Department of Housing and Urban Development.   In the opinion, the

Maryland Attorney General stated:

> Although we are not aware of any legislative history bearing on the purpose
> of [Art. 27, § 465A], it is evidently intended to prevent a real estate broker,
> for example, from having a financial incentive to steer a purchaser of real
> property to a particular provider of settlement services. **Presumably, the
> General Assembly perceived that the purchaser would be better served
> if advice about settlement services was free of such bias.**

78 Md. Op. Atty. Gen. 86, 86-87 (1993), <u>available at</u> https://www.oag.state.md.us/Opinio

ns/1993/78oag86.pdf  [https://perma.cc/DA5N-7KEN]  (emphasis  added).    Stated

otherwise, the Maryland Attorney General also found no specific class of individuals

intended to be protected by RP § 14-127, but opined that purchasers—*i.e.*, consumers—of

settlement services would receive the benefit of RP § 14-127 by receiving settlement

services free of bias.

Nevertheless, we reiterate that RP § 14-127 does not expressly provide a right to a

particular class of persons.  For example, the prohibition in RP § 14-127(c)(1) is not

phrased along the lines of "all consumers of settlement services have the right to have

kickback-free settlement services." Cf. Baker, 427 Md. at 711, 50 A.3d at 1123 ("[T]he

Supreme Court listed several statutory schemes that conferred a right on a class of persons

and created an implied private cause of action: 'All citizens of the United States shall have

the same right . . . as is enjoyed by white citizens thereof,' 'no person shall be denied the

right to vote,' and 'employees shall have the right to organize and bargain collectively.'"

(Citation and brackets omitted) (ellipsis in original)).  Rather, RP § 14-127(c)(1) contains

a general prohibition—namely, that persons connected "with the settlement of real estate

transactions involving land in the State may not pay to or receive from another any consideration to solicit, obtain, retain, or arrange real estate settlement business." And, RP § 14-127(c)(1) appears to confer only, as a result of the prohibition, a generalized benefit that inures to consumers of settlement services. See Baker, 427 Md. at 710-11, 50 A.3d at 1123 ("If a statute's language provides a right to a particular class of persons, there is a strong inference that the [General Assembly] intended the statute to carry an implied cause of action. Conversely, that inference becomes attenuated when the statute is framed as a general prohibition or a command to a governmental entity or other group or confers a generalized benefit." (Citations and internal quotation marks omitted)). Significantly, RP § 14-127 does not mention, let alone identify, consumers or the public in general as a class who benefits from the provisions of the statute.

In any event, as we stated in Baker, 427 Md.at 708-09, 50 A.3d at 1122, "[a] private cause of action in favor of a particular plaintiff or class of plaintiffs does not exist simply because a claim is framed that a statute was violated and a plaintiff or class of plaintiffs was harmed by it." (Citation omitted). Rather, the question of whether a private right of action exists is a matter of statutory construction. See id. at 709, 50 A.3d at 1122. As such, although Appellants are in a class of individuals who arguably receive the benefit of RP § 14-127, we still must examine RP § 14-127's plain language, legislative history, and legislative scheme/purpose to determine whether the General Assembly intended to create a private right of action under RP § 14-127. See Baker, 427 Md. at 710, 50 A.3d at 1123 ("Courts discern legislative intent whether a private cause of action was intended by analyzing the language of the statute to identify its purpose and intended beneficiaries,

- 23 -

reviewing the statute's legislative history, and determining whether the statute provides otherwise an express remedy." (Citations omitted)); see also Scull, 435 Md. at 122-24, 76 A.3d at 1191-92 (Although concluding that the plaintiff was a member of the class for whose benefit the statute at issue was enacted, we also analyzed legislative intent and purpose before concluding that no implied private right of action existed.).

### *Legislative History/Intent*

As to whether there is any indication of legislative intent, either explicit or implicit, to create or deny a private right of action, we conclude that RP § 14-127's legislative history fails to reveal any intent on the General Assembly's part to create a private right of action, either expressly or impliedly. As stated above, nothing in RP § 14-127's plain language expressly provides a private right of action for anyone allegedly harmed by a violation of the prohibition in RP § 14-127(c)(1). Thus, we look to RP § 14-127's legislative history to determine whether an implied private right of action exists.

RP § 14-127's predecessor, Art. 27, § 465A, was enacted in 1967; on June 1, 1967, Article 27, § 465A became effective. See 1967 Md. Laws 1662-63 (Vol. II, Ch. 756, H.B. 1075); 78 Md. Op. Atty. Gen. at 86 ("This prohibition was enacted as Chapter 756 of the Laws of Maryland 1967 in essentially" the same form as it existed in 1993.). The purpose for enacting Art. 27, § 465A was stated as follows:

> AN ACT to add new Section 465-A to Article 27 of the Annotated Code of Maryland (1957 Edition), titled "Crimes and Punishments," subtitle "Real Estate Settlements," to follow immediately after Section 465 thereof, prohibiting the payment by any person, firm, or corporation to any other person, firm, or corporation connected with the settlement of a real estate transaction affecting land situated and lying in this State, of any fee or other consideration to obtain any real estate settlement or real estate settlement

business prohibiting the receipt of any such fee or thing of value for such purpose; CREATING CERTAIN EXCEPTIONS FROM THIS ACT and providing penalties for violation of such provisions.

