IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | | |
|---|---|---|
| EDWARD J. AND VICKIE FANGMAN, *et al.*, | * | |
| | * | |
| Plaintiffs, | * | Civil Action No.:1:14-cv-00081-RDB |
| v. | * | |
| GENUINE TITLE, LLC, *et al.*, | * | |
| Defendants. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DEFENDANT WEST TOWN BANK AND TRUST'S
## <u>OPPOSITION TO MOTION FOR CLASS CERTIFICATION</u>

Brian L. Moffet, Bar No. 13821
Dwight W. Stone, II, Bar No. 22968
Zachary S. Schultz, Bar No. 03927
MILES & STOCKBRIDGE, P.C.
100 Light Street
Baltimore, MD  21202
410-385-3656
bmoffet@milesstockbridge.com
dstone@milesstockbridge.com
zschultz@milesstockbridge.com
**Attorneys for Defendant West Town
Bank & Trust a/k/a West Town Savings Bank**

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL BACKGROUND...................................................................................2
        A.      West Town Bank & Trust ...........................................................................2
        B.      The Named Plaintiffs ..................................................................................4
                1.      Plaintiff Geraldine Walters ..............................................................4
                2.      Plaintiffs Jameson And Katherine Cooper....................................5

        C.      Genuine Title ..............................................................................................7

III.    THE STANDARD FOR CLASS CERTIFICATION.........................................11

IV.     ARGUMENT ........................................................................................................13
        A.      Plaintiffs' Equitable Tolling Claim Does Not Satisfy The
                Requirements Of Rule 23..........................................................................13
                1.      Plaintiffs Have Made No Effort To Satisfy Their Burden
                        That Equitable Tolling Applies Or Can Be Proven On A
                        Class-Wide Basis ............................................................................14
                2.      Equitable Tolling, Not To Be Confused With The Discovery
                        Rule, Is An Extraordinary Remedy To Be Used Only Sparingly..............16
                3.      Equitable Tolling Raises Inherently Individualized Issues That
                        Cannot Be Resolved Class-Wide ...................................................18
                4.      Plaintiffs Lack Standing To Represent The Proposed Class
                        Because The Evidence Does Not Support Equitable Tolling Of
                        Their Claims....................................................................................20
                5.      Plaintiffs' Equitable Tolling Claim Does Not Satisfy The
                        Commonality Or Predominance Elements Of Rule 23...............31
                6.      Class Adjudication Of Time-Barred Claims Subject To Unique
                        Statute Of Limitations Defenses Is Not Superior To Individual Adjudication
                        ..........................................................................................................34

        B.      Plaintiffs Fail To Meet Their Burden Of Proving Commonality And
                Typicality Because Their Argument To Avoid The Statute Of Limitations
                Does Not Apply To The Class They Seek To Represent......................36
                1.      Plaintiffs' Motion Identifies Three Different Groups Of Individuals
                        They Seek To Represent ..................................................................36
                2.      Plaintiffs Cannot Meet The Typicality And Commonality
                        Requirements With Respect To The Timely Group Or The
                        Time-Barred Group.........................................................................37

i

C.    Plaintiffs Cannot Meet The Typicality Requirements Because Their
      Claims Are Based On A Different Course Of Conduct And Different
      Legal Theories Than Those Of Each Other And Much Of The Class
      They Seek To Represent .......................................................................................38

D.    Individual Issues Regarding The RESPA Claims Predominate And Preclude
      To Class-Wide Adjudication..............................................................................41
      1.    Whether RESPA Applies To Each Putative Class Member Is A
            Highly Individualized Question That Cannot Be Determined
            By Common Poof ......................................................................................41
      2.    Determining Whether A RESPA Section 8 Violation Occurred
            Will Require Fact-Specific, Individualized Inquiries For Every
            Proposed Class Member ..........................................................................44

E.    Neither Plaintiffs Nor Their Counsel Are Adequate Representatives ..................46

F.    This Case Is Not Yet Similar To Other RESPA Cases Plaintiffs Cite Where
      A Class Was Certified...........................................................................................52

V.    CONCLUSION....................................................................................................54

# I.   INTRODUCTION

Plaintiffs Geraldine Walters (Ms. Walters) and Jameson and Katherine Cooper's ("the Coopers") motion seeking the extraordinary mechanism of class certification is defective and fails to satisfy the rigorous standards imposed by Rule 23 of the Federal Rules of Civil Procedure for several fundamental reasons.[1] *First*, Plaintiffs have completely ignored – apparently for strategic reasons – whether the Court can and should certify an "equitable tolling class" so as to resolve on a class-wide basis whether the claims of the putative class are timely despite the fact that this litigation was commenced against West Town more than one year after the loans of most of the putative class members closed (*i.e.*, beyond RESPA's 1-year statute of limitations). Notwithstanding Plaintiffs' surprising approach, the Court cannot ignore this elephant in the room. Indeed, the Court has recognized that for purposes of this case, equitable tolling on a class-wide basis would be required in order for class certification of merits issues to even be a viable consideration.  ECF No. 211 at 14. Yet, as courts addressing proposed equitable tolling classes have recognized, and as the facts of this case demonstrate, certifying an equitable tolling class does not comport with the requirements of Rule 23 because there are too many plaintiff-specific and fact-specific inquiries that predominate over any common questions of fact or law.

*Second*, even apart from the equitable tolling problem, the merits questions regarding Plaintiffs' RESPA claims are unsuitable for class treatment because Plaintiffs cannot meet their burden of proving that the case meets the commonality, typicality and adequacy requirements of Rule 23(a), much less satisfy the far more demanding requirements of predominance and superiority of Rule 23(b)(3).

---

[1] More than one and one half months *after* filing their motion for class certification and less than two weeks before West Town's opposition was due, Plaintiffs filed a motion to substitute a new named plaintiff for Plaintiff Deloris Woods, who withdrew from participating in this litigation more than seven months ago. ECF No. 350. West Town will be opposing Plaintiffs' motion to substitute and reserves its right to challenge certification of a class represented by the proposed new plaintiff, if that motion is granted.

*Finally*, Plaintiffs' invocation of case law does not support their request for class certification, as this case is materially unlike and factually inapposite to the RESPA cases they cite in which class certification was granted.

## II.       FACTUAL BACKGROUND

### A.  West Town Bank & Trust.

West Town is an Illinois state chartered bank that maintains commercial branch locations in Illinois and North Carolina and has loan production offices ("LPOs") in several states, including Maryland. Ex. 1, Declaration of Melissa Marsal ("Marsal Decl."), ¶ 2. Between January 1, 2009 and December 31, 2014, West Town operated sixteen (16) LPOs located throughout the State of Maryland. *Id*. While these sixteen (16) LPOs were responsible for originating more than 5,000 mortgage loans during this five-year period, only a small percentage of these loans (approximately 5%) were closed by Genuine Title. *Id*. These loans were originated by loan officers who worked in one of eight (8) of West Town's sixteen (16) Maryland LPOs. Exs. 2A and 2B, West Town's Ans. to Int. No. 3, and June 28, 2016 letter from Brian Moffet, Esq. supplementing the response. These eight (8) LPOs employed more than 280 people, including approximately 175 mortgage loan originators (including branch managers). Ex. 3, List of West Town employees in the eight (8) Maryland LPOs. Only 48 of these mortgage loan originators were responsible for originating one or more mortgage loans closed by Genuine Title, with approximately twenty (20) originators originating only one such loan during the relevant five-year period. Exs. 2A and 2B, West Town's Ans. to Amended Ints., Apx. A, and June 28, 2016 letter from Brian Moffet, Esq. Curtis Cullison is one of these originators.

Mr. Cullison was responsible for originating Ms. Walters' reverse mortgage. Ex. 4, Declaration of Curtis Cullison ("Cullison Decl."), ¶ 3. This is the only loan he originated while employed at West

Town that Genuine Title closed. Ex. 2A, West Town's Ans. to Amended Ints., Appendix A. Between April 2011 and August 2011, Mr. Cullison worked as a mortgage loan originator at West Town's Abington LPO. Ex. 4, Cullison Decl. ¶ 2. The Abington LPO employed 35 individuals at various times between 2009 and 2014. Ex. 3, List of West Town employees. Eight (8) of these employees, including Mr. Cullison, were responsible for originating a total of eleven (11) loans closed by Genuine Title. Exs. 2A and 2B, West Town's Ans. to Amended Ints., Apx. A, and June 28, 2016 letter from Brian Moffet, Esq.

In contrast, the Coopers' mortgage loan was originated by George Makoutz, who was the branch manager of West Town's Ellicott City LPO. Ex. 5, Deposition of Jameson Cooper ("JC Dep.") at 30:17-31:16. Mr. Makoutz originated a total of twenty-two (22) mortgage loans that were closed by Genuine Title between April 2010 and February 2011. Ex. 2A, West Town's Ans. to Amended Ints., Apx. A. Another twenty-six (26) loans originated by different mortgage loan originators in the Ellicott City LPO also were closed by Genuine Title between November 2010 and March 2013. *Id.*; *see also* Ex. 2B June 28, 2016 letter from Brian Moffet, Esq.

The remaining 200 or so West Town loans that were closed by Genuine Title were originated by different mortgage loan originators who worked in different LPOs at different periods of time. *Id.* None of the named Plaintiffs obtained a loan from these other mortgage loan originators or from any other LPO.

**B.  The Named Plaintiffs.**

**1.  Plaintiff Geraldine Walters.**

Ms. Walters obtained her reverse mortgage loan from West Town in August 2011. Ex. 6, Walters HUD-1. The only West Town representative with whom she spoke was Mr. Cullison. Ex. 7, Deposition of Geraldine Walters ("Walters Dep.") at 47:6-9.

Prior to closing on the loan, Mr. Cullison provided Ms. Walters with a series of documents, including a Notice of Right to Select Attorney or Title Company, which she signed. Ex. 7, Walters Dep. at 36:11-37:6. This notice informed Ms. Walters that she "may select the attorney or title company which will provide these [settlement services] and close the loan."  Ex. 8, Notice of Right to Select Attorney or Title Company.  Ms. Walters testified that she understood she had the right to select her own title company and, in fact, her now-deceased husband selected the title company that closed the loan they obtained to purchase their home back in 1983. Ex. 7, Walters Dep. at 22:3-7; 37:8-16. Ms. Walters knew that her loan could not be settled without a title company and that if she did not select one, one would be selected for her.  *Id.* at 37:8-38:5. Because Ms. Walters did not know how to select her own title company, Mr. Cullison selected Genuine Title for her. *Id.* at 32:3-5; 37:8-16. In doing so, Mr. Cullison did not make any oral statements to Ms. Walters regarding the selection of Genuine Title, and Ms. Walters asked no questions about it, nor can she remember having any discussions with Mr. Cullison concerning settlement costs. *Id.* at 38:7-39:2; 23:13-16. Other than the HUD-1, Ms. Walters received no documents prior to settlement disclosing or referencing Genuine Title.

Mr. Cullison was not part of any "kickback scheme." He had no agreement or understanding with anyone regarding the referral of any business to Genuine Title, and did not receive any kickbacks

or anything of value from anyone in exchange for the referral of real estate settlement business to Genuine Title with respect to Ms. Walters' loan or any loan. Ex. 4, Cullison Decl., ¶¶ 2, 4-5.

Ms. Walters' reverse mortgage loan settled on August 20, 2011. Ex. 6, Walters HUD-1. The August 20, 2011 HUD-1 listed all of the settlement charges associated with Ms. Walters' loan. *Id.*. Ms. Walters paid Genuine Title for title insurance in the amount of $1,158, (*id.* at Line 1104), and another $1,700 in other charges including $850 for an abstract or title search (*id.* at Line 1109) and $850.00 for a title examination (*id.* at 1110). Ms. Walters testified that when she received the loan proceeds, she was not satisfied with her loan because she felt the amount of loan proceeds she received "was not as much as I thought I should have gotten." Ex. 7, Walters Dep. at 13:4-12. However, she did not ask any questions of Mr. Cullison or anyone else at West Town nor did she investigate or pursue the issue in any way. *Id.* at 13:13-14:4; 14:8-15:16; 52:5-21.  In fact, even after she received a solicitation letter from her present attorneys in October 2014, she still "didn't even try to do anything about it." Ex. 7, Walters Dep. at 72:21-73:4; Ex. 9, Solicitation letter dated October 24, 2014.

**2.  Plaintiffs Jameson and Katherine Cooper.**

On January 4, 2011, the Coopers obtained a mortgage loan from West Town in the principal amount of $417,000. Ex. 5, JC Dep. at 37:1-7. To obtain the loan, the Coopers worked with George Makoutz pursuant to a Broker Agreement. *Id.* at 30:17-31:14; 42:13-16; *see also* Ex. 10, Broker Agreement.

Prior to closing, Mr. Makoutz provided the Coopers with a series of documents, including (i) a "Settlement Services Disclosure" that informed the Coopers of the right to select their own title company (Ex. 11); (ii) three copies of the same "Settlement Services Provider List" dated August 25, 2010, September 23, 2010, and December 30, 2010 (Exs. 12A-12C), each identifying Genuine Title as a

potential provider of settlement services but expressly stating that reference to Genuine Title should not be construed as an endorsement of the company and that the Coopers are not obligated to use Genuine Title and are free to shop and select their own title company; and (iii) an "Initial Fees Worksheet" dated August 25, 2010, September 23, 2010, and December 30, 2010 (Exs. 13A-13C), that, *inter alia*, identified the title/settlement charges associated with the loan and included a reference to Genuine Title. The Coopers signed these documents[2] without asking any questions about Genuine Title or the amount of settlement charges. Ex. 5, JC Dep. at 57:18-20; 66:9-68:15; 71:5-73:17; 74:15-75:2; 78:2-8; 81:11-82:4; 87:10-13; Ex. 14, Deposition of Katherine Cooper ("KC Dep.") at 28:19-31:17; 34:18-35:7; 50:11-56:22. The Coopers also did not shop and select their own title company as was their right. Ex. 5, JC Dep. at 43:18-20; 54:16-55:13; Ex. 14 KC Dep. at 25:9-14; 26:15-27:5; 36:6-20; 55:9-16. As a result, Mr. Makoutz engaged Genuine Title to handle the closing of the Coopers' loan. Ex. 5, JC Dep. at 56:4-20; Ex. 14 KC Dep. at 36:6-20; 55:9-16.