1967 Md. Laws 1662 (Vol. II, Ch. 756, H.B. 1075) (capitalization in original).

Although not part of Art. 27, § 465A's legislative history, a series of newspaper articles published in 1967 and 1968 provides some context to the circumstances leading up to Art. 27, § 465A's enactment. Apparently, a real estate settlement and title insurance scandal occurred in Montgomery County and Prince George's County "in which more than 70 home owners face[d] the possibility of double mortgages against their property as a result of misuse of settlement funds by title lawyers." Bart Barnes, *Md. Bar Now Asks for Rapid Revision of Title Escrow Laws*, The Washington Post, Times Herald, Mar. 9, 1967, at C2. In response, then-State Insurance Commissioner Norman Polovoy proposed a three-bill package that "would make title insurance companies financially liable for any misuse of funds changing hands in real estate settlements, outlaw kickbacks from lawyers to brokers steering business their way[,] and require lawyers to explain to home buyers the difference between mortgage title insurance, protecting only the lender, and home owners title insurance." Id.; see also Staff Writer, *Escrow Bills Advance at Annapolis*, The Washington Post, Times Herald, Mar. 17, 1967, at B1. The House Banking and Insurance Committee endorsed all three bills. See Sandy Royner, *Polovoy Bill Gains in Part*, The Sun, Mar. 16, 1967, at C12; Staff Writer, *supra*, at B1. Thereafter, House Bill 1075, outlawing kickbacks, was enacted as Art. 27, § 465A. See 1967 Md. Laws 1662-63 (Vol. II, Ch. 756, H.B. 1075). An article dated February 1, 1968 noted, however, that "a stronger measure that failed to pass in the 1967 General Assembly" would be reintroduced, namely,

a "bill [that] would hold title insurance companies liable for defalcations by their 'approved attorneys.'" Peter A. Jay, *Proposed Realty-Closing Controls Hit*, The Washington Post, Times Herald, Feb. 1, 1968, at B5.[17]

A "Report of the Committee to Study the Problem of Delayed Disbursements of Real Estate Settlements," included in the Report of the 72nd Annual Meeting of the Maryland State Bar Association (1967 Md. State Bar Ass'n Transaction Report, at 211-13), provided a fuller report on the three bills, stating:

> As a result of defalcations by various attorneys handling real estate settlements in which buyers and sellers of real property in Montgomery and Prince George's Counties lost well over $1,000,000, a large number of bills were introduced in the 1967 Session of the General Assembly dealing with various aspects of the problem. The State Insurance Commissioner . . . prepared for introduction three bills known as House Bills 1073, 1074, and 1075. . . . The three bills, which came to be known as the "Polovoy Package", would attempt to solve the problem in the following manner:

> H.B. 1073 provided that[,] whenever a title insurance company shall issue a policy of insurance insuring the title to such property for the benefit of any mortgagee, the title company or the title attorney shall, prior to the disbursement of the settlement funds, notify the mortgagor of his right to purchase insurance insuring title to the property for his benefit and of the cost of such insurance. Substantially similar proposed legislation was included in H.B. 41[.]

> H.B. 1074 would have, in effect, placed an "absolute and unqualified liability" as to the proper disbursement of settlement funds upon a title company [that] issued a binder or policy insuring title to the property for the

---

[17]Before this Court, Appellees moved to strike two newspaper articles from The Sun that were included in the appendix to Appellants' reply brief, as well as all references to the newspaper articles contained in Appellants' reply brief, on the ground that the newspaper articles are not part of the record. We deny the motion to strike. Even if the newspaper articles were not included in the record, in reviewing RP § 14-127's legislative history, this Court would have undoubtedly uncovered the newspaper articles, which provide useful context concerning the circumstances surrounding the enactment of Art. 27, § 465A, RP § 14-127's predecessor.

benefit of any party to the settlement. To accomplish this, the title insurance company would be conclusively presumed to have constituted and designated its so-called approved attorney as its agent for the closing of the transaction and the presumption and liability so imposed by statute would extend for the benefit of all parties to the settlement.

H.B. 1075, the "Anti-Kick Back Bill[,]" would have amended Article 27 of the Code[,] making it a criminal offense to pay or receive anything of value for the purpose of soliciting, obtaining, retaining[,] or arranging any real estate settlement or real estate settlement business.

. . .

H.B. 41 was enacted by the General Assembly and has been signed by the Governor. This Bill, for practical purposes, accomplishes the same result as H.B. 1073.

H.B. 1075 was enacted by the General Assembly and has been signed by the Governor.

H.B. 1074 failed of enactment and was referred to the Legislative Council for further study.