The Coopers settled on their loan on January 4, 2011. Ex. 15, Cooper HUD-1. They netted $344,172.43 from the transaction and received this amount in cash. *Id.* Other than "Cash Out Other," West Town has no information concerning the purpose of the loan or how the Coopers used their loan proceeds. Ex. 16, Loan Application. At settlement, the Coopers signed a HUD-1 that listed all of the settlement charges associated with their loan. Ex. 15, the Coopers' HUD-1. According to the HUD-1, the Coopers paid Genuine Title for title insurance in the amount of $1,150.80 (*id.* at Line 1104), and another $975 in other charges, including $500 for an abstract or title search (*id.* at Line 1109) and $475 for a title examination (*id.* at 1110).

---

[2] It is unclear from the Coopers' testimony whether they actually signed each of the referenced documents. In some instances, Mr. Cooper was not confident that he signed certain documents and in other instances, Ms. Cooper disputed the genuineness of her signature. *See, e.g.,* Ex. 5, JC Dep. at 57:18-58:17; Ex. 14, KC Dep. at 55:17-56:9.

The Coopers admit that despite being unhappy with the settlement charges and believing that they were overcharged at the time they received the loan, they did nothing to discover the claim they allege in this case. Ex. 5, JC Dep. at 92:7-93:14; Ex. 14, KC Dep. at 79:6-9. The Coopers did not ask any questions about Genuine Title in connection with their loan and did not ask whether West Town or Mr. Makoutz had any business or other type of relationship with Genuine Title. Ex. 5, JC Dep. at 71:5-72:4; Ex. 14, KC Dep. at 27:10-28:11; 36:21-37:3; 39:21-40:20. Ms. Cooper testified that she believed no such relationship existed because one of the documents she signed indicated that Genuine Title was not "affiliated" with West Town, but she did not make any further inquiry beyond reading the disclosure. Ex. 14, KC Dep. at 37:4-14-40:16.

On or about October 24, 2014, the Coopers received an unsolicited letter regarding West Town from one of their present attorneys, stating that "[i]f you were a victim, you are entitled to recovery – in many cases THOUSANDS OF DOLLARS." Ex. 5, JC Dep. at 96:11-20; Ex. 14, KC Dep. at 92:10-12; Ex. 17, Solicitation letter dated October 24, 2014 to "Jameson & Cooper."  Even after receiving the solicitation letter, the Coopers still did not take any action to investigate their claim besides calling the attorney's office. Ex. 14, KC Dep. at 79:6-9. The Coopers did not review their loan documents nor did they call Mr. Makoutz or anyone else at West Town to inquire about the "kickback scheme" alleged in the letter. Ex. 5, JC Dep. at 105:15-106:17; Ex. 14, KC Dep. at 103:14-104:5.

**C.  Genuine Title.**

According to its president, Jay Zukerberg, Genuine Title provided marketing materials and paid money to *unidentified* brokers, managers, banks and lenders in exchange for an agreement from these same individuals to refer borrowers to Genuine Title for title services. Ex. 2 to Pls. Mot., ¶¶ 4-5.

Contrary to Plaintiffs' characterization of his affidavit (Pls. Mot. at 5),[3] Mr. Zukerberg previously testified at a deposition that Genuine Title's settlement costs were <u>not</u> higher because it paid kickbacks. Mr. Zukerberg testified that his arrangements with the various mortgage brokers "didn't determine what I was charging. I charged what I charged." Ex. 18, Zukerberg Dep. at 37:10-38:16. According to Mr. Zukerberg, whatever inducements he was paying "came out of [Genuine Title's] profits" and "sometimes [Genuine Title] didn't make much at all" and other times it "really didn't make anything." *Id.* at 38:1-4; 41:11-20. In other words, Genuine Title's settlement charges were not inflated and the cost would not have been lower "[b]ut for Genuine Title's Kickback Scheme" (SAC, ¶ 261); Genuine Title simply did not make as much money for the settlement services it performed on loans where inducements were provided. *Id.*

In support of the kickback scheme, Plaintiffs attach to their motion hundreds of checks from Genuine Title and other documents that have nothing to do with their transactions or their claims against West Town. *See* Exs. 3A-C, 4, 9-11 to Pls. Mot. Some of these checks are payable to one of the three non-lender defendants while others are payable to individuals who never worked for and have no relationship with West Town. Exs. 3A-C, 4, 9 to Pls. Mot. A third group of checks are payable to mailing services providers and appear to concern the marketing activities of Wells Fargo. Exs. 10-11 to Pls. Mot. While these documents may support claims against others, they do not support Plaintiffs' claims against West Town.

---

[3] Plaintiffs mischaracterize Mr. Zukerberg's affidavit as acknowledging that "the kickbacks resulted in higher prices to borrowers." Pls. Mot. at 5. That is not what the affidavit says. Rather, the affidavit, which was prepared by Plaintiffs' counsel for Mr. Zukerberg to sign in lieu of Mr. Zukerberg appearing for a deposition, states that Genuine Title would have preferred to compete against other title companies "by providing lower pricing" but paying kickbacks was "far more effective." Ex. 2 to Pls. Mot., ¶ 6. Mr. Zukerberg explains in an earlier deposition that "other title companies . . . were making similar inducements to the mortgage originators to refer work" and Genuine Title felt that in order to compete, "[it] had to do the same thing." Ex. 18, Deposition of Jay Zukerberg ("Zukerberg Dep.") at 26:13-27:12.

Plaintiffs recognize this and refer to other documents that supposedly show that Genuine Title's "kickback" scheme "reached the top levels of [West Town]." Pls. Mot. at 9. Not only is this a gross exaggeration but the statement is based on conjecture and speculation. For example, Plaintiffs attach to their motion a series of checks from Genuine Title payable to certain individuals who, at one time, were employed by West Town. Comparing these checks with West Town's employment records reveals that almost all of these checks pre-date or post-date the individual's employment with West Town.

| Ex. | Payor | Payee | D/Check(s) | D/Employment |
|-----|-------|-------|-----------|--------------|
| 25 | Genuine Title | Teri Johnson | 5/13/09; 11/10/09 | 3/29/10-4/14/10 |
| 26 | Genuine Title | Adam Ellis | 4/17/09 | 1/18/11-4/27/11 |
| 26 | Genuine Title | BK&N  (Jason Sklar) | 4/17/09; 5/6/09 | 9/29/10-5/31/13 |
| 26 | Genuine Title | Bernard Burns Jr. | 3/3/09 | 10/17/11 – 12/15/11 |
| 27 | Genuine Title | Fred Campbell | 1/17/12 | 8/31/10-11/10/10 |
| 27 | Genuine Title | Christian Dixon | 2/9/09 | 11/15/10-3/31/11 |
| 27 | Genuine Title | Bryce Jackson | 5/8/09; 2/16/12 | 11/19/10-3/3/11 |

Ex. 1, Marsal Decl., ¶ 3. West Town does not know the circumstances surrounding the issuance of these checks, but they are unrelated to and do not support Plaintiffs' claims. *First*, none of the payees on these checks had anything to do with Plaintiffs' loans. Plaintiffs do not know these individuals, have never spoken with these individuals, and did not obtain a loan with the assistance of these individuals. Ex. 5, JC Dep. at 147:7-150:1; Ex. 7, Walters Dep. at 82:17-84:20; Ex. 14, KC Dep. at 82:22-85:10. *Second*, to the extent Plaintiffs believe these checks represent illegal payments, they are payments to individuals who were not employed by West Town at the time. Thus, regardless of the bona fides of the payments, they are insufficient to create liability for West Town.

Next, Plaintiffs focus on checks prepared by Genuine Title that are payable to Chris Casazza and Brent Erickson's wife. Messrs. Casazza and Erickson jointly managed the Bel Air South LPO, but they reported to another manager who reported to an officer of the bank who ultimately reported to the bank's president. Ex. 1, Marsal Decl., ¶ 4. Messrs. Casazza and Erickson therefore hardly represent the

"top levels of the organization" as suggested by Plaintiffs. Pls. Mot. at 9. Plaintiffs also exaggerate the number of checks payable to these individuals by attaching multiple copies of the same checks,[4] when in reality Mr. Casazza and Mr. Erickson's wife received twelve (12) checks from Genuine Title over an eight month period beginning September 15, 2010 and ending May 16, 2011.[5] Exs. 18 & 19 to Pls. Mot. This is remarkable for several reasons. *First*, neither Ms. Walters nor the Coopers dealt with Mr. Casazza or Mr. Erickson or anyone else in the Bel Air South LPO. Ex. 5, JC Dep. at 42:13-16; Ex. 7, Walters Dep. at 28:1-4; 26:3-10; Ex. 14, KC Dep. at 42:1-12. Accordingly, any check by Genuine Title to Mr. Casazza or Mr. Erickson's wife that Plaintiffs claim represents an impermissible payment involved a transaction *other than Plaintiffs.' Second*, Plaintiffs seek to certify a class based on a five year period beginning January 1, 2009 and ending December 31, 2014, yet these checks cover a much smaller, more limited period of time (*i.e.*, September 2010 – May 2011).

Plaintiffs' reliance on these checks is further complicated by affidavits their counsel obtained from Messrs. Casazza and Erickson that make clear that the term of their "agreement" to refer settlement services to Genuine Title coincided with the dates of the checks they received from Genuine Title and when the checks stopped, so did the agreement to refer settlement services.  ECF No. 349 (Exs. B & C). Assuming this is true, there are, at least, 47 loans originated by mortgage loan originators in the Bel Air

---

[4] Exhibit 19 purports to include 16 checks payable to Mr. Casazza or Mr. Erickson's wife, but upon closer examination, there are only 6 unique checks. Either intentionally or through oversight, Plaintiffs attached four copies of the same three checks and two copies of another check.

[5] Plaintiffs also attach a series of checks drawn on an account jointly owned by Messrs. Casazza and Erickson that are made payable to various individuals who worked at the Bel Air South LPO. Plaintiffs speculate "upon information and belief" that these checks show that "[a]ll of these loan officers . . . furthered the illegal kickback scheme." Pls. Mot. at 10. Plaintiffs offer no support for their belief and the evidence they attach to their motion appears to undermine the claim. First, the dates of the employee checks are not conterminous with the Genuine Title checks to Mr. Casazza and Mr. Erickson's wife. For example, some of the checks drawn on Messrs. Casazza and Erickson's account are from 2013 yet the last payment from Genuine Title is dated May 16, 2011. Second, the aggregate amount of these checks far exceeds the aggregate amount of the Genuine Title checks to Mr. Casazza and Mr. Erickson's wife. Third, many of the checks reflect reimbursement of expenses, which makes complete sense given that the checks are drawn on the Bel Air South LPO's operating account. *Compare* Exs. 18-19 to Pls. Mot. *to* Ex. 20 to Pls. Mot. Against these facts, the Court cannot and should not accept such rank speculation.

South LPO that are entirely unrelated to Genuine Title's alleged kickback scheme. These 47 loans were closed by Genuine Title either well before its first check or well after its last check and thus, undermine Plaintiffs' attempt to certify a five year class beginning January 1, 2009. Exs. 2A and 2B, West Town's Ans. to Amended Ints., Apx. A, and June 28, 2016 letter from Brian Moffet, Esq.

Lastly, Plaintiffs rely on a series of checks from Genuine Title payable to Cambridge Business Solutions ("CBS"). Ex. 23 to Pls.' Mot. CBS is a trade name for Cambridge Mortgage Corporation. The Maryland Department of Assessments and Taxation records indicate that Cambridge Mortgage Corporation was formed by Mr. Makoutz, on January 30, 1996, almost fourteen years before Mr. Makoutz's employment with West Town started. Ex. 2A, West Town's Answers to Amended Interrogatories, Ans. to Int. No. 10. Plaintiffs surmise that the Genuine Title checks made payable to CBS represent illegal payments but have presented no evidence to support this belief. Even if Plaintiffs' belief were correct, the checks are dated June 7, 2010 through November 20, 2012, yet Plaintiffs are asking this Court to certify a class of West Town borrowers from January 1, 2009 and through December 31, 2014.

### III.    THE STANDARD FOR CLASS CERTIFICATION

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). Accordingly, this Court must conduct a "rigorous analysis" to determine whether the class action requirements are satisfied. *Id.* at 350-51. Class certification does not come easily - and rightly so. Class actions are expensive to litigate, which, along with the *"in terrorem* increment of the settlement value," may unjustly force

defendants to settle even "anemic" class claims. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 558. 559 (2007) (internal quotations and citations omitted).

Rule 23 "imposes stringent requirements for certification that in practice excludes most claims." *Am. Express Co. v. Italian Colors Rest.*, 133 S.Ct. 2304, 2310 (2013). Indeed, Rule 23 "does not set forth a mere pleading standard." *Comcast Corp. v. Behrend,* 133 S.Ct. 1426, 1432 (2013) (quoting *Dukes,* 564 U.S. at 350). Rather, a party must not only "be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation as required by Rule 23(a)," but the "party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Id.* at 1432 (internal quotations and citations omitted). Courts cannot accept speculation or shortcuts in lieu of the requisite "evidentiary proof." *Id.*; *see also General Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("actual, not presumed, conformance with Rule 23 . . . remains . . . indispensable").