Thus, as originally enacted, Art. 27, § 465A, criminalizing kickbacks, provided, in

its entirety:

No person, firm, or corporation having any connection whatsoever with the settlement of real estate transactions involving land situated and lying in this State shall, for the purpose of soliciting, obtaining, retaining, or arranging any real estate settlement or real estate settlement business, pay to or receive from, any other person, firm, or corporation any fee, compensation, gift (except promotional or advertising materials for general distribution), thing of value, rebate, or other consideration, including loans and advancements of commissions or deposit monies. Any person, firm, or corporation violating the terms of this section, shall be guilty of a misdemeanor and upon conviction shall be subject to a fine not to exceed One Thousand Dollars ($1,000.00) or to imprisonment for not more than six (6) months or both. Every violation of this section shall constitute a separate offense and shall be punishable as such. Nothing herein contained shall be construed as preventing the payment of commissions to agents who have been duly licensed as such by the State Insurance Department. Nothing herein shall prohibit the referral of any such business from one attorney to another attorney, or prohibit any professional fee arrangement between attorneys in such cases.

1967 Md. Laws 1662-63 (Vol. II, Ch. 756, H.B. 1075) (italics and some capitalization omitted). Art. 27, § 465A remained largely unchanged until 2002.

In 2002, pursuant to House Bill 11, as part of the Code Revision that created the Criminal Law Article, Art. 27, § 465A was recodified as RP § 14-127. See 2002 Md. Laws 197, 202, 1089-90 (Vol. I–II, Ch. 26, H.B. 11). Specifically, House Bill 11 was enacted for the purpose of, among other things, "adding a new article to the Annotated Code of Maryland, to be designated and known as the 'Criminal Law Article', to revise, restate, and recodify the laws of the State relating to criminal law; [and] revising, restating, and recodifying certain provisions relating to . . . real estate settlements[.]" 2002 Md. Laws 197 (Vol. I, Ch. 26, H.B. 11). At that time, RP § 14-127 was divided into subsections, including RP § 14-127(c) (now RP § 14-127(c)(1)), which provided then, as it does now, that "[a] person who has a connection with the settlement of real estate transactions involving land in the State may not pay to or receive from another any consideration to solicit, obtain, retain, or arrange real estate settlement business." 2002 Md. Laws 1090 (Vol. II, Ch. 26, H.B. 11). The Revisor's Note stated that "subsections (a)(3) and (b) through (e)" of RP § 14-127 were "new language derived without substantive change from former Art. 27, § 465A." 2002 Md. Laws 1090 (Vol. II, Ch. 26, H.B. 11). Two other notes in the Revisor's Note pertained to RP § 14-127(c): (1) that "the former references to a 'firm' and 'corporation' [we]re deleted in light of the definition of 'person' in [RP] § 1-101(bb)"; and (2) "the former reference to land 'situated and lying' in the State [wa]s deleted as included in the comprehensive reference to 'land in the State'." 2002 Md. Laws

1090 (Vol. II, Ch. 26, H.B. 11).

House Bill 11's Fiscal Note explained the purpose of House Bill 11 as follows:

This Code Revision bill revises, restates, and recodifies the laws of the State relating to criminal law. The new article is a nonsubstantive revision of statutes that relate to substantive crimes in the State of Maryland. It derives primarily from Article 27 – Crimes and Punishments, and includes related provisions from the Agriculture, Commercial Law, and Family Law Articles, and others.

In the "Fiscal Summary" portion of House Bill 11's Fiscal Note, it was noted that House Bill 11 simply "recodifie[d] specified existing laws without substantive change." In the "Analysis" portion of House Bill 11's Fiscal Note, it was noted that "House Bill 11 also revise[d] in several other articles a number of provisions relating to criminal law, regulatory, and enforcement matters originally codified in Article 27. These other articles include[d] . . . [the] Real Property Article[.]"

In 2010, RP § 14-127 was amended through Senate Bill 1019 and House Bill 1471. At that time, among other things, certain definitions were added to RP § 14-127(a); RP § 14-127(c) became RP § 14-127(c)(1); and RP § 14-127(c)(2) and (d) were added. See 2010 Md. Laws 2417-19 (Vol. III, Ch. 373, S.B. 1019); 2010 Md. Laws 2419-21 (Vol. III, Ch. 374, H.B. 1471). The stated purpose of the amendments was to "requir[e] a certain person who offers settlement services in connection with residential real estate transactions involving land in the State to comply with certain federal disclosure requirements; alter[] a certain provision relating to the payment of a commission to a certain person; repeal[] a certain definition; defin[e] certain terms; and generally relat[e] to real estate settlements." 2010 Md. Laws 2417 (Vol. III, Ch. 373, S.B. 1019); 2010 Md. Laws 2419 (Vol. III, Ch.

- 29 -

374, H.B. 1471).  Senate Bill 1019's and House Bill 1471's Fiscal and Policy Notes

explained that the purpose of the bills was as follows:

> Th[ese] bill[s] establish[] that a person who participates in an "affiliated
> business arrangement" as defined under the federal Real Estate Settlement
> Procedures Act (RESPA) is not a violation of a State law that otherwise
> prohibits affiliates from participating in a real estate settlement (1) solely
> because that person participates in an affiliated business arrangement; and
> (2) as long as that person complies with existing RESPA disclosure
> requirements.  A person who does not comply is guilty, under existing
> penalty provisions, of a misdemeanor and subject to maximum penalties of
> six months imprisonment and/or a fine of $1,000.