Plaintiffs must first prove an ascertainable class that satisfies all four requirements of Rule 23(a), namely, that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a)(1)-(4). These four requirements "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Dukes*, 564 U.S. at 349 (internal quotations and case citations omitted). Only if Plaintiffs satisfy all four elements is the Court obliged to consider the requirements of Rule 23(b). *See Broussard v. Meineke Disc. Muffler Shops Inc.*, 155 F.3d 331, 337 n.3 (4th Cir. 1998) (quoting *Lukenas v. Bryce's Mountain Resort, Inc.*, 538 F.2d 594, 596 (4th Cir. 1976) ("It is, however, unimportant to determine whether the action meets the criteria of

[section (b)], if . . . plaintiffs' action failed to qualify for class action treatment under . . . section (a) of Rule 23, qualifications which a party must satisfy as a basis for class certification before compliance with section (b) of Rule 23 is considered. . . .")).

Rule 23(b) sets forth three general types of class actions. Plaintiffs contend the class should be certified pursuant to Rule 23(b)(3), which requires the Court to find that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast*, 133 S.Ct. at 1432. Predominance "tes[ts] whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* (quoting *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). Plaintiffs must show that "the issues they seek to litigate are ones that are 'readily susceptible to classwide proof.'" *Lloyd,* 266 F.R.D 98, 105 (D. Md. 2010) (quoting *Broussard,* 155 F.3d at 341). "Plaintiffs must also demonstrate that a given question 'can be resolved for each class member in a single hearing.'" *Id.*, (quoting *Thorn v. Jefferson-Pilot Ins. Co.,* 445 F.3d 311, 319 (4th Cir. 2006)). If "'resolution turns on a consideration of the individual circumstances of each class member,' then commonality and predominance are lacking" and a class cannot be certified. *Id.*

## IV.    ARGUMENT

### A.  Plaintiffs' Equitable Tolling Claim Does Not Satisfy The Requirements Of Rule 23.

RESPA requires that actions brought pursuant to 12 U.S.C. § 2607 (Section 8) be asserted within one year "'from the date of the occurrence of the violation,' which generally refers to the date of closing for loan origination violations." *Grant v. Shapiro & Burson*, LLP, 871 F. Supp. 2d 462,

470 (D. Md. 2012) (quoting 12 U.S.C. § 2614) (citations omitted). Here, neither set of Plaintiffs obtained their loan within one year of the filing of their claims against West Town. The Coopers' loan closed on January 4, 2011, and Ms. Walters' loan closed several months later on August 20, 2011. SAC, ¶¶ 111-12. However, it was not until January 2, 2015 – more than three years later – that the amended complaint was filed, naming West Town as a defendant for the first time.  ECF No. 47. As a result, this Court held that "in order to avoid dismissal for untimely filing, Plaintiffs must demonstrate that their claims warrant equitable tolling." ECF No. 211 at 14. Plaintiffs have this same burden for much of the class they seek to represent since membership is defined to include borrowers who obtained mortgage loans from West Town more than one year – and in some cases as many as six years - before the filing of the First Amended Complaint on January 2, 2015. Plaintiffs have not and cannot satisfy this burden either individually or on a class-wide basis.

1.    **Plaintiffs Have Made No Effort To Satisfy Their Burden That Equitable Tolling Applies Or Can Be Proven On A Class-Wide Basis.**

Treating the issue of equitable tolling as a foregone conclusion, Plaintiffs make no effort to justify their remarkable request that this Court certify a class back to 2009 on a claim that is subject to a one-year statute of limitations. Not only do Plaintiffs fail to cite any case law in support of their request, they also fail to present a single piece of evidence to satisfy their burden that equitable tolling applies. In fact, the term "equitable tolling" does not appear anywhere in their motion for class certification.

While this Court previously held that "RESPA claims are eligible for equitable tolling," it made no finding whether Plaintiffs are entitled to equitable tolling or whether the claims can be equitably tolled on a class-wide basis. Ex. 19, Transcript from June 15, 2016 hearing at 6:4-18 ("I [Judge Bennett] ultimately held in that opinion [ECF No. 211] that the RESPA claims are eligible for equitable tolling and haven't ruled whether it tolled or not . . .") and 6:13-18 (". . . the issue still remains with respect to

due diligence and whether or not the equitable tolling . . .  applies or not").[6]  Nor could it; the Court's ruling was based solely on sufficiency of the allegations in the Second Amended Complaint. It made no factual findings or legal conclusions as to whether there was any evidence showing that these Plaintiffs or the putative class actually satisfied the prerequisites for equitable tolling. Thus, this Court's prior ruling does not control the merits of whether Plaintiffs have established that equitable tolling applies either individually or class-wide. *McAnaney v. Astoria Fin. Corp.*, Case No. 04-cv-01101-ADS-WDW, 2007 U.S. Dist. LEXIS 67552, *48-49 n.19 (E.D.N.Y. Sept. 12, 2007) (prior ruling that plaintiffs sufficiently alleged equitable tolling did not bind subsequent decision of whether equitable tolling applied).  To hold otherwise would improperly relieve Plaintiffs of their burden to prove that certification of an equitably tolled class is appropriate. *Thorn*, 445 F.3d at 321 ("[W]e have stressed in case after case that it is not the defendant who bears the burden of showing that the proposed class does not comply with Rule 23, but that it is the plaintiff who bears the burden of showing that the class does comply with Rule 23.") (citations omitted); *Stand Energy Corp. v. Columbia Gas Transmission Corp.*, No. Civ. A. 2:04-0867, 2008 U.S. Dist. LEXIS 63913, *63 (S.D. W.V. Aug. 19, 2008) (holding that it is plaintiff's burden to prove that equitable tolling applies class-wide as part of their burden to show compliance with Rule 23).

Plaintiffs' cavalier approach is even more remarkable given the overwhelming case law within the Fourth Circuit refusing to certify classes that require equitable tolling due to the individualized issues that a tolling analysis requires.  *Thorn,* 445 F.3d at 321 (finding that equitable tolling is not

---

[6] Plaintiffs' failure to satisfy their burden that equitable tolling is available to them and to the putative class is particularly surprising given their counsel's agreement with the Court's recitation of the status of this case during the June 15, 2016 hearing. At that time, this Court made clear that in deciding defendants' motions to dismiss, it only found that RESPA claims are eligible for equitable tolling and made no finding as to whether equitable tolling applies to Plaintiffs' claims. Ex. 19, Tr. at 6:4-8. Plaintiffs' counsel responded "That is correct." *Id.* at 6:10. Despite clearly understanding this Court's prior ruling, Plaintiffs filed their motion for class certification almost one month later on July 11, 2016, without presenting any evidence or argument supporting the application of equitable tolling individually or on a class-wide basis.

readily susceptible to class-wide determination because "[e]xamination of whether a particular plaintiff possessed sufficient information such that he knew or should have known about his cause of action will generally require individual examination of testimony from each particular plaintiff to determine what he knew and when he knew it"); *Broussard,* 155 F.3d at 342 (reversing trial court class certification, in part, because equitable tolling depended upon individualized showings as to what each putative class member knew and when); *Minter v. Wells Fargo Bank, NA*., Civil Action WMN-07-3442, 2013 U.S. Dist. LEXIS 59965, at *13, *12 (D. Md. Apr. 26, 2013) (because "a RESPA violation [is] not a self-concealing wrong which satisfies the fraudulent concealment element of tolling," the circumstances of each individual borrower's transaction are "relevant to the concealment and due diligence inquiries of tolling" and thus, give rise to "difficulties in managing a class action" that make certification inappropriate). Indeed, the availability of equitable tolling rests on what each putative class member knew and understood, what, if any, affirmative acts of concealment were directed to him or her, and what level of due diligence, if any, each putative class member exercised to protect his or her rights. Inasmuch as Plaintiffs have not made any effort to satisfy their burden to prove that equitable tolling is available to them or the putative class, their request to certify an equitably tolled class must be denied.

2.     **Equitable Tolling, Not To Be Confused With The Discovery Rule, Is An Extraordinary Remedy To Be Used Only Sparingly.**

Plaintiffs allege in the Second Amended Complaint that "despite exercising reasonable diligence, the Plaintiffs and the [putative] Class Members did not, and could not have learned of the illegal kickback scheme until contact by counsel." SAC, ¶ 253. However, discovery shows that despite being "unsatisfied" with the loan or believing that the settlement fees they paid were too "high," Plaintiffs did

not engage in any "diligence" to investigate the claim they now assert against West Town. Ex. 5, JC Dep. at 92:7-93:14; Ex. 7, Walters Dep. at 13:21-14:7; 52:22-53:5. Rather, Plaintiffs contend they are entitled to equitable tolling because they filed the First Amended Complaint against West Town within one year after "becoming aware that there was a possible breach of RESPA and illegal kickbacks paid." Ex. 20, Walters' First Supp. to Ans. to First Set of Ints., Ans. to Int. No. 22; Ex. 21, Mr. Cooper's First Supp. to Ans. to First Set of Ints, Ans. to Int. No. 22. Plaintiffs' position conflates an equitable tolling analysis with the discovery rule, which does not apply to RESPA.[7]

"Unlike the discovery rule, which determines the time of the initial commencement of a limitations period, '[e]quitable tolling functions to stop the statute of limitations from running where the claim's accrual has already passed.'" *Forbes v. Eagleson*, 228 F.3d 471, 486 (3d Cir. 2000) (citation omitted). This is a critical distinction for purposes of class certification. Whereas a discovery rule issue might be susceptible to common proof of when a "hypothetical reasonably diligent plaintiff" should have been placed on notice, *see Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 646-47 (2010), equitable tolling is a very different animal. The Fourth Circuit has admonished on a number of occasions that equitable tolling is an extraordinary remedy and that "any invocation of equity to relieve the strict application of a statute of limitations must be guarded and infrequent, lest circumstances of

---

[7] The discovery rule does not apply to RESPA claims because Congress specifically legislated that the time of the alleged statutory violation is the time of accrual for such claims. *White v. PNC Fin. Servs. Group, Inc.*, Civil Action No. 11-7928, 2013 U.S. Dist. LEXIS 86650, at *10 n.3 (E.D. Pa. Jun. 20, 2013) ("Courts have found the discovery rule inapplicable to violations of § 2607 [i.e., one-year limitations period under RESPA] 'because Congress was explicit in establishing a designated time for the filing of an action.'") (quoting *Mullinax v. Radian Guar. Inc.*, 199 F. Supp. 2d 311, 324 (M.D.N.C. 2002)); *see also TRW Inc. v. Andrews*, 534 U.S. 19, 27-28 (2001) ("Where Congress has specified an accrual date by 'explicit command' or 'by implication from the structure and text of the statute,' we defer to its directive.").

individualized hardship supplant the rules of clearly drafted statutes." *Chao v. Virginia Dept. of Transp.*, 291 F.3d 276, 283 (4th Cir. 2002) (quoting *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000) and *Spencer v. Sutton*, 239 F.3d 626, 629 (4th Cir. 2001)). Equitable tolling is permitted only in the narrowest circumstances, and Plaintiffs have made no showing that it should be so liberally applied here. *Rouse v. Lee*, 339 F.3d 238, 246 (4th Cir. 2003) (en banc) (equitable tolling is available only in "those rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result") (citation omitted); *see also Val-Com Acquisitions Trust v. Wells Fargo Bank, N.A.*, Civil Action No. 3:10-CV-1331-L,  2011 U.S. Dist. LEXIS 67882, at *10 (N.D. Tex. June 23, 2011) (holding that even if equitable tolling is available under RESPA, it "should only be available in 'rare and exceptional circumstances'") (citations omitted).

### 3. Equitable Tolling Raises Inherently Individualized Issues That Cannot Be Resolved Class-Wide.

To meet the very steep threshold for equitable tolling set by the Fourth Circuit, Plaintiffs have the burden of establishing "(1) that [they have] been pursuing [their] rights diligently, and (2) that some extraordinary circumstance stood in [their] way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005) (citation omitted). Here, the extraordinary circumstance Plaintiffs identify is "fraudulent concealment." SAC, ¶ 4. To invoke equitable tolling under a theory of fraudulent concealment, Plaintiffs must demonstrate that (1) West Town fraudulently concealed facts that are the basis of their claims, and (2) they failed to discover those facts within the statutory period, despite (3) the exercise

of due diligence. *Supermarket of Marlington, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122

(4th Cir. 1995) (citing *Weinberger v. Retail Credit Co.*, 498 F.2d 552, 555 (4th Cir. 1974)).

The first element of fraudulent concealment requires more than merely failing to disclose illegal

conduct; it requires evidence of additional affirmative conduct directed at deflecting litigation.

*Pocahontas Supreme Coal Co. Inc. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218-19 (4th Cir. 1987); *see*

*also Pinney Dock & Transport Corp. v. Penn. Cent. Corp.*, 838 F.2d 1445, 1472 (6th Cir. 1988)

(holding that mere silence, or one's unwillingness to divulge one's allegedly wrongful activities, does

not by itself establish fraudulent concealment).

As to the second and third elements, "[t]he objective standard of due diligence requires

reasonable investigation of the possibility of misrepresentation once an individual has been placed on

inquiry notice of wrongdoing." *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993).

In the Fourth Circuit, "[i]nquiry notice is triggered by evidence of the *possibility of fraud*, not by

complete exposure to the alleged scam. *Go Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 179 (4th

Cir. 2007) (quoting *Brumbaugh*, 985 F.2d at 162) (emphasis added). This holds true even if the fraud is

allegedly well-disguised. *Id.* The *GO Computer* decision puts the point in context:

> Fraud by its nature is something perpetrators take pains to disguise, and
> plaintiffs' notion that allegedly concealed fraud excuses the need for any
> diligence on plaintiffs' part would permit statutory periods to be tolled
> indefinitely, even when plaintiffs could reasonably be expected to bring
> suit.

*Id.* at 179 (affirming dismissal of suit on statute of limitations grounds). *See also Brown v. Neuberger,*

*Quinn, Gielen, Rubin & Gibber, P.A.*, 495 Fed. App'x 350, 356 (4th Cir. 2012) (citing *GO Computer*

for the proposition that "a party's diligence is crucial in establishing his right to equitable tolling due to

fraudulent concealment.").