When RP § 14-127 was amended in 2010, it was the first time that RP § 14-127 included

specific references and citations to RESPA, in RP § 14-127(a)(4), (c)(2), and (d).  See 2010

Md. Laws 2418-19 (Vol. III, Ch. 373, S.B. 1019); 2010 Md. Laws 2420-21 (Vol. III, Ch.

374, H.B. 1471).

RP § 14-127 was most recently amended this year.  Specifically, the references to

the Code of Federal Regulations in RP § 14-127(a)(4), (c)(2), and (d) were updated; the

amendment became effective upon its enactment, and was approved by the Governor on

March 14, 2016.  See 2016 Md. Laws ___ (Vol. __, Ch. 8, S.B. 506).

Upon consideration of the above-described circumstances, we conclude that RP §

14-127's legislative history fails to demonstrate that an implied private right of action

exists.  The legislative history of RP § 14-127's prohibition against persons connected

"with the settlement of real estate transactions involving land in the State . . . pay[ing] to

or receiv[ing] from another any consideration to solicit, obtain, retain, or arrange real estate

settlement business" is completely devoid of any mention whatsoever of an intent to create

a private right of action on behalf of consumers of settlement services.  There is simply

nothing in RP § 14-127's legislative history from which we can glean any intent on the General Assembly's part to create an implied private right of action. In other words, RP § 14-127's legislative history is silent as to any intent to create an implied private right of action. "[W]here the plain language of a provision weighs against implication of a private remedy, silence within the legislative history as to a private cause of action reinforces the decision not to find such a right implicitly." Baker, 427 Md. at 714, 50 A.3d at 1125 (citation and internal quotation marks omitted); see also Scull, 435 Md. at 123, 76 A.3d at 1192 ("While legislative silence is not conclusive, this certainly weighs against finding a private right of action." (Citation and footnote omitted)).

Indeed, in reviewing RP § 14-127's legislative history, we observe that the only indication that the General Assembly even considered creating a private right of action was in connection with House Bill 1074, which was introduced as part of the Polovoy Package along with House Bill 1075 (which became Art. 27, § 465A, RP § 14-127's predecessor). Significantly, House Bill 1075 was intended to prohibit and criminalize kickbacks in real estate settlements, and the General Assembly was silent as to any intent to create a private right of action on behalf of consumers of settlement services who were allegedly harmed by a violation of the new prohibition against kickbacks. See 1967 Md. Laws 1662-63 (Vol. II, Ch. 756, H.B. 1075). By contrast, House Bill 1074 "would [have] ma[d]e title insurance companies financially liable for any misuse of funds changing hands in real estate settlements[,]" Barnes, supra, at C2, or, stated otherwise, "would [have] h[e]ld title insurance companies liable for defalcations by their 'approved attorneys[,]'" Jay, supra, at B5. Plainly put, a review of RP § 14-127's legislative history and the articles providing

context for enactment of the prohibition against kickbacks in real estate settlements clearly shows that the General Assembly considered creating a private right of action only with respect to House Bill 1074, which was separate and distinct from House Bill 1075. The circumstance that the General Assembly considered creating a private right of action to hold title insurance companies financially liable for misuse of settlement funds, but apparently did not consider the same with respect to the prohibition against kickbacks, further bolsters our determination that RP § 14-127's legislative history is devoid of anything from which we can conclude that the General Assembly intended to create a private right of action.[18]

### Legislative Scheme/Purpose

Finally, we examine whether an implied private right of action would be consistent with the underlying purposes of the legislative scheme. As an initial matter, we observe

---

[18]Additionally, we note that, in 2010, when the General Assembly amended RP § 14-127 to provide specific references and citations to RESPA, it failed to include or otherwise incorporate a private right of action into RP § 14-127, even though RESPA contains an express private right of action. See 12 U.S.C. § 2607(d)(5) ("In any **private action** brought pursuant to this subsection, the court may award to the prevailing party the court costs of the action together with reasonable attorneys fees." (Emphasis added)). We have stated, on many occasions, that "[t]he General Assembly is presumed to have had, and acted with respect to, full knowledge and information as to prior and existing law and legislation on the subject of the statute and the policy of the prior law." Breslin v. Powell, 421 Md. 266, 289, 26 A.3d 878, 892 (citation and internal quotation marks omitted). To be sure, in amending RP § 14-127 in 2010, the General Assembly did not expressly state that it was rejecting a civil remedy. Nonetheless, that the General Assembly was aware that RESPA provides a private right of action for those who are harmed by violations of its provisions, and yet chose not to amend RP § 14-127 to similarly provide a private right of action for violations of RP § 14-127(c)(1), lends additional support to the determination that the General Assembly did not intend to create a private right of action under RP § 14-127.

that RP § 14-127 is not part of a larger statutory scheme concerning, for example, real estate settlement services in general; rather, it is currently a part of the "Miscellaneous Rules" title in the Real Property Article. Before it became RP § 14-127, the statute was in the "Crimes and Punishments" article of the Code of Maryland. Nonetheless, despite not necessarily being one statute in a larger statutory scheme, it is evident from RP § 14-127's plain language and legislative history that its purpose is to criminalize kickbacks in relation to settlement services, not to protect a certain class of individuals or to create a private right of action on behalf of a specific class of individuals.