Finally, "due diligence contemplates more than [a mere] un-pursued inquiry." *Pocahontas Supreme Coal*, 828 F.2d at 219. A plaintiff must make a reasonable inquiry under the circumstances in light of the facts of which he or she has been given notice. *Brumbaugh*, 985 F.2d at 162; *Chao*, 291 F.3d at 283 ("[E]quitable tolling is not appropriate . . . where the claimant failed to exercise due diligence in preserving his legal rights.").

To certify a class beyond the relevant statute of limitations, Plaintiffs must not only satisfy each of the stringent requirements for equitable tolling for themselves, but "the record must [also] affirmatively reveal that resolution of the statute of limitations defenses on [their] merits may be accomplished on a class-wide basis." *Thorn*, 445 F.3d at 321. This is no simple task as it is generally understood that "equitable tolling does not lend itself to bright-line rules." *Harris*, 209 F.3d at 330 (citation omitted).

### 4. Plaintiffs Lack Standing to Represent the Proposed Class Because the Evidence Does Not Support Equitable Tolling Of Their Individual Claims.

Plaintiffs do not have standing to represent the putative class. In the class certification context, the concept of standing is tied closely to the requirements of typicality and adequacy of representation. *See Dukes*, 564 U.S. at 349 n.5 (noting that the commonality, typicality, and adequacy requirements of Rule 23(a) "tend to merge"). Typicality requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The adequacy of representation requirement demands that the named plaintiffs demonstrate that they will fairly and adequately represent the class. *See* Fed. R. Civ. P. 23(a)(4).  Here, Plaintiffs have not and cannot sustain their burden of demonstrating each of the elements of equitable tolling on an individual basis and therefore, cannot represent a class of borrowers who likewise require equitable tolling to state a claim. As explained by the Supreme Court in *Dukes*, "a class representative must be part of the class and

possess the same interest and suffer the same injury as the class members . . . . Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Dukes*, 564 U.S. at 348-49 (internal quotations and citations omitted). For the reasons explained below, Plaintiffs are not part of the class they seek to represent.

### a) West Town Did Not Engage In Any Affirmative Acts Of Concealment.

To obtain the benefits of equitable tolling, Plaintiffs must first establish that "[West Town] fraudulently concealed facts that are the basis of the plaintiff's claim." *Supermarket of Marlinton*, 71 F.3d at 122. Courts have consistently recognized that equitable tolling of a RESPA claim requires each plaintiff to "provide evidence of *affirmative acts* of concealment undertaken by the defendants." *Minter*, 279 F.R.D. 320, 324 (D. Md. 2012) (emphasis added); *see also Pocahontas Supreme Coal*, 828 F. 2d at 218-19; *White v. PNC Fin. Servs. Grp., Inc.*, No. 11-7928, 2013 U.S. Dist. LEXIS 86650, at *19 (E.D. Pa. June 20, 2013) ("to benefit from equitable tolling, a plaintiff must show an affirmative act of concealment by *each* defendant") (internal quotations and citations omitted) (emphasis in original). Mere silence or an unwillingness to divulge allegedly wrongful activities does not itself establish fraudulent concealment because a RESPA violation is not a "self-concealing wrong." *Minter v. Wells Fargo Bank, NA*., 924 F. Supp. 2d 627, 642 (D. Md. 2013) (citing *Egerer v. Woodland Realty, Inc.*, 556 F.3d 415 (6th Cir. 2009)).  *See Garczynski v. Countrywide Home Loans, Inc.,* 656 F. Supp. 505, 516 (E.D. Pa. 2009) ("For a RESPA claim to warrant equitable tolling, mere silence or nondisclosure is not enough to trigger estoppel[;] the adversary must commit some affirmative independent act of concealment upon which the plaintiffs justifiably rely in order to toll the statute.") (internal quotations omitted).

In *Mullinax v. Radian Guar, Inc.*, the Middle District of North Carolina found as follows:

> [B]ased on the Fourth Circuit's standard, the Court concludes that ***a violation of RESPA is not a self-concealing wrong***, because the elements of RESPA do not include fraud, deception, or concealment. Instead, RESPA is violated when the lender or the insurer gives or accepts a "fee, kickback, or thing of value" in return for the referral of business "incident to or a part of a real estate settlement service." 12 U.S.C. § 2607. Accordingly, ***even if a kickback scheme "is generally secretive, it need not be so," and therefore it does not qualify as a self-concealing wrong***. *Supermarket of Marlinton*, 71 F.3d at 123 n.1.

199 F. Supp. 2d at 329 (emphasis added).

Here, Plaintiffs' equitable tolling theory fails because of the complete absence of evidence showing that West Town engaged in any affirmative act of concealment designed to deflect litigation.[8] In fact, the evidence shows just the opposite. There were no misrepresentations made to Plaintiffs, and to the extent any representations were made about Genuine Title or the cost of settlement charges, those representations did not prevent Plaintiffs from timely investigating their claims.

According to Plaintiffs, they did not have any oral communications with their respective loan officers regarding the selection or use of Genuine Title to provide settlement services or the costs of those services. Ex. 5, JC Dep. at 71:5-72:4; 87:10-13; Ex. 7, Walters Dep. at 32:14-18; Ex. 14, KC Dep. at 24:14-17; 46:9-16, 47:16-18. Plaintiffs did not ask any questions, and their loan officers did not orally offer any information on the subject. *Id.* Thus, the Court can properly focus its tolling analysis solely on the written documents provided to Plaintiffs. While the Coopers confirmed they received two different

---

[8] In the Second Amended Complaint, Plaintiffs allege that only "Genuine Title concealed the kickbacks." SAC, ¶ 252. Even if this were true, it would not help Plaintiffs equitably toll their RESPA claims against West Town. It is insufficient for Plaintiffs to simply lump together West Town with the other defendants who allegedly "actively concealed" information. *Orsi v. Kirkwood*, 999 F. 2d 86, 88 (4th Cir. 1993) (holding that allegation of fraudulent concealment on the part of one defendant was ineffective to toll the statute of limitations on claims against the other defendant); *Riddle v. Bank of America Corp.*, Civil Action No. 12–1740, 2013 U.S. Dist. LEXIS 163526, at **14-15 (E.D. Pa. Nov.18, 2013) ("[I]f [plaintiffs] seek to toll the statute of limitations against a particular Defendant, they must put forward an affirmative act of concealment by that Defendant."); *Pedraza v. United Guar. Corp.,* 114 F. Supp. 2d 1347, 1357 (S.D. Ga. 2000) (in RESPA case, holding that the plaintiff must identify "specific conduct of the defendant that entitled the plaintiff to toll the statute [of limitations] against *that* defendant") (emphasis in original)).

documents (the Settlement Services Provider List (Ex. 12) and the Initial Fees Worksheet (Ex. 13)) prior to the closing of their loan that referenced Genuine Title (Ex. 14, KC Dep. at 46:17-47:5), Ms. Walters received no such documents. Ms. Walters did not receive a Settlement Services Provider List and, unlike the Coopers, her Itemized Fee Disclosure did not identify Genuine Title in any respect. *Compare* Ex. 13, the Coopers' Initial Fees Worksheet *to* Ex. 22, Walters' Itemized Fee Disclosure.

Ms. Walters testified that she only "believes" Genuine Title closed her loan because its name is reflected on the HUD-1 she signed at loan closing. Ex. 7, Walters Dep. at 34:9-21. The difference in loan documents alone prevents Plaintiffs from satisfying the first element of equitable tolling on a class-wide basis. If the named Plaintiffs' own loan transactions are different, how can they argue that the loan transactions of the putative class are the same? Even if Plaintiffs can overcome this obstacle, nothing in the two documents provided to the Coopers contain an affirmative misrepresentation or overt act of concealment designed to deflect litigation.

As to the Settlement Services Provider List (Ex. 12), this was provided to and signed by the Coopers on at least three separate occasions prior to the closing of their loan on January 4, 2011. The disclosure informed the Coopers that they are "permit[ed] to shop for third party settlement services" and that identifying Genuine Title as a provider of settlement services "should not . . . be construed in any way as an endorsement" of its services or an "obligation to select [Genuine Title] . . . for any of the [settlement] services listed." Ex. 12, Settlement Services Provider List. The disclosure also indicated that Genuine Title is not an "affiliated business" of West Town.[9] *Id.* The other document provided to the

---

[9] Ms. Cooper claims that because of the alleged payment of kickbacks, West Town's representation in the Settlement Services Provider List that Genuine Title is not an "affiliated business" of the bank is inaccurate. Ex. 14, KC Dep. at 37:4-14. To the contrary, identifying Genuine Title as not being an "affiliate" of West Town does not constitute fraud or a misrepresentation because the statement is <u>true</u>. Genuine Title is not an "affiliate" of West Town as a matter of law. "'[A]ffiliate' is a well-established term in the business context, and always denotes some significant degree of control between the two entities." *Jermar, Inc. v. L.M. Commc'ns II of S.C., Inc.*, 181 F.3d 188, 1999 U.S. App. LEXIS 12082, at 11 (4th Cir. 1999); BLACK'S LAW DICTIONARY 63 (8th ed. 2004) (defining "affiliate" as "(a) corporation that is related to

Coopers that identified Genuine Title was the Initial Fees Worksheet. This worksheet accurately disclosed the settlement services required for the loan, identified Genuine Title as a provider of those services, and the cost of each service. Ex. 13, Initial Fees Worksheet. The content and statements in these two disclosures do not constitute the "additional affirmative conduct" required to satisfy the first element of fraudulent concealment.

Plaintiffs' reliance on the HUD-1s to show an independent act of concealment is equally misguided. Ms. Walters could not possibly have relied on anything on the HUD-1 because she never read it. Ms. Walters was only "interest[ed] in getting the loan and . . .  wasn't worried too much about the cost at that time." Ex. 7, Walters Dep. at 31:10-18. As a result, she "signed a lot of papers, but I didn't read all of this." *Id.* at 49:8-19. Ms. Walters' admission is fatal to any argument that the HUD-1 justifies the application of equitable tolling to her individual claim. *See Thorn*, 445 F.3d at 321 ("[I]n cases where the legal issue is similarly focused on the plaintiff's knowledge, such as the requirement that a plaintiff in a fraud claim reasonably reply on the defendant's representations, we have consistently held that individual hearings are required."). Without equitable tolling, Ms. Walters' claim is time-barred (ECF No. 211 at 14), and if she does not possess the claim herself, she cannot represent a class of individuals who potentially have a claim.

As to the Coopers, they believe that a portion of the settlement charges identified in section 1100 of their HUD-1 were used by Genuine Title to pay an alleged kickback to their loan officer. Ex. 5, JC Dep. at 70:6-9; Ex. 14, KC Dep. at 100:3-101:3. Because these payments "were not disclosed on

---

another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation."). Plaintiffs do not allege nor can they claim that West Town: (i) has any degree of control over Genuine Title; (ii) has an ownership interest in Genuine Title; or (iii) shares any common officers or directors with Genuine Title. Absent such facts, Genuine Title is not an "affiliate" of West Town and the Settlement Services Provider List accurately discloses this fact. Of course, if the Coopers had any questions about the meaning of "affiliated business" or the relationship between West Town and Genuine Title, they should have asked their loan officer, but they did not.

Plaintiffs' HUD-1[]," the Coopers believe they were actively concealed. SAC, ¶ 4. Such belief is legally

unsupportable. *See, e.g., Miller v. Pacific Shore Funding*, 224 F. Supp. 2d 977, 988 (D. Md. 2002)

(rejecting claim of fraudulent concealment based on contention that the "allegedly illegal charges

deceived [plaintiff] into believing that the charges were legal" because "the statement of a monetary

charge says nothing whatsoever about the lawfulness of the underlying transaction").

Plaintiffs' misunderstanding of the law is founded on their misconstruction of the nature of a

HUD-1. Its purpose is to itemize the money coming in and out of a real estate transaction:

> Federal law requires the settlement agent to itemize clearly "all charges
> imposed upon a borrower" and the "actual charges paid" by the parties on
> the HUD-1. 12 U.S.C. § 2603(a); 24 C.F.R. § 3500.8(b)(1). These statutes
> and regulations reflect that the HUD-1's utility is in its itemization and
> disclosure of charges being paid.

*Slapikas v. First Am. Title Ins. Co.*, 298 F.R.D. 285, 296 (W.D. Pa. 2014). Thus, as long as the borrower

is told what he or she has paid for what charges, the HUD-1 is accurate. *See Arthur v. Ticor Title Ins.*

*Co. of Fla.*, 569 F.3d 154, 162 n.3 (4th Cir. 2009) (rejecting claim that HUD-1 was false because it did

not inform borrower that charge for title insurance was allegedly "unlawfully high"; the HUD-1 was

accurate because "the dollar amount listed on the HUD-1 statement under title insurance was the amount

charged and collected . . . .").

*Moll v. U.S. Life Title Insurance Co. of N.Y.*, 700 F. Supp. 1284 (S.D.N.Y. 1988) is instructive.

In that case, the court rejected the plaintiffs' equitable tolling argument that their HUD-1s "falsely stated

that US Life would receive the full premium charged for the title insurance," when in fact portions of

that premium allegedly were "kicked back" to another entity. *Id.* at 1292-93. Citing the pertinent HUD

regulation (see *Slapikas* and *Arthur* above), the court reasoned that the HUD-1s made no representation

as to "the ultimate disposition of those charges," and did not represent that "US Life . . . was 'accepting'

(i.e., retaining for its own account) the premium charged." *Id.* at 1291-92. Likewise, Plaintiffs here do not dispute that the settlement charges itemized in section 1100 of their HUD-1s were precisely the amount of fees they paid Genuine Title. The HUD-1s were therefore accurate notwithstanding Plaintiffs' argument that Genuine Title used a portion of those fees to pay the alleged kickbacks. And, because the HUD-1s were accurate, the itemization of fees cannot serve as an affirmative act of concealment for purposes of equitably tolling a RESPA claim.   "[W]ere this Court to hold that entries on HUD-1 forms, standing alone, constitute evidence of fraudulent concealment, the RESPA statute of limitations would have little meaning." *Moll*, 700 F. Supp. at 1293 n.6.