Importantly, RP § 14-127's predecessor, Art. 27, § 465A, was enacted and added to Article 27 of the Code of Maryland, entitled "Crimes and Punishments," for the express purpose of prohibiting kickbacks in connection to settlement services. See 1967 Md. Laws 1662 (Vol. II, Ch. 756, H.B. 1075). And, as enacted, Art. 27, § 465A "provid[ed] penalties for violation of such provisions[,]" by making a violation of the prohibition against kickbacks a misdemeanor punishable by a fine not exceeding $1,000, imprisonment for not more than six months, or both. 1967 Md. Laws 1662 (Vol. II, Ch. 756, H.B. 1075). Stated otherwise, RP § 14-127's predecessor's placement in a criminal law article is not consistent with the intent to create a private right of action, but rather supports the conclusion that RP § 14-127's purpose is—and has always been—to criminalize behavior related to settlement kickbacks. Thus, as originally enacted, it is clear that Art. 27, § 465A's purpose was criminal in nature in that it created a new crime and set forth the possible punishments for conviction of that crime.

That Art. 27, § 465A was intended to be a criminal statute is confirmed by its

addition as RP § 14-127 through House Bill 11 in 2002. Indeed, in 2002, as part of the Code Revision that created the Criminal Law Article, Art. 27, § 465A was recodified as RP § 14-127. See 2002 Md. Laws 197, 202, 1089-90 (Vol. I–II, Ch. 26, H.B. 11). House Bill 11's stated purpose was, among other things, to create the Criminal Law Article "to revise, restate, and recodify the laws of the State relating to criminal law; [and to] revis[e], restat[e], and recodify[] certain provisions relating to . . . real estate settlements[.]" 2002 Md. Laws 197 (Vol. I, Ch. 26, H.B. 11). House Bill 11's Fiscal Note stated that "House Bill 11 [] revise[d] in several other articles a number of provision relating to criminal law, regulatory, and enforcement matters originally codified in Article 27. These other articles include[d] . . . [the] Real Property Article[.]"

From RP § 14-127's plain language and legislative history, we have no difficulty in concluding that RP § 14-127's purpose was criminal in nature, and not to create an implied private right of action on behalf of a specified protected class of individuals. Moreover, we note that, in addition to criminalizing kickbacks in connection with settlement services, RP § 14-127 effectively prevents practices that could increase the costs of settlement and limit competition among providers of settlement services; i.e., RP § 14-127 helps keep the costs of settlement down and provides consumers with a wider choice of providers of settlement services than would otherwise be available absent the prohibition against kickbacks.

As a final matter, we point out that RP § 14-127 furnishes a penalty for violations of RP § 14-127(c)(1) and (d). Specifically, RP § 14-127(e) provides: "A person who violates [RP § 14-127] is guilty of a misdemeanor and on conviction is subject to

imprisonment not exceeding 6 months or a fine not exceeding $1,000 or both." And, "[e]ach violation of [RP § 14-127] is a separate violation." RP § 14-127(f). Thus, RP § 14-127 does not prohibit certain conduct without providing any penalty or means of enforcement whatsoever; RP § 14-127 clearly provides a criminal penalty for violations. Cf. Baker, 427 Md. at 713, 50 A.3d at 1125 ("An elemental canon of statutory construction is [that,] where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it. Under [the statute at issue], citation recipients . . . may (but are not obliged to) defend against receiving a citation on the basis that the local government violated [the statute]. This militates against finding a separate, private cause of action to enforce the statute." (Citations, brackets, footnotes, and internal quotation marks omitted)).

In sum, as we did in Baker, id. at 714-15, 50 A.3d at 1126, here, we conclude that "the lack of discernible legislative intent to create an implied [right] of action in the plain language and structure of [RP § 14-127], its legislative history, or some other legitimate and reliable source cements the conclusion that the [General Assembly], in enacting [RP § 14-127], did not contemplate an implied private [right] of action."

### *Enforceable Duty*

Given that, as part of our analysis of whether RP § 14-127 contains a private right of action, we conclude that Appellants are members of a group who receive a benefit from RP § 14-127, we shall address whether there otherwise exists a duty under RP § 14-127 pursuant to which Appellants may maintain a tort claim. Stated differently, we consider whether RP § 14-127 gives rise to an actionable duty that inures to the benefit of

- 35 -

Appellants. We determine that there is no such enforceable duty arising under RP § 14-127 and explain.