In short, Plaintiffs' "evidence" of active concealment is the same evidence they present that loan officers of West Town violated RESPA; this does not suffice on an individual basis nor does it suffice on a class-wide basis. Accordingly, Plaintiffs have not and cannot satisfy the first element of fraudulent concealment so as to justify the extraordinary remedy they are seeking.

### b) Plaintiffs Exercised No Due Diligence To Uncover The Facts Supporting Their Claims.

To satisfy the "due diligence" requirement, each class member must establish that they were "not aware of, and should not have been aware of, any facts that should have provoked" inquiry into that which was concealed. *Minter,* 279 F.R.D. at 324. Each class member must show that they made a reasonable inquiry in light of the facts pertinent to them regarding the notice they received. *Brumbaugh*, 985 F.2d at 162; *Chao*, 291 F.3d at 283; *see also Egerer*, 556 F.3d at 423-24.

"Examination of whether a particular plaintiff possessed sufficient information such that he knew or should have known about his cause of action will generally require individual examination of testimony from each particular plaintiff to determine what he knew and when he knew it." *Thorn,* 445 F.3d at 321. When and whether each putative class member became aware of a claim, or should have

become aware of a claim, is an individualized inquiry which cannot be resolved on a class-wide basis. *See Zimmerman v. Bell*, 800 F.2d 386, 390 (4th Cir. 1986); *Kay v. Wells Fargo & Co.*, 247 F.R.D. 572, 578 (N.D. Cal. 2007) (refusing to certify an equitably-tolled class alleging RESPA kickback violations; holding that disclosures, payment schedules and nature of the transactions should have placed putative class members on notice of possible RESPA claim).

Here, Plaintiffs admittedly exercised no diligence in working to uncover the stale claims they now assert against West Town.  Ms. Walters testified that she was not satisfied with her loan because "the money that I got [out of the loan] was not as much as I thought I should have gotten." Ex. 7, Walters Dep. at 13:4-12. Despite coming to this conclusion "about five years ago, around 2011," Ms. Walters did nothing to investigate her concern. *Id.* at 13:13–14:4; 52:5-21. Ms. Walters did not call her loan officer nor did she call anyone at West Town to inquire why she received less loan proceeds than she expected.  *Id.* at 14:8-15:16.

Similarly, the Coopers testified that at the time of their loan they had concerns about the amount of settlement fees that were being charged by Genuine Title. Ex. 5, JC Dep. at 92:7-15. Mr. Cooper thought the fees were too "high." *Id.* at 92:7-93:14. Despite this concern, the Coopers never raised the issue with their loan officer nor did they try to shop their settlement services to another title company to see if they were being charged too much. *Id.* at 92:16-93:14; Ex. 14, KC Dep. at 54:16-55:8. Moreover, despite being provided an itemization of the settlement fees charged by Genuine Title months prior to loan closing and believing that the Settlement Services Provider List "shows Genuine Title as the only recommendation" (despite the disclaimer in the same document), the Coopers did not ask any questions concerning Genuine Title, its relationship with West Town or Mr. Makoutz or why Genuine Title was being "recommended" at all. Ex. 5, JC Depo. at 71:5-72:4;

Ex. 14, KC Dep. at at 27:10-28:11; 36:21-37:3; 39:21-40:20. Rather, they "trusted" Mr. Makoutz would obtain a loan with "the lowest possible fees" although neither of them recall having any specific conversations on the issue and they both signed the Broker Agreement, which affirmatively states that Mr. Makoutz "cannot guarantee the lowest price or best terms available in the market." Ex. 5, JC Depo. at 43:21-44:2; 92:7-93:3; Ex. 14, KC Dep. at 25:9-26:8; 55:2-8; Ex. 10, Broker Agreement. Even after receiving the solicitation letter, Plaintiffs did not take any action to investigate their potential claim, explaining "[t]hats why I have my attorney." Ex. 14, KC Dep. at 79:6-9.

The lack of diligence on the part of Plaintiffs is confirmed by their candid admissions that none of them undertook any independent research or inquiry to learn of the facts to support their RESPA claims at any point in time. Ex. 5, JC Dep. at 142:16-143:3; 151:3-10; Ex. 7, Walters Dep. at 72:21-73:4; 30:10-31:3; 72:21-73:4; Ex. 14, KC Dep. at 79:6-9; 92:10-12. Indeed, Plaintiffs concede that they made no inquiries on their own before or after their loans closed and only learned of their claims in this case when they were contacted by their present attorney in October 2014. *Id.*

The Fourth Circuit has made it clear that the "negligence" of a plaintiff – like Plaintiffs here – cannot be used as an excuse to delay pursuit of her claims. As the Court has expressly stated, "due diligence contemplates more than [a mere] un-pursued inquiry." *Pocahontas Supreme Coal*, 828 F.2d at 219; *see also Egerer*, 556 F.3d at 423 (declining to toll RESPA limitations period where plaintiffs did not exercise due diligence when they received disclosures informing the borrower of the affiliated relationship but never once asked about the relationship or the financial or other benefits received). Plaintiffs have nothing more to offer than an "un-pursued inquiry," and that is not enough to avoid the statute of limitations imposed by Congress on RESPA claimants.

Because Plaintiffs have not and cannot establish tolling as to their own untimely RESPA claims, they are not sufficiently "typical" to satisfy Rule 23(a)(3), they are not adequate class representatives under Rule 23(a)(4), and they do not have standing to represent the proposed class. *Dukes* 564 U.S. at 348-49; *East Tex. Motor Freight Sys. v. Rodriguez*, 431 U.S. 395, 403-04 (1977); *Wu v. Mamsi Life & Health Ins. Co.*, 269 F.R.D. 554, 563-64 (D. Md. 2010) (typicality lacking where named plaintiffs' claims subject to unique defenses).

Since Plaintiffs completely ignore the issue of equitable tolling in their motion for class certification, West Town cannot be certain what arguments Plaintiffs will advance to try to preserve their untimely claims. However, West Town expects Plaintiffs will ask this Court to excuse their lack of diligence by arguing that, prior to attorney intervention, they had no reason to suspect they were victims of Genuine Title's kickback scheme. SAC, ¶ 94. Adopting such an approach would both "eviscerate the statute of limitations and deter rather than promote the requisite due diligence." *Turner v. Bank of America, N.A.*, No. 2:12-cv-1319, 2013 U.S. Dist. LEXIS 11836, at *8 (D. Nev. Jan. 25, 2013) (rejecting equitable tolling in TILA case until unsophisticated borrowers seek the advice of counsel).

The Eastern District of Pennsylvania addressed a similar argument in a RESPA case where the plaintiff urged the court to toll the statute of limitations in cases involving complicated legal issues until an attorney notifies the plaintiff that his or her rights may have been violated. *Riddle v. Bank of America Corp*, Civil Action No. 12–1740, 2013 U.S. Dist. LEXIS 163526, at *20 (E.D. Pa. Nov.18, 2013). The district court rejected this argument, reasoning:

> Plaintiffs' theory would provide them with an unlimited time to resuscitate stale claims and would leave the Court with no way to determine when the clock begins to run on their claims. Under Plaintiffs' theory, when would the statute of limitations run?  One year after Plaintiffs received their first solicitation letter?  One year after Plaintiffs first met with lawyers to

> discuss their claims? Is there a point in time in which Plaintiffs had to seek
> the advice of counsel, rather than having counsel approach them?

*Id.* at \*\*20-21. While courts are not unsympathetic to the "reasonable borrower" who "may be disinclined

to question the propriety of various behind-the-scenes transactions," those same courts have refused to

adopt a futility standard because it would "effectively rewrite the statute of limitations out of RESPA."

*Cunnigham v. M&T Bank Corp.*, Civil Action No. 12-CV-1238, 2015 U.S. Dist. LEXIS 15767, at \*\*19

and 23 (E.D. Pa. Feb. 10, 2015) (adopting *Riddle*).  As the *Cunnigham* Court explained:

> That a typical purchaser may not learn of potential RESPA violations until
> advised of same by counsel is not unexpected.  Unfortunately, RESPA
> simply does not contemplate an inquiry notice or discovery rule element
> which permits equitable tolling of the limitations period.

*Id.* at \*\*23-24.

Moreover, any argument advanced by Plaintiffs that exercising diligence would have been futile

is legally and factually flawed.  First, it is purely speculative, as there is no evidence (much less an

allegation) that Plaintiffs were thwarted in any way from asking questions or inquiring about the facts

they now allege in the Second Amended Complaint.  Further, there is no reason Plaintiffs could not have

asked questions about Genuine Title or the settlement charges they paid or conducted an investigation

into the claims they now assert given that Ms. Walters was not "satisfied" with the amount of proceeds

received from the loan and the Coopers suspected they were being overcharged for settlement services.

Indeed, other borrowers with similar RESPA claims against Genuine Title were able to discover and

timely pursue their claims within the one year statute of limitations. Several years prior to the filing of

this case, on December 27, 2012, three separate sets of plaintiffs filed suit against Genuine Title and

their lender (Wells Fargo), alleging the same RESPA claim that Plaintiffs assert here. *See Roach v.*

*Genuine Title LLC*, 12-cv-03800-WDQ (D. Md)  The fact that these plaintiffs discovered their claims

and filed suit within one year after the closing of their loans (*Roach* Complaint, ¶¶ 7-9), belies any

argument by Plaintiffs that the exercise of due diligence would have been futile.  At the very least the

*Roach* case shows that different borrowers possess different knowledge at different times thus making

the equitable tolling analysis highly individualized and inappropriate for class treatment.

### 5. Plaintiffs' Equitable Tolling Claim Does Not Satisfy The Commonality Or Predominance Elements Of Rule 23.

To demonstrate commonality as to their equitable tolling claim, Plaintiffs must show that the

claims of the class members they seek to represent depend upon a "common contention."  *Dukes*, 564

U.S. at 349-50. The Supreme Court has reminded parties "[t]hat [the] common contention . . . must be

of such a nature that it is capable of classwide resolution - which means that *determination of its truth*

*or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke*." *Id.*

at 350 (emphasis added). The *Dukes* Court also cautioned that "[w]hat matters to class certification . . .

is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide

proceeding to generate common answers apt to drive the resolution of the litigation.  Dissimilarities

within the proposed class are what have the potential to impede the generation of common answers."

*Id.* (citation omitted). Here, Plaintiffs' common contention – the applicability of equitable tolling to

their untimely RESPA claim – will not resolve the tolling of the statute of limitations for any putative

class member "in one stroke."

Even if this Court were to find that Plaintiffs are somehow entitled to the benefits of equitable

tolling such that their individual RESPA claims are timely, it would, at most, give them standing to

represent a class of borrowers whose claims are also timely. *But see* Section B, *infra*. Such a ruling does

not allow Plaintiffs to represent borrowers who need equitable tolling to state a timely claim. To

conclude otherwise would effectively allow time-barred claims to be revived without these borrowers

satisfying the requirements of equitable tolling on their own. Because the equitable tolling analysis

requires examination of each individual transaction, class treatment of borrowers with time-barred claims is inappropriate.

As to Rule 23(b)(3), Plaintiffs also must demonstrate that common questions of law or fact *predominate* over questions affecting individual class members. Fed. R. Civ. P. 23(b)(3); *see also Thorn*, 445 F.3d at 319. "Predominance" is "far more demanding" than the Rule 23(a) commonality requirement, requiring the Court to ask whether questions common to all class members will be the ones that consume the trial. *Amchem*, 521 U.S. at 623-24 (1997); *accord Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004).

Whether any class member was aware of, or should have been aware of, their potential RESPA claims is an individualized inquiry that cannot be resolved on a class basis. Separate and apart from identifying what disclosures and what representations were provided to individual borrowers (which as Plaintiffs' transactions show were not uniform), West Town is entitled to submit evidence regarding what each putative class member understood and what they did in response to that knowledge. For example, West Town is entitled to submit evidence whether: (1) any putative class member independently inquired into the relationship between Genuine Title and their loan officer or West Town; (2) for each putative class member that did so inquire, whether that putative class member received a response and the content of that response; and (3) whether and to what extent each putative class member exercised any due diligence, bearing in mind that there should be a different standard for putative class members who sat on their rights for one or two years versus those who sat on their rights for six years. *See Cooke v. Mfr d Homes, Inc.*, 998 F.2d 1256, 1263 (4th Cir. 1993) ("whether due diligence was exercised must be judged *solely under the peculiar circumstances of each case*.") (citation omitted) (emphasis added). Plaintiffs' counsel's solicitation letters do not eliminate any of these

32

individual inquiries. At most, the letters show the *latest* possible date on which a putative class member became aware of his or her potential claim. They do not address whether the putative class member knew of facts *prior to receiving the letter* and if so, what facts the putative class member knew and what, if anything, the putative class member did with such knowledge.

In short, the varying information available for putative class members will require mini-trials on what each borrower knew, was told and understood, the varying levels of each borrower's sophistication, and what level of due diligence, if any, was exercised. As Magistrate Judge Gauvey recognized in *Minter*, the Fourth Circuit routinely denies equitable tolling under similar circumstances where the determination of class claims would turn on facts peculiar to the individual claims. *Minter*, 675 F. Supp. 2d at 595. *See also Thorn*, 445 F.3d at 321 (holding that equitable tolling is not readily susceptible to class-wide determination because "[e]xamination of whether a particular plaintiff possessed sufficient information such that he knew or should have known about his cause of action will generally require individual examination of testimony from each particular plaintiff to determine what he knew and when he knew it"); *Broussard*, 155 F.3d at 345 (denying class certification, in part, because "applying class-wide equitable tolling without providing the defendants an opportunity to determine what each putative class member knew and when would force [the defendant] to defend against a fictional composite without the benefit of deposing or cross-examining the disparate individuals behind the composite").