In Baker, 427 Md. at 711 & n.16, 50 A.3d at 1123 & n.16, we determined that, because the statute at issue did "not confer rights on a class of persons[,]" the plaintiffs' "alternative argument that their causes of action are based on common law tort duties" was "foreclose[d,]" explaining:

> A statute creates an enforceable duty when the plaintiff is a member of the class of persons [whom] the statute was designed to protect and the injury was of the type [that] the statute was designed to prevent. Furthermore, the statute must set forth mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole.
>
> In *Gourdine* [v. Crews, 405 Md. 722, 757, 955 A.2d 769, 790 (2008)], the plaintiff argued that the following language in the federal Food, Drug, and Cosmetic Act created an enforceable duty in the defendant drug manufacturer: "The following acts and the causing thereof are prohibited: (a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded." We disagreed, noting that the statute was framed to protect the public in general. In *Muthukumarana* [v. Montgomery Cnty., 370 Md. 447, 499-500, 805 A.2d 372, 403 (2002)], a Maryland statute required all counties to have an operational 9-1-1 system to protect the safety and well-being of Marylanders. The plaintiff posited that the statute placed on a 9-1-1 operator a duty of care to an injured citizen utilizing that service. Again, we disagreed, stating that statutory language requiring broad emergency services did not evince a special benefit to a particular class of persons: "In our view, acting to protect or assist a specific group of individuals, sufficient to create a special relationship, involves more than general actions taken to serve members of the public at large in need of emergency telephone services."
>
> The assertedly relevant portion of the present statute, like the statutes in *Gourdine* and *Muthukumarana*, protects the public in general by prohibiting certain contingency fees, without enumerating a particular class of persons. Therefore, no actionable tort duty inures from [the statute] to the benefit of [the plaintiffs].

(Some citations and internal quotation marks omitted).

- 36 -

By contrast, in Blackburn Ltd. P'ship v. Paul, 438 Md. 100, 111-12, 90 A.3d 464, 470-71 (2014), we explained that, pursuant to the Statute or Ordinance Rule, a plaintiff may demonstrate a *prima facie* case in negligence—a common law tort—by showing, among other things, the violation of a statute or ordinance that was intended to protect a particular class of people that includes the plaintiff. Specifically, in Blackburn, id. at 128, 90 A.3d at 480, we held that the defendants' alleged violation of a Code of Maryland Regulation ("COMAR") pertaining to barriers surrounding public swimming pools, "if proven, would demonstrate the breach of a duty from" the defendants to a three-year-old child who "entered the pool [of his apartment complex] by slipping through [an] allegedly defective gate"; that "[s]uch a duty, derived from statute, would apply irrespective of [the child]'s legal status on the property when the incident occurred"; and that "[a] reasonable trier of fact could find that such a duty existed, that [the defendant]s violated this duty, and that such violation was the cause of [the child]'s injuries." In Blackburn, id. at 110, 90 A.3d at 469-70, we acknowledged that the child was a trespasser, and that ordinarily a property owner owes a very limited common law tort duty to trespassers. However, we explained that "the Statute or Ordinance Rule" provided an exception to that limited duty, and that the "Rule can apply irrespective of a property owner's duty to trespassers under the common law[.]" Id. at 111, 117, 90 A.3d at 470, 474. We explained that, under the Statute or Ordinance Rule,

> to make out a *prima facie* case in a negligence action, all that a plaintiff must show is: (a) the violation of a statute or ordinance designed to protect a specific class of persons [that] includes the plaintiff, and (b) that the violation proximately caused the injury complained of. Proximate cause is established by determining whether the plaintiff is within the class of persons sought to

be protected, and the harm suffered is of a kind [that] the drafters intended the statute to prevent. It is the existence of this cause and effect relationship that makes the violation of a statute *prima facie* evidence of negligence.

Id. at 112, 90 A.3d at 471 (citation, internal quotation marks, and asterisks omitted).

Applying the Statute or Ordinance Rule, we held that "the COMAR regulations incorporate[d] the Model Barrier Code, which [] identif[ied] a specific class—namely, young children under the age of five years[,]" who were a "special class of young children that COMAR most assuredly recognize[d] as beneficiaries of the pool owner's duty." Id. at 125, 90 A.3d at 479. Under COMAR, the defendants "were required to provide a barrier that did not allow passage of a sphere 4 inches in diameter, except when the entrance gate was open." Id. at 125, 90 A.3d at 479 (citation omitted). We explained that COMAR set forth requirements for pool owners that were specifically meant to protect the class that was identified in the Model Barrier Code—children under the age of five. See id. at 125, 90 A.3d at 479. We concluded that the child, who was three years old at the time of the accident, "was clearly a member of this protected class." Id. at 126, 90 A.3d at 479. The holding in Blackburn gave rise to common law tort duty under the Statute or Ordinance Rule. Blackburn did not purport to establish a test for whether a statute gives rise to a private right of action for any and all actions that a plaintiff may seek to pursue.