Consistent with controlling Fourth Circuit authority, this Court should likewise decline to certify a class that requires equitable tolling. Plaintiffs' entire equitable tolling argument rests solely on the false premise that West Town should have disclosed a purported RESPA violation; an argument courts have repeatedly rejected. *Mullinax*, 199 F. Supp. 2d at 329; *Williams*, 2009 U.S. Dist. LEXIS 107812, at

**24-25; *Pedraza*, 114 F. Supp. 2d at 1357; *see also Pocahontas Supreme Coal Co.*, 828 F.2d at 218-19.

Moreover, there is ample record evidence that Plaintiffs had information to put them on inquiry notice of

any potential claims, and the issue of whether tolling ultimately applies requires individualized inquiries

not amenable to class treatment.

> **6.  Class Adjudication Of Time-Barred Claims Subject To Unique Statute of Limitations Defenses Is Not Superior To Individual Adjudication**

Plaintiffs' untimely RESPA claims do not, and cannot, satisfy the superiority prerequisite to

class certification under Rule 23(b)(3). The hallmark of the superiority analysis is whether proposed

class claims are manageable for trial on a class basis.  *See* Fed. R. Civ. P. 23(b)(3)(D). Where proposed

class claims are unmanageable, the class action mechanism is not the superior method for adjudication

of the plaintiff's claims. *See Cox House Moving, Inc. v. Ford Motor Co.*, CA No. 7:06-1218-HMH, 2006

U.S. Dist. LEXIS 81132, at *25 (D. S.C. Nov. 6, 2006). This is particularly true in this case where

resolution of each putative tolling class member's claim over a six-year span will require the

presentation of individualized evidence necessitating numerous mini-trials, defeating the judicial

efficiencies promoted by the class action vehicle.  *See Avalon Ctr. Inv. Co. v. Commercial Defeasance,*

*LLC*,  Docket No. 3:08-cv-00535-W, 2010 U.S. Dist. LEXIS 65239, at *23 (W.D. N.C. May 21, 2010)

(holding that the need to present evidence on "each defeasance transaction" presents a "likely difficulty in

managing this case as a class action" and leads to conclusion that "a class action . . . does not provide a

superior method for resolving these claims").

As set forth above, Plaintiffs' RESPA claims present a multitude of individual issues that this

Court will need to address to determine whether each putative class member is entitled to the benefits of

equitable tolling. These individual issues illustrate that untimely RESPA claims are not suitable for class

treatment. A class covering a five year period (2009-2014) on a claim subject to a one year statute of limitations where equitable tolling is required to avoid dismissal makes the proposed class unmanageable.

Judge Nickerson's decision in *Minter v. Wells Fargo Bank, NA*., Civil Action WMN-07-3442, supports this conclusion.  Although the *Minter* Court initially certified a class of putative plaintiffs whose RESPA claims would be subject to equitable tolling, it ultimately determined that certification of an equitable tolling class was not manageable under Rule 23(b)(3). As a result, the Court decertified the class because of the individualized issues associated with equitable tolling. *Minter*, 2013 U.S. Dist. LEXIS 59965, at **12-13. The *Minter* Court emphasized that: "The elements of equitable tolling must be established by the Tolling Class, in addition to the substantive elements of the alleged RESPA violations." *Id*. It explained that equitable tolling is only available when "'(1) the defendant fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence. *Id*. (quoting *Supermarket of Marlinton*, 71 F.3d at 122).The plaintiffs in *Minter* attempted to use the alleged failure of an ABA Disclosure to disclose a fact as the basis for equitable tolling. *Minter*, 2013 U.S. Dist. LEXIS 59965, at *13 (noting plaintiffs' argument that "active concealment is best shown by Prosperity's ABA Disclosure").  The *Minter* Court, however, found that an alleged failure to disclose a fact in the ABA Disclosure was insufficient on its own to support equitable tolling of the RESPA claim. *Id*. It stated that in "light of the Court's holding that violations of RESPA are not self-concealing, individual class members' transactions are now more relevant to the concealment and due diligence inquiries of tolling." *Id.*

35

The *Minter* Court concluded that the examination of the individual transactions required in the equitable tolling analysis made any class treatment unmanageable. *Id*. It explained that "[m]anaging a class action where some class members had a duty to inquire while others did not, presents substantial logistical and mental challenges for the Court and jury which warrant decertification in this already complicated case." *Id*. This Court should avoid the procedural detour taken by the *Minter* Court and deny Plaintiffs' motion for class certification in the first instance.

**B. Plaintiffs Fail to Meet Their Burden of Proving Commonality and Typicality Because Their Argument to Avoid the Statute of Limitations Does Not Apply to the Class They Seek to Represent.**

**1. Plaintiffs' Motion Identifies Three Different Groups of Individuals They Seek To Represent.**

Plaintiffs seek certification of the following class:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C § 2602) from West Town Bank & Trust for which Genuine Title provided a settlement service, as identified in Section 1100 on the HUD-1, between ***January 1, 2009, and December 31, 2014.***

Pls. Mot. at 15 (emphasis added). This single definition encompasses three materially different groups of individuals that render Plaintiffs' claims not common or typical of the class they seek to represent:

- Proposed Equitably Tolled Group: This group includes individuals who obtained loans closed by Genuine Title between January 1, 2009 and January 1, 2014, and, therefore, must satisfy the requisites for equitable tolling "in order to avoid dismissal for untimely filing." ECF No. 211 at 14.

- Time-Barred Group: This group includes individuals who received solicitation letters from Plaintiffs' counsel in May 2013, but did nothing to pursue their potential claims during the eighteen (18) months leading up to the filing of the First Amended Complaint on January 2, 2015. Ex. 20, Walters' First Supplement to Answers to First Set of Interrogatories, Ans. to Int. No. 6. These individuals' RESPA claims are time-barred,

even under Plaintiffs' theory of equitable tolling (*i.e.*, the "Class" exercised due diligence because suit was filed "less than one (1) year after [they] had any idea that [they were] subject to such conduct." *Id.*, Ans. to Int. No. 22).

- Timely Group: This group includes individuals who obtained loans closed by Genuine Title between January 2, 2014 and December 31, 2014. Ex. 2A, West Town's Answers to Amended Interrogatories, Appendix A. Unlike Plaintiffs, these individuals do not require equitable tolling because to the extent they have a claim, the First Amended Complaint was filed within one year after the closing of their loans.

Despite only being a member of the Proposed Equitably Tolled Group, Plaintiffs seek to represent individuals in all three groups. The commonality and typicality requirements of Rule 23(a) prevent Plaintiffs from doing so.

### 2. Plaintiffs Cannot Meet the Typicality and Commonality Requirements with Respect to the Timely Group or the Time-Barred Group.

A plaintiff who must prove equitable tolling for their claim fails to meet the typicality and commonality requirements with respect to putative class members who do not need to make the same showing. *Minter v. Wells Fargo Bank, N.A.*, Civil Action No. WMN-07-3442, 2011 U.S. Dist. LEXIS 47588, at *74 (D. Md. May 3, 2011) ("Tolling Class claims must, as a threshold matter, satisfy certain requirements to be equitably tolled, whereas the claims of the Named Minter Plaintiffs suffer no such burden. Defendants, therefore, are entitled to attack the Tolling Class members' claims as unqualified for equitable tolling, and the Named Minter Plaintiffs' claims are not typical for this purpose."): *see also Munoz v. PHH Corp.,* No. 1:08-cv-0759-AWI-BAM, 2013 U.S. Dist. LEXIS 69306, at *69-71 (E.D. Cal. May 15, 2013) (plaintiffs fail to meet typicality requirement with respect to proposed members of class who do not have to prove equitable tolling because "the interests of tolling class members would be represented by individuals who have no interest in claim tolling"); *Tait v. BSH Home Appliances Corp.,* 289 F.R.D. 466, 476-77 (C. D. Cal. 2012) (finding a named plaintiff whose claims were outside the statute of limitations typical of those class members

whose claims were similarly outside the statute of limitations, but atypical of those class members whose claims were inside the statute of limitations).

Because RESPA has a one-year statute of limitations that runs from the date of the closing of the loan, and Plaintiffs' loans closed in 2011, they must prove equitable tolling "in order to avoid dismissal for untimely filing." ECF No. 211 at 14. Members of the putative class who obtained a loan from West Town on or after January 2, 2014 (*i.e.*, within one year before the filing of the First Amended Complaint), however, may not need to prove equitable tolling. And members who learned of their potential claims through solicitation letters in May 2013, but took no action whatsoever to pursue those claims have no ability to argue for equitable tolling. Their claims are time-barred irrespective of whether Plaintiffs can satisfy the elements of equitable tolling. Plaintiffs, therefore, do not meet the commonality and typicality requirements with respect to those putative class members who do not need to prove equitable tolling or whose claims are time-barred even with the application of equitable tolling.

### C. Plaintiffs Cannot Meet the Typicality Requirement Because Their Claims Are Based On a Different Course of Conduct And Different Legal Theories Than Those Of Each Other And Much Of The Class They Seek To Represent.

"The test for determining typicality is whether the claim or defense arises from the same course of conduct leading to the class claims, and whether the same legal theory underlies the claims or defenses." *Robinson v. Fountainhead Title Group Corp.*, 252 F.R.D. 275, 288 (D. Md. 2008) (citations and internal quotations omitted). The essence of the typicality requirement is captured by the proposition that "as goes the claim of the named plaintiff so go the claims of the class." *Broussard*, 155 F.3d at 340 (4th Cir. 1998) (citation omitted).

To establish typicality, Plaintiffs must be able to establish the bulk of the elements of each class member's claims by proving their own claims. *See Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006). Thus, common legal theories alone do not establish typicality "when the facts required to prove the claims are markedly different among class members." *Retired Chicago Police Ass'n v. City of Chicago*, 141 F.R.D. 477, 486 (N.D. Ill. 1992); *Deiter*, 436 F.3d at 467 (same).

In considering whether Plaintiffs meet the typicality requirement with respect to their RESPA claims, it is important to recognize that they have ***no evidence of an entity-level kickback scheme*** involving Genuine Title and West Town; rather, their evidence relates only to alleged agreements and payments between Genuine Title and certain individual loan originators and branch managers of certain LPOs. This factual distinction is material and prevents Plaintiffs from satisfying the typicality requirement of Rule 23(a). This Court does not need to look any further than the individual loan transactions of each of the named Plaintiffs to arrive at this conclusion.

Ms. Walters dealt exclusively with Mr. Cullison (Ex. 7, Walters Dep. at 47:6-9); the undisputed evidence is that he received no kickback from Genuine Title (or anyone else) regarding this loan or any other loan he originated while at West Town, and he did not choose Genuine Title to settle Ms. Walters' loan based on any agreement he had with Genuine Title. Ex. 4, Cullison Decl., ¶ 4. On these facts alone, Ms. Walters cannot establish a RESPA violation and her claims must be dismissed as set forth in West Town's motion for summary judgment (ECF No. 351), which is incorporated herein. That Ms. Walters herself does not have a RESPA claim renders her atypical of those who may have such a claim. *See Broussard*, 155 F.3d at 340.

The Coopers' claim is likewise atypical of many of the putative class they seek to represent. The Coopers *only* dealt with George Makoutz. As discussed above, there is evidence that a business formed

by Mr. Makoutz received certain payments from Genuine Title, and Plaintiffs contend these payments are kickbacks in violation of Section 8 of RESPA. Thus, whether Mr. Makoutz received money in exchange for his agreement to refer the Coopers' loan to Genuine Title in violation of Section 8 of RESPA will be central to the trial of their claim but will have no bearing on claims of other borrowers whose loans were originated by other West Town mortgage loan originators. In other words, even if the Coopers are able to prove that Mr. Makoutz received a kickback in violation of RESPA, that finding will do "nothing to establish the claims of those" other borrowers who dealt with different mortgage loan originators in different LPOs. *Benway v. Residential Real Estate Servs., LLC*, 239 F.R.D. 419, 424 (D. Md. 2006) (refusing to certify class on RESPA claim against affiliated businesses that were not involved in the named plaintiffs' loan transaction). For the same reason, the Coopers are not adequate representatives of those other borrowers because the Coopers "have little incentive to present evidence that" other loan originators, who the Coopers do not know, never met, and did not transact any business with, referred other borrowers to Genuine Title pursuant to an agreement for the referral of settlement services. *Baehr v. Craig Northrop Team, P.C.*, Civil No. WDQ-13-0933, 2014 U.S. Dist. LEXIS 11030, at *29 (D. Md. Jan. 29, 2014) (refusing to certify class on RESPA claim based on alleged kickback scheme that ended prior to the closing of the named plaintiffs' loan). Because any agreement to refer settlement services was between Genuine Title and the individual loan originator or branch manager as opposed to West Town itself, merely demonstrating that Mr. Makoutz received a kickback pursuant to an agreement to refer the Coopers to Genuine Title for settlement services will not establish that any other loan originator in any other LPO likewise received a kickback.

In sum, because the claims of Ms. Walker and the Coopers are based on a different course of conduct involving different people and subject to different defenses than much of the class they seek to represent, their claims are not typical for purposes of Rule 23(a)(3).

## D.  Individual Issues Regarding The RESPA Claims Predominate And Preclude Class-Wide Adjudication.

### 1.  Whether RESPA Applies to Each Putative Class Member Is a Highly Individualized Question that Cannot Be Determined by Common Proof.

As indicated in the Second Amended Complaint, Plaintiffs believe that RESPA applies to every "federally-related mortgage loan" that is secured by residential real estate. SAC, ¶ 242. Plaintiffs' assertion is categorically untrue. By its express terms, RESPA does not apply to federally-related mortgage loans secured by residential real estate where the loans were made (a) "primarily for business, commercial, or agricultural purposes," or (b) "on property of 25 acres or more." 12 U.S.C. § 2606(a)(1); 12 C.F.R. 1024.5(b); *In re Long*, No. 09-12827, 2010 Bankr. LEXIS 1782, at *8 (Bankr. D. Kan. May 26, 2010) (dismissing RESPA claim premised on loan taken out primarily for business purposes); *LaPorte v. Countrywide Home Loans, Inc.*, No. 3:08-cv-408, 2009 U.S. Dist. LEXIS 80441, at **3-4 (E.D. Tenn. Sept. 3, 2009) (same).