In this case, we hold that there is no enforceable common law duty arising under RP § 14-127. Among the inquiries in determining whether there is an enforceable common law duty under RP § 14-127 are whether Appellants are members of the class of persons whom RP § 14-127 was designed to protect and whether the injury was the type that RP § 14-127 was designed to prevent. See Baker, 427 Md. at 711 n.16, 50 A.3d at 1123 n.16;

Blackburn, 438 Md. at 112, 90 A.3d at 471. The first inquiry is not satisfied in this case, as there is a difference between being a member of a group who arguably receives a benefit from a statute and being a member of a class whose injury the statute was designed to protect. A review of RP § 14-127's plain language, legislative history, and legislative purpose does not reveal any indication on the General Assembly's part to protect an identifiable class of persons. As discussed above, although Appellants, as consumers of settlements services, are members of a class who incidentally receive the benefit of RP § 14-127, at core, RP § 14-127 is a criminal statute that fails to mention, let alone identify with any specificity, consumers of settlement services, the public in general, or some other group of persons who are intended to be protected by RP § 14-127. Rather, RP § 14-127(c)(1) simply contains a general prohibition that persons connected "with the settlement of real estate transactions involving land in the State may not pay to or receive from another any consideration to solicit, obtain, retain, or arrange real estate settlement business"; *i.e.*, RP § 14-127(c)(1) contains only a prohibition, the by-product of which is a benefit that inures to consumers of settlement services. And, RP § 14-127's legislative history does not reveal that RP § 14-127 was enacted to create a tort duty that applies to persons who are connected with settlements.

Blackburn and the regulations at issue in Blackburn are readily distinguishable from RP § 14-127 and the circumstances of this case. In Blackburn, id. at 103, 105, 126-27, 90 A.3d at 466, 467, 479, the plaintiff's claim was grounded in the common law tort of negligence, but, due to the child's status as a trespasser and because a property owner owes no affirmative duty of care to a trespasser, the plaintiff could not pursue such a claim; we

held that, under the Statute or Ordinance Rule, the plaintiff could establish that: the child was a member of a protected class, *i.e.*, the class that COMAR was designed to protect; the fence failed to meet the requirements of COMAR; and there was sufficient circumstantial evidence of causation. Stated otherwise, Blackburn is a case in which this Court specifically found the violation of an ordinance or statute could under certain circumstances serve as evidence of negligence. Moreover, in Blackburn, id. at 125, 90 A.3d at 479, the regulatory history of the relevant COMAR provisions demonstrated that they were specifically designed to protect a specific class of persons—namely, children under the age of five—who could be harmed by pool barriers not complying with the regulation. Thus, COMAR clearly created a duty that was specifically intended to protect young children. See id. at 125, 90 A.3d at 479.

By contrast, here, Appellants do not bring a claim of negligence against Appellees; as such, this is not a case where a violation of RP § 14-127 could serve as evidence of Appellees' negligence. First, as a practical matter, in the second amended complaint, Appellants allege a knowing and deliberate illegal kickback scheme—*i.e.*, knowing violations of laws, including RP § 14-127—as opposed to negligence; thus, there is no underlying issue of duty. Even if a violation of RP § 14-127 could theoretically serve as evidence of Appellees' negligence under Blackburn, such a conclusion is meaningless in the context of this case, where Appellants have not alleged that Appellees were negligent in the first instance, and where the nature of Appellants' allegations would not support a negligence claim. At oral argument, Appellants' counsel acknowledged that the conduct that was involved in this case was "intentional[,]" that Appellees could not "negligently

pay a kickback[,]" and that Appellants' action was not a "negligence-based action[.]"

Equally significant is our determination that RP § 14-127 does not, and was not intended

or designed to, protect a specific class of persons. This determination is fatal to any

contention that RP § 14-127 creates an enforceable duty.[19]

### Policy Considerations

Before concluding, we pause to address policy considerations raised by Appellants.

Specifically, Appellants contend that implying a private right of action, *i.e.*, a civil remedy,

---

[19]We are similarly unpersuaded by Appellants' reliance on Horridge v. St. Mary's
Cnty. Dep't of Soc. Servs., 382 Md. 170, 854 A.2d 1232 (2004) for the contention that,
like the statutes at issue in Horridge, RP § 14-127 protects an identifiable class of persons.
In Horridge, 382 Md. at 187, 854 A.2d at 1241, we held that the General Assembly, through
certain statutes of the Family Law Article of the Code of Maryland, "has created a duty
flowing to children specifically identified to [the Department of Social Services] as being
the subject of suspected abuse[.]" (Emphasis omitted). We further stated that there existed
a common law tort duty under the statutes, explaining, in pertinent part:

> The legislative policy of preventing future harm to children already
> reported to have been abused is so abundantly clear as to be beyond cavil,
> and, given the statutory mandate to act and the general waiver of tort
> immunity when State employees fail to act in a reasonable way and harm
> ensues, we can see no great burden or consequence to regarding this existing
> statutory duty as a civil one from which tort liability may arise. . . . The
> [General Assembly] meant for [the Department of Social Services] and its
> social workers to act immediately and aggressively when specific reports of
> abuse or neglect are made, and the best way to assure that is done is to find
> that they do have a special relationship with specific children identified in or,
> upon reasonable effort, identifiable from, facially reliable reports of abuse or
> neglect and, subject to the State Tort Claims Act, to make them liable if harm
> occurs because they fail in their mandated duty.