Thus, whether a loan is subject to RESPA will depend on each borrower's "primary purpose" in obtaining the loan. *See*, *e.g. Hinchcliffe v. Option One Mortg. Corp.*, No. 08-2094, 2009 U.S. Dist. LEXIS 51573, *at 12 (E.D. Pa. June 16, 2009) (the court "must look at the *entire transaction* and determine the borrower's primary motive for seeking the loan") (emphasis added); *see also Sherlock v. Herdelin*, No. No. 04-cv-3438, 2008 U.S. Dist. LEXIS 21794, at **8-9 (E.D. Pa. March 17, 2008) (the court must review the entirety of transaction to determine "whether the transaction was made *primarily* for 'personal, family, or household purposes'") (quoting *Gombosi v. Carteret Mortgage Corp.*, 894 F. Supp. 176, 180 (E.D. Pa. 1995)); *Nelson v. Farm Credit Serv. of N. Dakota*, *PCA*, 380 F. Supp. 2d

1061, 1065 (D. N.D. 2005) (same); *Mauro v. Countrywide Home Loans, Inc.*, 727 F. Supp. 2d 145, 153-54 (E.D.N.Y. July 22, 2010) (same).

Importantly, the focus of the "primary purpose" inquiry is *not* on the nature of the property securing the loan, as Plaintiffs seem to believe, but instead on the ultimate purpose for which the loan proceeds were used. *Hinchcliffe,* 2009 U.S. Dist. LEXIS 51573, at *12. Accordingly, this Court cannot determine a borrower's "primary purpose" in obtaining a loan without hearing individualized evidence concerning each loan transaction. *Sherlock,* 2008 U.S. Dist. LEXIS 21794, at **8-9; *Nelson*, 380 F. Supp. 2d at 1065-66; *Mauro*, 727 F. Supp. 2d at 153-54.

By way of example, the following types of loans are deemed to have a "business purpose," and are thus exempt from RESPA, even though the loans are "federally-related" and secured by the borrower's primary residence:

- A loan intended to start, expand or improve a business (including a home business);
- A loan intended to improve a principal residence by putting in a business office;
- A business credit account, even if used occasionally for consumer purposes; and
- A loan intended to improve or maintain non-owner-occupied rental property.

12 C.F.R. §226, Supplement I to Part 226—Official Staff Interpretations, cmts. 226.3(3)(iii) and 226.3(3)(a)(4).

Because many borrowers take some or all of their loan proceeds in cash without ever disclosing to West Town the purpose for which the proceeds will be used, it is impossible to know whether the loan is subject to RESPA or falls within these broad "business purpose" exemption without examining each

individual transaction.[10] For example, the Coopers disclosed the purpose of their loan was "cash out." Ex. 16, Loan Application. This information, of course, only invites additional questions such as: Was the underlying mortgage loan taken out for a "business or agricultural purpose"? Was the loan taken out to improve or maintain a rental property? Was the loan used to consolidate debts and if so, what debts did they consolidate? Were the debts consumer, business, or agricultural in nature? How did they intend to use the cash proceeds? How did they actually use it? These questions are particularly material here since Mr. Cooper is self-employed and owns his own business and Ms. Cooper is a stay-at-home mother. Ex. 5, JC Dep. at 12:18-19, 14:17-18; Ex. 14, KC Dep. at 13:18-20. Even if the Coopers are able to demonstrate that they used the $344,172.43 in loan proceeds primarily for personal, family, or household purposes, that does not prove anything for the class of borrowers they seek to represent.[11]

For example, according to West Town's records, there are at least sixteen loans closed by Genuine Title where the property type is described as "investment."  Ex. 1, Marsal Decl., ¶ 2.  If the proceeds of any these loans were used to "acquire, improve, or maintain" an investment property, the loan is deemed to be for "business purposes" and therefore outside the purview of RESPA. 12 C.F.R. §226.3, Supp. I to Part 226—Official Staff Interpretations, cmt. 226.3(3)(a)(4). If, however, "the owner expects to occupy the [investment] property for more than 14 days during the coming year . . . this special rule [does] not apply." *Id.* This is just one of many examples of transactions exempt from RESPA and illustrates why this Court cannot simply assume (as Plaintiffs do) that RESPA will apply to

---

[10] Out of an abundance of caution, West Town treats all mortgage loans secured by residential property "as if" the loans were subject to RESPA, even though an exemption may apply. For obvious policy reasons, applicable regulations provide that such prophylactic treatment is neither relevant nor dispositive to the issue of whether RESPA actually applies to the loan. *See* 12 C.F.R. §226, Supp. I, cmt. 226.3(3)(a)(1) (noting that a "creditor is . . . free to make [applicable] disclosures, and the fact that disclosures are made . . . is not controlling on the question of whether [a] transaction [is] exempt").

[11] The proponent of RESPA coverage bears the burden of proving that RESPA applies. *Mauro*, 727 F. Supp. 2d at 154 (collecting cases). Indeed, courts have dismissed RESPA claims at the 12(b)(6) stage where plaintiffs failed to allege facts regarding their purpose in obtaining the loan. *E.g.*, *Daniels v. SCME Mortg. Bankers, Inc.*, 680 F. Supp. 2d 1126, 1129 (C.D. Cal. 2010).

every "federally-related" mortgage loan. To the contrary, before the Court could even begin to adjudicate the putative class member's claims, the Court would first have to individually determine *whether* RESPA applies.[12] *E.g. Sherlock*, 2008 U.S. Dist. LEXIS 21794, at **8-9; *Nelson*, 380 F. Supp. 2d at 1068. This critical threshold determination would overwhelm the Court with individualized issues, which never could be decided on a class-wide basis consistent with the requirements of due process. *See Pettrey v. Enter. Title Agency, Inc.*, 241 F.R.D. 268, 284 (N.D. Ohio 2006) (rejecting class certification, in part, because "the Court will also have to determine on an individual basis whether a particular class member is even covered by RESPA.").[13]

### 2. Determining Whether A RESPA Section 8 Violation Occurred Will Require Fact-Specific, Individualized Inquiries For Every Proposed Class Member.

By its express language, a violation of RESPA Section 8(a) requires Plaintiffs to demonstrate not only the payment of an unlawful "fee, kickback, or thing of value" to the loan officer, but that such payment was given and received pursuant to an "agreement or understanding" that "business incident to or part of a real estate settlement service involving a federally related mortgage loan *shall be referred*" to any person. 12 U.S.C. § 2607(a) (emphasis added). Thus, a critical element of proof is the agreement to refer settlement services. Such proof cannot be presented on a class-wide basis. Every borrower, including Plaintiffs, had the right to select his or her own title company to provide settlement services, and therefore, a referral cannot be presumed from the fact that Genuine Title closed a loan originated by West Town. Rather, each putative class member will need to present transaction-specific evidence

---

[12] The *Minter* and *Baehr* courts were not required to engage in this individual analysis because the plaintiffs' loans in those cases were used to *purchase* primary residences.

[13] *Accord Toldy v. Fifth Third Mortg. Co.*, No. 09-CV-377, 2011 U.S. Dist. LEXIS 113274, at *9 (Sept. 30, 2011 N.D. Ohio) (denying certification of a RESPA class because "whether a putative class member's loan garners RESPA coverage cannot be known short of a case-by-case analysis" upon consideration of factors such as whether the loan's primary purpose was for personal, family or household purposes, and whether it was a "federally related mortgage loan"); *Hinchliffe*, 2009 U.S. Dist. LEXIS 51573, at *13 ("The facts must be examined to determine if the loan was primarily commercial or personal.").

regarding the alleged "referral" by his individual loan officer to Genuine Title and whether a fee, kickback or thing of value was given for that referral.[14] The need to provide individualized proof to establish the "referral" element has caused courts to decline to certify RESPA Section 8 classes.

In *Wyman v. Park View Federal Savings Bank*, the plaintiff alleged that his mortgage lender "routinely and habitually refers its borrowers to PVF Title for the purpose of obtaining settlement services incident to the closing of federally related mortgage loans" in violation of Section 8 of RESPA. No. 09-cv-1851, 2011 U.S. Dist. LEXIS 124500, at **1, 6-7 (N.D. Ohio June 14, 2011). Much like the class definition proposed here by Plaintiffs, the plaintiff in *Wyman* sought to certify a class of "[a]ll borrowers who, on or after August 8, 2008, received a federally related residential mortgage loan from defendant Park View Federal Savings Bank, where the HUD-1 or HUD-1 A Settlement Statement, or other documents in the loan file, includes a payment to Defendant PVF Title Service LLC for real estate settlement services." *Id.* at *5-6. The court declined to certify the proposed class in large part because of the individualized proof needed to establish the "referral" element. *Id.* at 6 ("If the Court certified the putative class as defined in Plaintiff's Motion, an *individualized inquiry would be necessary* to determine whether PVF *referred each individual borrower* to PVF Title for settlement services.") (emphasis added).

The same outcome is required here. Proving a Section 8(a) claim requires establishing "an actual referral." *Gardner v. First Amer. Title. Ins. Co.*, No. 00-2176, 2003 U.S. Dist. LEXIS 1815, *21 (D. Minn. Jan. 27, 2003). Plaintiffs can prove a referral in one of two ways. First, Plaintiffs may show that they were "required to use . . . a particular provider of a settlement service" as a condition

---

[14] Of course, if the borrower exercised his right and selected Genuine Title on his own, there would be no referral and no basis to allege a violation of RESPA. Plaintiffs recognize the importance of the "referral requirement" because eligibility to participate in the Wells Fargo settlement was contingent upon certain borrowers answering the question of whether they "were . . .referred to Genuine Title for the closing of [their] Wells Fargo mortgage loan by a Wells Fargo employee, agent, or broker." ECF No. 237-2.

precedent of receiving the loan. 12 U.S.C. § 3500.14(f)(2). Plaintiffs do not allege nor do they argue

any such requirement was imposed here. In fact, both sets of Plaintiffs signed disclosures affirmatively

stating that they have the right to select their own settlement service provided (Exs. 8 and 11), and

both sets of Plaintiffs testified that they understood this right. Ex. 5, JC Dep. at 43:18-20; 54:16-55:13;

Ex. 7, Walters Dep. at 22:3-7; 37:8-16; Ex. 14 KC Dep. at 25:9-14; 26:15-27:5; 36:6-20; 55:9-16.

Alternatively, Plaintiffs can establish the "referral" element by proving that their loan officer

engaged in "any oral or written action . . . which [had] the effect of *affirmatively influencing* the

selection" of a settlement-service provider. 12 U.S.C. § 3500.14(f)(1) (emphasis added). But this

analysis is also inherently individualized because "[t]he Court would have to individually adjudicate

whether the use of Defendant's title services in each of the [hundreds of] transactions at issue was, in

fact, 'affirmatively influenced,' and by whom." *Gardner*, 2003 U.S. Dist. LEXIS 1815, at *21. While

Plaintiffs may be able to establish a referral, the same cannot be said for those they seek to represent

because every borrower had the right to select his or her own title company. As a result, the Court

would have to evaluate evidence from each borrower, including testimony as to whether the borrower

exercised his right to hire his own title company (like Ms. Walters' husband did in 1983 (Ex. 7, Walters

Dep. at 22:3-7)) and selected Genuine Title on his own or whether oral statements, if any, occurred in

connection with the loan that "affirmatively influenced" the borrower's decision. *Id*. Such evaluation

would need to be conducted through a series of mini-trials which would be overwhelming and defeat

the very purpose of a class action.

**E.  Neither Plaintiffs Nor Their Counsel Are Adequate Representatives.**

This is a lawyer-driven case. It started in May 2013, with Plaintiffs' counsel sending postcards to

individuals who received settlement services from Genuine Title, encouraging them to call "to see how

[they] can start [their] potential recovery."[15] Ex. 23, Solicitation postcard. Plaintiffs Edward and Vickie

Fangman ostensibly responded to one of these solicitations and shortly thereafter, a complaint was filed

against Genuine Title on December 6, 2013. Several months later, Genuine Title ceased operations and

became defunct in April 2014. This caused the future of the case to hang in doubt and, more

importantly, called into question the financial benefit of pursuing the litigation. In an effort to recoup the

time invested in the case, Plaintiffs' counsel engaged in a wide-spread marketing campaign in search of

new clients who could sue their lenders for the same claims that the Fangmans asserted against Genuine

Title. [16] *See, e.g., Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 n.12 (1981) (recognizing potential abuse of

class action process by attorneys or parties drumming up participation in the proceeding). While West

Town does not know how many solicitation letters were sent in total, Plaintiffs' counsel sent letters to, at

least, one hundred and twenty (120) West Town borrowers in hopes that some of them will be attracted

to the potential of recovering "THOUSANDS OF DOLLARS" and agree to lend their names to this

lawsuit. Ex. 20, Walters' First Supp. to Ans. to First Set of Ints., Ans. to Int. No. 6; Exs. 9 & 17,

Solicitation letters. The Coopers and Ms. Walters were among the group that received the solicitation

letters sent on October 24, 2014. Ex. 20, Walters' First Supp. to Ans. to First Set of Ints., Ans. to Int. No.

6.

---

[15] That Plaintiffs' counsel had reason to believe as early as May 2013 that Genuine Title may have been paying kickbacks suggests that, with some due diligence of their own, Plaintiffs likewise could have uncovered facts supporting their claims prior to 2015.

[16] For reasons that are unclear, Plaintiffs' counsel chose not to sue the Fangmans' lender, Eagle National Bank ("Eagle") when they filed the initial complaint. As a result, when Plaintiffs' counsel tried to sue Eagle in the First Amended Complaint, the claims were dismissed. While this result does not affect Plaintiffs' claims against West Town, it most certainly raises concerns regarding adequacy of counsel. Because the Fangmans did not sue Eagle when their counsel initiated this action in December 2013, they are now barred from recovering against Eagle and cannot represent a class of borrowers who still may have potential claims against Eagle. Likewise, the Fangmans' recovery is now limited to a defunct title company and three non-lender defendants that also are not in business anymore.