Id. at 193, 854 A.2d at 1245 (emphasis omitted). Again, in contrast to Horridge, there is
no legislative policy or legislative history identifying consumers of settlements services as
a class of persons needing protection, such that we could conclude that RP § 14-127 creates
a common law tort duty owed to those consumers.

is a more effective and efficient remedy than a criminal penalty alone because implying a private right of action "would provide an incentive for those subject to the statute'[s] mandatory acts to conform to the statute in regard to each potential liability[-]inducing event—*i.e.*, in each and every real estate transaction." Appellants argue that, absent a private right of action, they and other consumers will lack "access to [S]tate court" and will be forced to seek relief in the federal court, which they maintain is more expensive and less accessible.

Appellees respond that whether a civil remedy is more effective and efficient is irrelevant where the General Assembly neither expressly nor by implication intended to create a private right of action. Appellees argue that whether or not an alleged victim can seek redress in State court has no bearing in determining whether a statute provides a private right of action. And, Appellees assert that, in any event, an alleged victim can bring a RESPA claim in State court. We agree with Appellees in all respects and explain.

As discussed in detail above, whether a State statute contains an implied private right of action turns on three specific inquiries concerning class, legislative intent, and legislative purpose. See Scull, 435 Md. at 121-22, 76 A.3d at 1191. That an implied private right of action allegedly would be a "better" remedy is simply not one of the considerations that we take into account, and, thus, such a consideration is irrelevant for purposes of determining whether a statute contains an implied private right of action. Indeed, we are concerned only with whether there is any basis from which we could conclude that the General Assembly, either expressly or impliedly, intended to create a private right of action. See Baker, 427 Md. at 710, 50 A.3d at 1123 ("[T]he central inquiry remains

whether the legislative body intended to create, either expressly or by implication, a private cause of action." (Citation, brackets, and internal quotation marks omitted)). Here, there is nothing from which we can glean any intent on the General Assembly's part to create an express or implied private right of action under RP § 14-127. Additionally, we note that it is the General Assembly's province to create private rights of action, as it is "legislative bodies [that] know how to 'salt the mine' for the enablement of implied private causes of action." Baker, 427 Md. at 715, 50 A.3d at 1126 (citations omitted). In other words, such policy considerations are best presented to the General Assembly, not this Court, and it would be up to the General Assembly to create a private right of action if it so chooses.

As to lacking access to State court, we disagree with Appellants' position. First, whether an alleged victim is able to redress his or her harm in a State court is not a consideration in determining whether a State statute contains an implied private right of action. Second, under RESPA, an alleged victim is permitted to bring a claim for violation of RESPA's provisions in either State or federal court. See 12 U.S.C. § 2614 ("Any action pursuant to the provisions of section 2605, 2607, or 2608 of this title may be brought in the United States district court or in any other court of competent jurisdiction, for the district in which the property involved is located, or where the violation is alleged to have occurred[.]"); cf. R.A. Ponte Architects, Ltd. v. Investors' Alert, Inc., 382 Md. 689, 691, 857 A.2d 1, 2 (2004) (This Court held that "a private cause of action for damages, under the provisions of the federal Telephone Consumer Protection Act, for the receipt of unsolicited commercial telephone facsimile messages . . . may be brought in courts of this State." (Citation omitted)). That a case filed in State court, in which a plaintiff claims a

RESPA violation, subsequently can be removed to the federal court is of no consequence to whether that plaintiff still has a remedy for alleged violations of RESPA. See 28 U.S.C. § 1446(a) ("A defendant . . . desiring to remove any civil action from a State court shall file in the district court of the United States for the district and division within which such action is pending a notice of removal . . . and containing a short and plain statement of the grounds for removal[.]").

As a final matter, we observe that our holding in this case—that RP § 14-127 does not contain an express or implied private right of action—in no way deprives Appellants of a remedy altogether. As discussed above, RP § 14-127(e) provides criminal penalties' for those who are convicted of violating RP § 14-127(c)(1)'s prohibition against kickbacks. And, under RESPA, Appellants are specifically provided a private right of action for the type of conduct prohibited under RP § 14-127. Specifically, 12 U.S.C. § 2607(a) prohibits persons from giving or accepting "any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." And 12 U.S.C. § 2607(b) prohibits persons from giving or accepting "any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed." 12 U.S.C. § 2607(d) provides both criminal and civil penalties, stating, in relevant part:

> (1) Any person or persons who violate the provisions of this section shall be fined not more than $10,000 or imprisoned for not more than one year, or both.

(2) Any person or persons who violate the prohibitions or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service.

. . .

(5) In any private action brought pursuant to this subsection, the court may award to the prevailing party the court costs of the action together with reasonable attorneys fees.

Thus, nothing in our holding today deprives Appellants of their private right of action against Appellees under RESPA.

### *Conclusion*

In sum, we hold that RP § 14-127 does not contain an express or implied private right of action, as neither RP § 14-127's plain language, legislative history, nor legislative purpose demonstrate any intent on the General Assembly's part to create a private right of action. Accordingly, we answer the certified question of law "no."

**CERTIFIED QUESTION OF LAW ANSWERED. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**