Other than responding to the letters and agreeing to lend their names to this case, Plaintiffs have ceded complete control over this litigation to their attorneys. As a result, the attorneys are the real parties in interest in the litigation, rendering Plaintiffs inadequate to represent the absent members of the putative class. The adequacy requirement serves two purposes: (1) to uncover conflicts of interest between the named parties and the class they seek to represent; and (2) to uncover conflicts or incompetence on the part of class counsel. *See Amchem*, 521 U.S. at 591.

To be found adequate, Plaintiffs must (1) not have claims that are antagonistic to or that conflict with those of other class members; and (2) have sufficient interest in the outcome of the case to ensure vigorous advocacy. *See Ostrof v. State Farm Mut. Auto. Ins. Co.*, 200 F.R.D. 521, 530 (D. Md. 2001); *Linder v. Litton Systems, Inc.,* 81 F.R.D. 14, 19 (D. Md. 1978). Plaintiffs offer little to satisfy this test other than baldly asserting that they have "virtually identical claims" as the class they seek to represent and "have been diligent and committed participants in the litigation." Pls. Mot. at 28. As shown above, neither of these statements is accurate. Plaintiffs' claims are neither common nor typical of the class they seek to representative. Similarly, beyond answering some discovery and appearing for a deposition, Plaintiffs are only superficially involved in this matter and are "just trust[ing] that [their] attorney is handling everything perfectly." Ex. 14, KC Dep. at 79:1-5. Due process, however, requires a class representative to be more than a *pro forma* representative. *See Twymnan v. Rockville Hous. Auth.,* 99 F.R.D. 314, 322 (D. Md. 1983) (citations omitted). The Court must consider Plaintiffs' knowledge and understanding of the lawsuit when determining whether any or all of them will adequately and vigorously represent the class. *Id.* (finding that one of the named plaintiffs was an inadequate class representative because "she fail[ed] to possess even the most rudimentary notion of what her representative status would require"); *Ostrof,* 200 F.R.D. at 530 (denying class certification

in part because the class representatives displayed limited knowledge and understanding of the lawsuit, one plaintiff could not remember reading the complaint, and the other plaintiff had no knowledge of the relief she was seeking).

In addition to all of the failures of typicality discussed above, which are incorporated here with regard to the adequacy prong, Plaintiffs' deposition testimony highlights their inadequacy to represent meaningfully the putative class. Foremost, Plaintiffs do not even possess the most rudimentary of information about this litigation. None of the Plaintiffs has ever read the complaints filed in this case either before or after their filing and Ms. Walters denies ever being provided with copies of the complaints that bear her name. Ex. 5, JC Dep. at 112:9-120:18; Ex. 7, Walters Dep. at 62:4-64:5; Ex. 14, KC Dep. at 77:9-79:5. The Coopers also were never informed that two of the three claims they asserted against West Town were dismissed, and while Ms. Walters knew that some of her claims were lost, she only learned of that during the first week of August 2016[17] despite the opinions issuing months earlier in December 2015 and May 2016.[18] Ex. 5, JC Dep. at 134:4-136:19; Ex. 7, Walters Dep. at 64:19-65:7; Ex. 14, KC Dep. at 87:19-88:21. Equally troubling is that Plaintiffs do not know who they are suing. Other than West Town, Plaintiffs are not aware that they sued anyone else in this case despite their attorneys filing a motion seeking to have them represent a class of borrowers on claims asserted against four other defendants. Ex. 5, JC Dep. at 94:17-95:1; Ex. 7, Walters Dep. at 62:4-64:5; Ex. 14, KC Dep. at 68:22-69:14.

Plaintiffs' adequacy as class representatives is further weakened by their lack of knowledge about the nature of the allegations. Other than knowing that their claims relate to the payment of

---

[17] Ms. Walters learned that some of her claims were "lost" during her meetings with counsel to prepare for her deposition on August 10, 2016.

[18] The failure to keep Plaintiffs informed of the status of the litigation gives rise to another concern regarding adequacy of counsel.

"kickbacks," Plaintiffs are unable to provide any additional information. Ex. 5, JC Dep. at 95:7-16-96:9 ("All my information comes from counsel."); Ex. 7, Walters Dep. at 24:5-12; 25:9-12; Ex. 14, KC Dep. at 68:1-9; 70:6:9; 81:5-82:1. Ms. Walters signed answers to interrogatories that provided certain information about her claims, but when asked about those answers, she did not recall ever reading her written discovery responses and simply responded "I don't know." Ex. 7, Walters Dep. at 82:17-83:13, 84:7-86:2.

Under circumstances similar to those presented here, courts have found named representatives inadequate under Rule 23(a)(4). *See, e.g., Ogden v. AmeriCredit Corp.*, 225 F.R.D. 529, 534-35 (N.D. Tex. 2005) (finding named representative inadequate where plaintiff was solicited by class counsel for the lawsuit, had done no independent investigation into the background and experience of class counsel, and demonstrated a lack of knowledge about the case); *Welling v. Alexy*, 155 F.R.D. 654, 659 (N.D. Cal. 1994) (holding a proposed class representative inadequate due to his "apparent unfamiliarity with the allegations in the amended complaint and the overall status of the proceedings" and his "fail[ure] to exhibit an interest in supervising" his attorneys); *Koenig v. Benson*, 117 F.R.D. 330, 337 (E.D.N.Y. 1987) (finding that the class representative was inadequate in a case in which the representative had not read the complaint before it was filed, and his understanding of the cause of action was weak); *Kassover v. Computer Depot, Inc.*, 691 F. Supp. 1205, 1213-14 (D. Minn. 1987) (holding proposed class representative inadequate because he is "unfamiliar with several critical aspects of this litigation" and "contented himself to rely entirely upon his attorney's direction"), *aff'd*, 902 F.2d 1571 (8th Cir. 1990); *Krim v. Pcorder.com, Inc.*, 210 F.R.D. 581, 587 (W.D. Tex. 2002) ("Representatives should understand the action in which they are involved, and their understanding should not be

limited to derivative knowledge acquired solely from counsel." (internal quotations omitted)).
This Court should do the same and find Plaintiffs inadequate to represent the proposed class.

**F.  This Case Is Not Similar To Other RESPA Cases Plaintiffs Cite Where A Class Was Certified.**

Plaintiffs conclude their motion by claiming that this case is "similar" to three other cases in which courts have certified classes of borrowers on RESPA claims. Pls. Mot. at 40-44. Plaintiffs argue that these cases have "similar facts" and allege "similar RESPA violations" as those alleged here against West Town. Pls. Mot. at 40. Plaintiffs either ignore the factually distinguishing characteristics of this case compared to the cases they cite or exhibit a fundamental misunderstanding of their claims. Whichever is the case, none of authorities cited by Plaintiffs supports certification here and, in fact, some of the cases compel the denial of Plaintiffs' motion.

As a threshold matter, none of the cases cited by Plaintiffs (other than *Baehr v. Craig Northrop Team, P.C.*), were brought by plaintiffs who required equitable tolling of their individual RESPA claims or who sought to represent a class of borrowers who needed the benefit of equitable tolling to pursue their stale claims. As a result, the courts in those cases never addressed whether equitable tolling could be applied on a class wide basis or how a representative plaintiff would be able to satisfy his burden of proving equitable tolling on a class-wide basis. Accordingly, the cases Plaintiffs cite are simply not helpful with regard to equitable tolling.

While *Baehr* addressed the issue equitable tolling, its analysis is questionable. First, the court certified a class dating back to 2008 based solely on the allegations in the complaint and accepted those allegations as true despite Supreme Court guidance, emphasizing that Rule 23 "does not set forth a mere pleading standard" and that the plaintiffs "'must affirmatively

demonstrate [their] compliance' with Rule 23."[19] *Comcast*, 133 S. Ct. at 1432 (quoting *Dukes*, 564 U.S. at 350). Next, in examining the equitable tolling issue, the court did not address how the plaintiffs would show the exercise of due diligence on a class-wide basis but rather focused its analysis on the issue of concealment. 2014 U.S. Dist. LEXIS 11030, at *33-35. On this point, the court found that because plaintiffs allege that defendants concealed their "scheme" through "the *same* fake Marketing Agreement" and "*uniform* ABA disclosures," common issues would predominate. *Id.* at **33-34 (emphasis added). In reaching this conclusion, the *Baehr* court distinguished the facts before it from those in *Minter*, where Judge Nickerson found that equitable tolling renders a case unmanageable as a class action:

> There [*Minter*], the Plaintiffs relied on the violations of RESPA itself for equitable tolling, requiring inquiries into the transactions of individual class members.  Here, the Plaintiffs allege a violation of RESPA based on the exchange of illegal referral fees, separate from the alleged acts of concealment involving the creation of a sham Marketing Agreement and an agreement to conceal the arrangements from ABA Disclosures. The Plaintiffs' equitable tolling claims rely on uniform facts that do not require an individualized inquiry into each class member's transaction.

2014 U.S. Dist. LEXIS 11030, at *36.

This case is more like *Minter* than *Baehr*. Plaintiffs do not rely on uniform disclosures or uniform acts to support their claim of concealment. Rather, much like the plaintiffs in *Minter*, Plaintiffs rely on the alleged violation of RESPA itself for equitable tolling. SAC, ¶ 4 (alleging that "[t]hese payments were concealed from Plaintiffs"). Accordingly, to the extent this Court finds *Baehr* persuasive, its reasoning actually supports the denial of class certification here.

---

[19] After conducting discovery, the defendants in *Baehr* moved for summary judgment, arguing that the named plaintiffs are not entitled to equitable tolling, and therefore, their claims are time barred. The parties are in the process of completing the briefing on defendants' motion.

It also is important to recognize that all of the cases cited by Plaintiffs involve alleged violations of RESPA at the entity level. In each case, the plaintiffs alleged that two or three *companies* entered into some type of arrangement pursuant to which money was paid for the referral of settlement services. Pls. Mot. at 40-44 (citing *Benway*, 239 F.R.D. at 421 (alleging that title *company* and mortgage brokerage *company* created affiliated business arrangement to pay kickbacks to both companies in exchange for referral of settlement services); Baehr, 2014 U.S. Dist. LEXIS 11030, at *6 (alleging real estate brokerage *company* and title *company* entered into "sham" marketing agreement pursuant to which "kickbacks" were paid to the real estate brokerage company for the referral of business);; *Robinson v. Fountainhead Title Group Corp.*, 252 F.R.D. 275, 278 (D. Md. 2008) (alleging real estate brokerage *company* and title *company* created affiliated business arrangement to illegally extract referral fees paid to both companies); *Edwards v. First Am. Corp.*, 798 F.3d 1172 (9th Cir. 2015) (alleging title insurance *company's* contractual agreement with title *companies* – that were partially owned by title insurer - for exclusive referrals of title insurance resulted in impermissible kickbacks to the title insurer)).[20]

In contrast, Plaintiffs here do not allege, and the evidence does not support, any such arrangement between Genuine Title and West Town at the entity level. Rather, according to Genuine Title's president, Jay Zukerberg, the arrangements were between Genuine Title and each individual mortgage originator or branch manager, and to the extent Referring Cash or Free

---

[20] Plaintiffs' reliance on *Edwards* is particularly misplaced because in that case, there were written agreements pursuant to which First American was to receive "exclusive referrals" from title companies in which First American has an ownership interest. Here, there are no written agreements between Genuine Title and West Town (or any of West Town's employees), there is no allegation of "exclusive referrals" and West Town does not have nor is it alleged to have any ownership interest in Genuine Title. Moreover, Plaintiffs rely on a Ninth Circuit decision that affirms the district court's denial of class certification as to certain title companies and reverses and remands the district court's denial of class certification as to other title companies. *Edwards*, 798 F.3d at 1185. The Ninth Circuit did not certify any RESPA class. As such, it remains unclear how Plaintiffs can argue that *Edwards* supports certification of a RESPA class here.

Marketing Materials were provided by Genuine Title as alleged in the Second Amended Complaint, they were provided to and received by the individual, not by West Town. Ex. 18, Zukerberg Dep. at 26:13-17, 40:11-41:6; SAC, ¶ 3, 4, 62-73, 118-20, 124 (alleging payments to individual employees in exchange for referrals). This distinction not only renders the cases cited by Plaintiffs factually inapposite but also highlights the same typicality and adequacy concerns that forced the *Benway* and *Baehr* Courts to reject certification of the class proposed by the plaintiffs and instead, certify a much smaller, more limited group of borrowers. *See Benway*, 239 F.R.D. at 424 (concluding that proposed class was too broad and to satisfy typicality for purposes of Rule 23 limited the class to those class members who paid a fee to the same ABA involved in the class representatives' transaction); *Baehr*, 2014 U.S. Dist. LEXIS 11030, at **29-30 (rejecting certification of proposed class because plaintiffs were "not typical of those members of the proposed class who purchased homes from 2000 to 2007 when Defendants were allegedly operating their kickback scheme under the sham employment agreement" and redefining smaller class limited to those class members, like plaintiffs, who purchased their homes beginning in 2008 when the alleged marketing agreement was in place).  The typicality and adequacy requirements of Rule 23(a), as applied in *Benway* and *Baehr*, only demonstrate why certification of the proposed class here is inappropriate.

## V.   CONCLUSION

For all these reasons, West Town respectfully requests that this Court deny Plaintiffs' motion for class certification.

Respectfully submitted,

       /s/
_____
Brian L. Moffet, Bar No. 13821
Dwight W. Stone, II, Bar No. 22968
Zachary S. Schultz, Bar No. 03927
MILES & STOCKBRIDGE, P.C.
100 Light Street
Baltimore, MD  21202
410-385-3656
bmoffet@milesstockbridge.com
dstone@milesstockbridge.com
zschultz@milesstockbridge.com
**Attorneys for Defendant West Town**
**Bank & Trust a/k/a West Town Savings Bank**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of September 2016, I served the foregoing Opposition to Plaintiffs' Motion for Class Certification via this Court's CM/ECF system to counsel of record for the parties.

_____/s/_____
Brian L. Moffet
